IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ACQIS LLC | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| APPRO INTERNATIONAL, INC., | § | |
| CLEARCUBE TECHNOLOGY, INC., | § | CASE NO. 6:09 CV 148 |
| DELL INC., FUJITSU COMPUTER | § | PATENT CASE |
| SYSTEMS CORP., HITACHI AMERICA, | § | |
| LTD., HEWLETT-PACKARD CO., | § | |
| INTERNATIONAL BUSINESS | § | |
| MACHINES CORP., NEC CORP. OF | § | |
| AMERICA, NEXCOM INC., ORACLE | § | |
| AMERICA, INC., and SUPER MICRO | § | |
| COMPUTER, INC., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

This Memorandum Opinion construes the terms in U.S. Patent Nos. 6,216,185 ("the '185 Patent"), 6,718,415 (the "'8,415 Patent"), 7,099,981 (the "'981 Patent"), 7,146,446 (the "'446 Patent"), 7,328,297 (the "'297 Patent"), 7,363,415 (the "'3,415 Patent"), 7,363,416 (the "'416 Patent"), and 7,376,779 (the "'779 Patent") (collectively, "the patents-in-suit"). Furthermore, after considering the briefing and oral argument, and for the reasons explained below, the Court **DENIES** Defendants' Motion for Partial Summary Judgment of Indefiniteness Under 35 U.S.C. § 112, ¶ 2 (Docket No. 274).

**BACKGROUND**

Plaintiff ACQIS LLC ("ACQIS") alleges that Dell Inc., Hewlett-Packard Co., International Business Machines Corp., NEC Corp. of America, Oracle America, Inc., and Super Micro Computer,

Inc. (collectively, "Defendants") infringe the eight patents-in-suit owned by ACQIS. The ACQIS patent portfolio includes one patent directed to a computer peripheral console, the '185 Patent, and seven patents allegedly directed to blade servers, the '8,415, '981, '446, '297, '3,415, '416, and '779 Patents ("the '8,415 Patent family" or "blade server patents"). The '446, '297, '3,415, '416, and '779 Patents are continuations of the '981 patent, which itself is a continuation of the '8,415 Patent. The blade server patents supplement a modular computer concept of the peripheral console patent. The peripheral console ("PCON") provides a platform (e.g., keyboard, mouse, display, and disk drive) adapted to receive an attachable computer module ("ACM") having core computing hardware (e.g., CPU, memory, I/O, and hard drive). The ACM (100) can be inserted into the PCON (200) to form a complete PC. The console concept is illustrated as follows:



*Figure 1 of the '185 Patent.*

A blade server implements an ACM, and the patents-in-suit contemplate using two or more ACMs in a single PCON. The various blade server patents address particular aspects of connectivity

between modules for high speed serial communication, common hardware I/O connectivity to allow "swapping out" of modules, mechanical configurations for multiple modules, and fault tolerance.

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* Courts presume a difference in meaning and scope when a patentee uses different phrases in separate claims. *Id.* at 1314–15. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* However, the doctrine of claim differentiation

is not a "hard and fast rule," and courts cannot use the doctrine to broaden claims beyond their correct scope, determined in light of the intrinsic record and relevant extrinsic evidence. *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005); *see also Phillips*, 415 F.3d at 1312–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the

specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

A claim is invalid as indefinite under 35 U.S.C. § 112, ¶ 2 if the claim fails to particularly point out and distinctly claim the subject matter the applicants regard as the invention. The primary purpose of the definiteness requirement is to ensure public notice of the scope of the patentee's legal protection, such that interested members of the public can determine whether or not they infringe. *Halliburton Energy Servs., Inc. v. M-I, LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008). Thus, the definiteness inquiry focuses on how a skilled artisan understands the claims, and a claim is indefinite if the "accused infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Id.* at 1249–50. "If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, . . . the claim [is] sufficiently clear to avoid

invalidity on indefiniteness grounds." *Exxon Res. & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). Thus, a claim is indefinite only if its meaning and scope are "insolubly ambiguous." *Id.*

**CLAIM TERMS**

**"computing module" / "computer module"**

Various asserted claims of the patents-in-suit[1] contain the terms "computing module" and "computer module." The parties agree that the terms should be given the same construction. ACQIS originally contended the terms meant "an assembly with a main circuit board having at least a processing unit, memory, I/O circuitry and a connector component distinct from the main circuit board that couples to a corresponding connector component in the console for power and data communication." However, at the claim construction hearing, ACQIS recognized that its original proposal both included some elements that were already affirmatively recited in all claims, rendering those elements superfluous, and included other elements that were not affirmatively recited in all claims, inserting additional limitations into those claims. Thus, ACQIS now proposes that the terms mean "an assembly for providing a computing function within a computer system, wherein the assembly has a circuit board, a connector for engaging a corresponding connector of a console, and other elements as recited in a particular claim." Defendants contend that the terms mean "a structure comparable in size to a videocassette that provides the core computing power and environment for the computer system." The parties' dispute centers around two issues: (1) whether a size limitation

---

[1] '185 Patent: Claims 7, 13-14, 20, 37-40; '8,415 Patent: 1-3, 5-13; '981 Patent: 1-7, 17, 18, 25, 26, 33-38, 51-55, 61-70, 76-82, 84, 85; '446 Patent: 11-15, 36, 38-45, 51, 56-60, 66, 68, 69; '297 Patent: 1-5, 11-12, 14, 15, 21-24, 26-28, 31, 41-43, 55-57, 65, 74, 79, 84; '3,415 Patent: 11-14, 20, 22, 24, 25, 27-29, 40, 41, 43, 50-52, 54, 55, 57-59, 73-75, 79, 82, 86, 88; '416 Patent: 1, 3-7, 9-16, 19-21, 23, 26, 28-30, 41, 42, 44, 45, 56, 57, 60, 61, 63-66, 70, 71, 73, 75; '779 Patent: 11-16, 19, 20, 26, 27, 29, 30, 41, 42, 44, 45, 51, 52, 54-58, 60, 66, 68, 70.

should be imported into the claims, and (2) whether the inclusion of "core computing power and environment" is necessary given the computing elements present in each claim.

Regarding the first dispute, ACQIS argues that Defendants' inclusion of a size limitation unnecessarily injects ambiguity into the terms and would improperly read limitations from a single preferred embodiment into the claims. ACQIS further contends that had the patentee intended to include size limitations in the claims, he would have done so. Defendants contend that the inventor disclaimed computer modules larger than a notebook computer. Although the '185 Patent specification does emphasize the module's size and portability, the same emphasis is missing in the specifications and prosecution histories of the '8,415 Patent family. In further support of their position, Defendants point to figures of the computer module in the '8,415 Patent family which illustrate its portable size, as well as the incorporation by reference of the '185 Patent specification into the '8,415 Patent family's specifications. Defendants' arguments are unpersuasive. The specifications in '8,415 Patent family specifically state that "*[s]ome* details of the ACM" can be found in the '185 Patent's application. *See e.g.,* '8,415 Patent, col. 4:50. There is no reason to conflate the invention described in the '185 Patent with the inventions described in '8,415 Patent family. Furthermore, the fact that the patent examiner did not require the patentee to include any size limitations in the claims demonstrates that the '185 Patent invention focused more on the separability of and interconnection between the ACM and PCON units, rather than the portability and size of the ACM.

As for the parties' second dispute, ACQIS contends that Defendants' inclusion of "core computing power and environment" also injects ambiguity into the terms by repeating what is already expressly recited in all asserted claims. Defendants contend that the inventor disclaimed

7

modules without a "core computer power and environment." This argument fails for the same reason discussed above—there is no reason to conflate the the invention described in the '185 Patent with the inventions described in '8,415 Patent family. Moreover, the '185 Patent specification provides that "[t]he core computing power in the ACM comprises the central processing unit (CPU), system memory, any auxiliary processors, and primary mass storage (e.g., a hard disk drive) which serves as the boot device for the computer system." '185 Patent, col. 2:48-57. Thus, Defendants' inclusion of "core computing power and environment" is superfluous and confusing when cast against the specific claim limitations that recite a CPU, memory, mass storage, etc. *See, e.g.*, '185 Patent, 18:32–46.

There is no express disavowal of claim scope with regard to Defendants' size limitation or the "core computer power and environment" limitation. Thus, Defendants' proposed construction is improper in all respects. ACQIS's revised proposed construction, although consistent with the specification, may create unnecessary ambiguity for the fact finder. Accordingly, the Court adopts a modified version of ACQIS's proposed construction and construes the terms "computing module" and "computer module" to mean "an assembly for providing a computing function within a computer system as recited in a particular claim."

**"console"**

Various asserted claims of the patents-in-suit[2] contain the term "console." ACQIS contends the term means "an enclosure with internal power and data connections for housing computer

---

[2] '185 Patent: 7, 13-14, 20, 37-40; '8,415 Patent: 1-3, 5-13; '981 Patent: 1-7, 17, 18, 25, 26, 33-38, 51-55, 61-70, 76-82, 84, 85; '446 Patent: 11-15, 36, 38-45, 51, 56-60, 66, 68, 69; '297 Patent: 1-5, 11-12, 14, 15, 21-24, 26-28, 31, 41-43, 55-57, 65, 74, 79, 84; '3,415 Patent: 11-14, 20, 22, 24, 25, 27-29, 40, 41, 43, 50-52, 54, 55, 57-59, 73-75, 79, 82, 86, 88; '416 Patent: 1, 3-7, 9-16, 19-21, 23, 26, 28-30, 41, 42, 44, 45, 56, 57, 60, 61, 63-66, 70, 71, 73, 75; '779 Patent: 11-16, 19, 20, 26, 27, 29, 30, 41, 42, 44, 45, 51, 52, 54-58, 60, 66, 68, 70.

modules and other computer system components to the extent recited in the claims." Defendants originally contended the term meant "a chassis with a motherboard that connects several components of the computer system, capable of operation as a computer only upon connection to a computer module." However, at the claim construction hearing, Defendants deleted the phrase "with a motherboard" from their proposed construction. Also at the hearing, ACQIS acknowledged that it would agree to construing a "console" as "a chassis that connects several components of the computer system," but would not agree to the portion of Defendants' proposal that imports a negative limitation into the claims. Thus, the parties' dispute centers around the inclusion of "capable of operation as a computer only upon connection to a computer module."

ACQIS argues that the intrinsic evidence shows that the computer module requires a connection to a console for the computer module to operate as a computer system, but there is nothing that prevents the console itself from functioning as a computer system on its own without a computer module. ACQIS contends that the real purpose behind Defendants' proposal is to add functionality to the backplanes or chassis structures of their systems to avoid infringement. The claims themselves specify the division of a personal computer into two subsystems: the ACM and the PCON. However, the claims use the open-ended transition term "comprising," and thus an accused "console" may have additional computer functionality, yet nevertheless be a "console" as specified by the claims. Because there is nothing in the claims that limits the functionality of a console, Defendants' proposal which imports a negative limitation into the claims is improper. Accordingly, the Court construes the term "console" to mean "a chassis that connects several components of the computer system."

**"password"**

Various asserted claims of the '297 and '416 Patents[3] contain the term "password." Though this term was originally disputed, during the claim construction hearing both sides agreed that the definition of the term is "a string of bits used for controlling access." This definition is consistent with the claim language, the specification, and the plain meaning of the term, and is adopted accordingly.

**"slot"**

Various asserted claims of the '981, '446, '297, '3,415, and '416 Patents[4] contain the term "slot." ACQIS contends the term means "a space for receiving a module and providing guidance to a connector," while Defendants contend the term means "an opening capable of housing only one computer module." The parties' main dispute is whether a "slot" is limited to receiving a single computer module.

Although the relevant specifications describe a preferred embodiment where a "slot" receives only a single module, *see* '8,415 Patent, col. 4:25–27 ("Each ACM module has a respective slot 121, 119, which mechanically houses and electrically couples each ACM to the computer console."), importing limitations from a preferred embodiment into the claims is improper. *Phillips*, 415 F.3d at 1323. Furthermore, limiting the claims in this manner would be inconsistent with the claim language. *See, e.g.*, '446 Patent, 21:63–65 ("each coupling site *comprising* a connector and a slot"); 22:1–2 ("a *plurality of computer modules*, each coupled to one of the coupling sites through the

---

[3] '297 Patent: 1, 11, 14, 21, 24, 27, 31, 41, 42, 55, 56, 57, 65, 74, 79, 84; '416 Patent: 1, 6, 11, 16, 21, 26, 41, 66, 71.

[4] '981 Patent: 61, 66, 76, 81; '446, 11, 36, 51, 56, 66; '297 Patent: 1, 11, 21, 26, 31, 55, 65, 74, 79, 84; '3,415 Patent: 11, 20, 25, 50, 55, 73, 79, 82, 86, 88; '416 Patent: 1, 6, 11, 16, 21, 26; '779, 11, 16, 26, 51.

connector and the slot"). Accordingly, the Court construes the term "slot" to mean "a space for receiving a computer module," where "*a* computer module" means "*one or more* computer modules." *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1370 (Fed. Cir. 2002) ("It is well settled that the term 'a' or 'an' ordinarily means 'one or more.'").

**"power supply circuitry"**

Claims 14 and 39 of the '185 Patent contain the term "power supply circuitry." ACQIS contends the term means "components and connections for the processing of electrical energy," while Defendants contend the term means "a battery."

The '185 Patent describes "power supply" as follows: "The primary power supply has sufficient capacity to power both the PCON and the ACM 100 for normal operations. Note that the ACM may include a secondary "power supply" in the form, for example, of a small battery." '185 Patent, col. 5:34–27. The term "power supply circuitry" is used in the claims as follows: "power supply circuitry having a stored energy capacity no greater than the energy required to power said CPU, memory and mass storage for 30 minutes of operation at the maximum rated speed of the CPU." ACQIS argues that even though a battery is a type of power supply, a power supply is not necessarily limited to just a battery. ACQIS further argues that Defendants' proposal ignores the word "circuitry" because a battery is only one component of a circuit, and thus the term "circuitry" implies more than just the power source.

Defendants' proposal limiting "power supply circuitry" to "a battery" is improper and inconsistent with the specification and claim language. Even devices using a battery as a power source include additional circuitry for voltage regulation purposes. Furthermore, Defendants' argument that the claims' reference to "stored energy capacity" restricts "power supply circuitry" to

"a battery" is misplaced. To illustrate, a power supply circuitry often uses a capacitor bank at the output to provide auxiliary power during a main power outage. The capacitor bank "stores" electrical energy even though it does not deliver that energy while the power supply circuitry is receiving power. Thus, the Court rejects Defendants' proposal.

ACQIS's proposed construction would only add ambiguity where none exists. The claim language is clear and understandable to the fact finder and does not require construction beyond its plain and ordinary meaning. *See Orion*, 406 F. Supp. 2d at 738 (stating that "although every word used in a claim has meaning, not every word requires construction" in declining to construe claim terms). Thus, the term "power supply circuitry" does not require construction.

**"power supply circuitry having a stored energy capacity no greater than the energy required to power said CPU, memory and mass storage for 30 minutes of operation at the maximum rated speed of the CPU"**

Claims 14 and 39 of the '185 Patent contain the phrase "power supply circuitry having a stored energy capacity no greater than the energy required to power said CPU, memory and mass storage for 30 minutes of operation at the maximum rated speed of the CPU." ACQIS contends the term means "a power supply circuitry with no stored energy or stored energy capacity insufficient to operate the CPU at full speed for more than 30 minutes." Defendants contend the term means "a battery capable of sustaining the operation of the CPU, memory, and mass storage for up to 30 minutes of operation at the maximum rated speed of the CPU."

A plain reading of the claim language specifies that the power supply circuitry is sized no larger than necessary to operate a CPU, memory, and mass storage for up to 30 minutes. Defendants' proposed construction properly captures this "stored energy capacity" portion of the claim language, but improperly limits "power supply circuitry" to "a battery." This is improper for

the reasons explained above. ACQIS's proposal is cumbersome and likely to cause confusion rather than aid the fact finder in applying the limitation to determine infringement. Accordingly, the Court adopts a modified version of Defendants' proposal and construes the term to mean "a power supply circuitry capable of sustaining the operation of the CPU, memory, and mass storage for up to 30 minutes of operation at the maximum rated speed of the CPU."

**"substantially similar in design" and "similar in design"**

Claims 1, 5, and 7-10 of the '8,415 Patent; claims 1, 2-7, 17-18, 25-26, 33-38, 81-82, and 84-85 of the '981 Patent; claims 1-5, 31, 55-57, 65, 74, 79, and 84 of the '297 Patent; claims 79, 86, and 88 of the '3,415 Patent; and claims 1 and 3-10 of the '416 Patent either include limitations of "substantially similar in design" or "similar in design," or depend either directly or indirectly on a claim that includes these limitations. An exemplary claim containing the "substantially similar in design" limitation recites:

> A computer system . . . comprising . . . a plurality of computer modules . . . wherein each of the computer modules is *substantially similar in design* to each other to provide independent processing of each of the computer modules in the computer system, and wherein any two of the computer modules can replace each other in operation.

'8,415 Patent, col. 10:46–62. Defendants contends the terms are indefinite and thus the claims containing these limitations are indefinite. After a review of the arguments and relevant evidence, the Court concludes that the terms "substantially similar in design" and "similar in design" meet the definiteness requirement of 35 U.S.C. § 112, ¶ 2.

Defendants contend that nothing in the specifications or the claims of the patents-in-suit provide any guidance or measure of when two or more computer modules are "substantially similar in design" or "similar in design" to each other. Defendants further contend that the terms have no

ordinary meaning to those of skill in the art, and there is nothing in the patents-in-suit that enables one of skill in the art to determine what aspects of the computer modules must be similar, or the required extent of similarity necessary to satisfy the limitations. Specifically, Defendants contend that the claims require that each computer module (1) have the specified components identified in the claim, and (2) be "substantially similar in design" to the other modules. Defendants assert that the specified component requirement cannot be equated with the "substantially similar in design" requirement because the two requirements are separately recited, and equating the two would improperly read out the "substantially similar in design" limitation. Defendants' central argument is that the claims are indefinite because they fail to specify whether the "substantially similar in design" limitations apply to the additional components in the computer modules, to the physical layout of the components in the modules, to the design, shape, and dimensions of the modules, or to the intended operation and performance of the modules.

ACQIS counters that the patent specifications inform one of skill in the art to determine when computer modules are "substantially similar in design" or "similar in design" by providing clear examples of computer modules that meet these limitations. ACQIS contends that Figures 2 and 3 of the patent specifications provide illustrations of computer modules that share common "architecture" and are "substantially similar in design." ACQIS further identifies portions of the specifications that address the "substantially similar" language and demonstrate the scope of the computer module "architecture." *See* ACQIS's Responsive Indefiniteness Brief, Docket No. 286, at 8–10, 13–14. For example, the written description relating to Figure 2 of the '8,415 Patent, produced below, provides that "[t]he second ACM has *the same or similar components* as the first ACM." '8,415 Patent, col.7:5–6. Although ACQIS correctly points to the module components and

circuit configuration in characterizing the scope of the "substantially similar in design" and "similar in design" limitations, it incorrectly characterizes the scope of the limitations in terms of "architecture," rather than "design."



FIG. 2

*Figure 2 of the '8,415 Patent.*

The terms "substantially similar in design" and "similar in design" are clearly limited in scope by specifying that substantial similarity is in regard to "design." The specification and the claims provide a framework for one of skill in the art to determine what "design" means within the

context of the claimed subject matter (i.e., "a computer system for multi-processing purposes" comprising "computer modules"). The claims define the computer modules as having the same electronic components and specify that the computer modules are interchangeable. The meaning of "design" would be understood by one of skill in the art to refer to the "electronic circuit configuration operative to implement the processing operations of the computer system." Characterizing the scope of the limitations in terms of computer module "design" is more restrictive than ACQIS's "architecture" characterization because one of skill in the art would understand "architecture" to refer broadly to "the structure and organization of a computer system's hardware," rather than the specific circuit configuration or design of the computer module.

One of ordinary skill in the art would understand the scope of the claims and be able to determine what constitutes infringement. Because Defendants have not shown by clear and convincing evidence that the terms "substantially similar in design" and "similar in design" are insolubly ambiguous rendering the claims indefinite, the Court **DENIES** Defendants' Motion for Partial Summary Judgment of Indefiniteness Under 35 U.S.C. § 112, ¶ 2 (Docket No. 274). In addition, the claim language is clear and understandable to the fact finder and any substitute for the claim language is likely to cause confusion rather than aid. Thus, the terms do not require construction.

## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above. Furthermore, the Court **DENIES** Defendants' Motion for Partial Summary Judgment of Indefiniteness Under 35 U.S.C. § 112, ¶ 2 (Docket No. 274). For ease of reference, the Court's claim interpretations are set forth in a table as Appendix A.

**So ORDERED and SIGNED this 2nd day of August, 2010.**

_____
**LEONARD DAVIS
UNITED STATES DISTRICT JUDGE**

# APPENDIX A

| Term or Phrase | Court's Construction |
|---|---|
| **"computing module"** / **"computer module"** | an assembly for providing a computing function within a computer system as recited in a particular claim |
| **"console"** | a chassis that connects several components of the computer system |
| **"password"** | [AGREED] a string of bits used for controlling access |
| **"slot"** | a space for receiving a computer module |
| **"power supply circuitry"** | No construction necessary. |
| **"power supply circuitry having a stored energy capacity no greater than the energy required to power said CPU, memory and mass storage for 30 minutes of operation at the maximum rated speed of the CPU"** | a power supply circuitry capable of sustaining the operation of the CPU, memory, and mass storage for up to 30 minutes of operation at the maximum rated speed of the CPU |