```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                        TYLER DIVISION
 3    ACQIS, LLC                    )
                                          DOCKET NO. 6:09cv148
 4        -vs-                      )
                                    Tyler, Texas
 5    APPRO INTERNATIONAL,          )    1:05 p.m.
      ET AL                              February 22, 2011
 6
                        TRANSCRIPT OF TRIAL
 7                       AFTERNOON SESSION
              BEFORE THE HONORABLE LEONARD DAVIS,
 8                UNITED STATES DISTRICT JUDGE
 9                  A P P E A R A N C E S
10    FOR THE PLAINTIFF:
11    MR. GEORGE CHANDLER
      CHANDLER LAW OFFICES
12    P.O. Box 340
      Lufkin, TX   75901
13
      MR. MICHAEL SMITH
14    SIEBMAN BURG
      P.O. Box 1556
15    Marshall, TX  75671-1556
16    MR. THOMAS FRIEL, JR.
      COOLEY
17    3175 Hanover Street
      Palo, Alto, CA  94304-1130
18
      MR. JAMES P. BROGAN
19    MR. WAYNE STACY
      COOLEY
20    380 Interlocken Crescent
      Broomfield, CO  80021-8023
21
      COURT REPORTERS:
22    MS. JUDY WERLINGER
      MS. SHEA SLOAN
23    shea_sloan@txed.uscourts.gov
24
      Proceedings taken by Machine Stenotype; transcript was
25    produced by a Computer.
```

```
 1   FOR THE DEFENDANTS:
 2
     MR. CHARLES K. VERHOEVEN
 3   MS. AMY CANDIDO
     QUINN EMANUEL
 4   50 California St., 22nd Floor
     San Francisco, CA  94111
 5
 6
     MR. ROBERT W. STONE
 7   MR. MICHAEL D. POWELL
     QUINN EMANUEL
 8   555 Twin Dolphin Dr., 5th Floor
     Redwood Shores, CA  94065
 9
10
     MR. ERIC ALBRITTON
11   ALBRITTON LAW FIRM
     P.O. Box 2649
12   Longview, TX  75606
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                   P R O C E E D I N G S

2              (Jury out.)

3              COURT SECURITY OFFICER:  All rise.

4              THE COURT:  Please be seated.

5              All right.  Now, let's see, after this

6    next witness, will that conclude Defendant's witnesses?

7              MR. VERHOEVEN:  Yes.  We will move some

8    exhibits in right before this witness, and then this

9    witness and that will conclude our trial presentation.

10             THE COURT:  Then are there going to be

11   any rebuttal witnesses?

12             MR. BROGAN:  Yes, Your Honor.

13             THE COURT:  How long do you anticipate

14   this witness will take?

15             MR. VERHOEVEN:  50 minutes, 5-0.

16             THE COURT:  5-0.  Any cross?

17             MR. BROGAN:  No more than any time we

18   have left, Your Honor.

19             THE COURT:  You're getting slim.  The

20   Court Security Officer has a hook over there.

21             Okay.  Well, just so you do have your

22   times, Plaintiff has used 11 hours and 17 minutes, and

23   Defendant has used 10 hours and 30 minutes.

24             So let me inquire whether do you

25   anticipate saving some time for willfulness?

1          MR. BROGAN:  It's very hard to say on the

2   limited time that we have, Your Honor.

3          THE COURT:  All right.  Before --

4          MR. VERHOEVEN:  And, Your Honor, I don't

5   know if you're inclined to hear it, but the case has

6   changed pretty dramatically since we moved on

7   willfulness.  You know, over the weekend before trial,

8   we've gotten three patents instead of seven.  So, you

9   know, we really don't think there is a willfulness case.

10          THE COURT:  Really?

11          MR. VERHOEVEN:  I'll sit down.

12          THE COURT:  Oh, okay.

13          All right.  Well, before we bring the

14   jury back in, let me just -- it sounds like we're going

15   to be through with the evidence here in another hour or

16   so, so we're printing out the Court's Charge.

17          I don't anticipate there will be any

18   objections from either side to it; but just in case

19   there are, I'll give you a chance to look at it

20   before -- and we will take up -- we will take up

21   objections to the Court's Charge immediately after the

22   close of evidence, and that will be your only

23   opportunity to object.

24          So have your legal folks -- you'll have a

25   couple of hours here to look at it.  Look over it good,

1    because I want to get in it final form this afternoon

2    where we don't come in in the morning -- and I won't

3    even entertain any further objections in the morning, if

4    you sleep on it and dream up something else, okay?

5                    MR. VERHOEVEN:  Yes, Your Honor.

6                    THE COURT:  All right.  Anything else

7    before we bring the jury?

8                    Okay.  Bring them in.

9                    COURT SECURITY OFFICER:  All rise for the

10   jury.

11                   (Jury in.)

12                   THE COURT:  All right.  Please be seated.

13                   Now, I don't know who got that good lunch

14   today, but you can't sleep this afternoon.  You still

15   have to listen to the testimony.

16                   JUROR:  It was good.  Thank you.

17                   THE COURT:  My compliments as well.  Our

18   staff really enjoyed that as well.  It was very nice.

19                   And I think that's worked well this week,

20   too.

21                   I want to thank the lawyers from both

22   sides for providing those lunches.  I think it's really

23   moved things along.  I hope it hasn't been -- I hope

24   y'all have been able to get some lunch during these

25   breaks.

1          All right.  Very well.  You may call your

2    next witness.

3          MS. CANDIDO:  Your Honor, Defendant IBM

4    calls Alan Ratliff.

5          And while he's approaching, we'd like to

6    hand up Defendant's Fourth Exhibit List, which includes

7    exhibits previously admitted and a short group at the

8    end of stipulated exhibits to be entered today, Your

9    Honor.

10         THE COURT:  Okay.  Has Plaintiff had a

11   chance to review that?

12         MS. CANDIDO:  I believe they have, Your

13   Honor.

14         THE COURT:  There are any objections to

15   those exhibits?

16         MR. FRIEL:  Assuming the ones in the book

17   are the ones we agreed to, no objection.

18         THE COURT:  Are they?

19         MS. CANDIDO:  Yes, Your Honor.

20         THE COURT:  All right.  They will be

21   admitted then, Defendants' Exhibit List No. 4.

22         Does Plaintiff have an exhibit list that

23   they wish to have admitted today or clean anything up?

24         Okay.  All right.  Raise your right hand

25   and be sworn.

```
 1                    MR. FRIEL:  Excuse me?

 2                    THE COURT:  Yes?

 3                    MR. FRIEL:  Plaintiff's Exhibit 39.

 4                    THE COURT:  You move admission of

 5      Plaintiff's Exhibit 39?

 6                    MR. FRIEL:  Yes, Your Honor.

 7                    THE COURT:  Any objection?

 8                    MS. CANDIDO:  I'm sorry --

 9                    THE COURT:  Can you tell them what that

10      is?

11                    MS. CANDIDO:  Yes, please.

12                    MR. FRIEL:  It's a stipulated exhibit.

13                    MS. CANDIDO:  Then we have no objections,

14      Your Honor, if it's one of the stipulated exhibits that

15      we discussed.

16                    THE COURT:  All right.  It will be

17      admitted.

18                    All right.  Now you may swear the

19      witness, please.

20                    (Witness sworn.)

21                    THE COURT:  You may be seated.

22                    Ms. Ferguson, I had you jumping up and

23      down there.  You couldn't type and swear the witness at

24      the same time.

25                    All right.  You may proceed.
```

063cedc6-2243-4bae-a397-41862974c2af

1          ALAN RATLIFF, DEFENDANT'S WITNESS, SWORN

2                     DIRECT EXAMINATION

3     BY MS. CANDIDO:

4          Q.   Good afternoon, Mr. Ratliff.

5               Would you please state your full name for the

6     record and tell the jury where you're from?

7          A.   Yes.  My name is Alan Ratliff, and I'm from

8     Houston, Texas.

9          Q.   What do you do for a living?

10         A.   I'm a partner in a firm called the StoneTurn

11    Group.  It's a financial, economic, and accounting

12    consultancy with offices across the U.S. and London.

13    And I work on those kind of projects.

14         Q.   What's your area of expertise?

15         A.   One of my specialties is patent licensing and

16    patent valuation, including determining reasonable

17    royalties in litigation like this.

18         Q.   What is your educational background?

19         A.   So I am a Texas CPA and Texas-licensed

20    attorney.  I've got an undergraduate degree and a

21    graduate degree in accounting and business from Baylor

22    University, and then I've got a law degree from Southern

23    Methodist University in Dallas.

24         Q.   Do you have any teaching experience?

25         A.   I do.  I taught on the Baylor Accounting

1    faculty.  I also taught first-year legal research and

2    writing at SMU Law School.  In addition to that, I've

3    served as an adjunct professor, meaning it wasn't my

4    main job, but I enjoyed teaching.  So I taught at two

5    different Houston law schools.

6          I also taught at the University of Houston

7    Business School, and then I have taught at various

8    seminar programs at University of Texas, University of

9    Virginia, University of California, Virginia Tech, other

10   schools like that.

11         Q.   You mentioned earlier that you're a CPA and a

12   lawyer.  Do you have any other professional

13   certifications?

14         A.   I do.  I'm also nationally certified in

15   financial forensics by the American Institute of

16   Certified Public Accountants.  Financial forensics is

17   the kind of work that people who do expert witness work

18   on damages and valuation, that's what financial

19   forensics is.

20         Q.   Mr. Ratliff, I won't make you go through every

21   bit of your work history for the jury, but would you

22   please describe generally your work experience that's

23   relevant to the analysis that you're here to testify

24   about today?

25         A.   Sure.  Sort of we're in time-saving mode as

1   you can tell, so I'm going to try to do these things

2   very quickly.

3           So the short story is, after graduate school,

4   I worked on a large international accounting firm.

5   That's where I first started doing financial and

6   economic analysis.

7           I went back to law school.  I clerked for a

8   federal judge; and during that clerkship, we handled

9   patent and other IP kinds of cases as part of the

10  clerkship.  That's my first exposure to this kind of

11  subject matter.

12          From there, I went to work for a larger

13  national law firm, and I was often given the economics

14  and accounting and finance issues in the cases and to

15  work with experts like I am today.

16          Then from there, I decided I sort of liked

17  this niche of working with the numbers on IP and other

18  kinds of cases; and a little over a decade ago, I

19  started working as a consultant, which is what I do

20  today.

21      Q.   Have you worked in any licensing projects for

22  a university or individual inventor?

23      A.   Yes.  You've heard testimony about licensing.

24  I've served as a licensing consultant and helped out

25  universities, including the University of Texas,

 1   University of Virginia, Caltech, Duke.  I'm working on a

 2   project currently for Kansas State, among others.

 3          I've also worked for individual inventors.

 4   I've worked for inventors who had inventions related to

 5   cardiovascular stents.  I've worked for inventors that

 6   had a little phone technology, computer server

 7   technology, and other types of contemporary high tech.

 8      Q.   Have you ever negotiated any real-world patent

 9   licenses?

10      A.   I have.  Both as a lawyer and a consultant,

11   I've served as the negotiator.  I've also served in

12   support of a negotiator.  I sort of lose count, but, you

13   know, it's several dozen, probably close to 50 by now.

14      Q.   Have you ever served in a role in a lawsuit

15   other than as an expert witness?

16      A.   I have.  I've also served as an arbitrator,

17   both on IP and non-IP kinds of disputes, and I've also

18   served as a special master.

19      Q.   Would you explain to the jury what's involved

20   in being an arbitrator and a special master?

21      A.   The short version of the story is sometimes

22   under contracts parties agree rather than going to

23   court, they'll handle it through some type of private

24   proceeding.  And an arbitrator serves in the role of a

25   private judge.

1           As a special master, I was appointed by a

2      federal judge in the District of Maryland to help sort

3      out a billion-dollar licensing dispute that involved

4      both U.S. and foreign countries, a total of 10 in all;

5      reviewed literally thousands of documents; wrote a

6      thousand-page report; submitted it in the case.  And it

7      was not objected to by the parties, and it was accepted

8      by the court.

9           Q.   Mr. Ratliff, like all of the other experts,

10     you're being compensated for your time in connection

11     with this case at your hourly customary rate.

12          But does any aspect of your compensation

13     depend on the outcome of this case?

14          A.   It does not.

15               MS. CANDIDO:  Your Honor, IBM moves to

16     qualify Mr. Ratliff as a qualified expert in patent

17     damages.

18               THE COURT:  Any objection?

19               MR. FRIEL:  No objection, sir.

20               THE COURT:  All right.  He will be so

21     qualified.

22          Q.   (By Ms. Candido) Mr. Ratliff, what was your

23     assignment in this case?

24          A.   I was basically asked to do two things.  I was

25     asked to take the information in the case and my

1    experience and to determine what a reasonable royalty

2    sufficient to compensate ACQIS would be, if you, as a

3    jury, decide that the patents are not invalid and that

4    IBM has infringed.

5         Q.    In summary, what is your opinion regarding the

6    appropriate royalty?

7         A.    In my opinion, the appropriate royalty, if

8    you, as a jury, determine that the patents are not

9    invalid and that IBM infringes, to be $3.5 million.

10        Q.    Now, Mr. Ratliff, you understand that IBM

11   believes it does not infringe ACQIS' patents, right?

12        A.    That's correct.  And, again, to sort of try to

13   save time for the jury, my testimony here is sort of

14   contingent.  And you're not going to really need what I

15   say, if you determine that the ACQIS patent is invalid

16   or that IBM does not infringe.

17             But you're not going to make that

18   determination until all of the evidence is closed and

19   the Judge has given you the case.  So both parties have

20   had to put on evidence about damages just in case you

21   get to that issue.

22        Q.    So in forming your opinion, you were asked to

23   assume that IBM infringes the ACQIS patents and that

24   those patents are found to be valid; is that right?

25        A.    That's correct.  It's just an assumption.

1      Q.    And if the patents are not infringed or the

2    patents are invalid, then what?

3      A.    There's no damages.

4      Q.    Can you give the jury an idea of the type and

5    amount of information you've reviewed in order to form

6    your opinions?

7      A.    You've probably gotten a sense already of the

8    voluminous amount of information that was produced by

9    the parties in this case.  You've seen a lot of it on

10   the screen.  You've heard witnesses talk about it.

11             I considered the same core information that

12   you heard Misters Vellturo and Murtha talk about last

13   week on Wednesday and Thursday.  So I considered things

14   like IBM's BladeCenter sales.  I considered things like

15   the settlement license.  I considered industry data.

16             You heard about a source that all the parties

17   referenced called IDC.  That industry data, I considered

18   that.  I considered the technical expert opinions.

19             But in addition to those things that Misters

20   Vellturo and Murtha considered, I also went further than

21   that.  So beyond just BladeCenter, I considered the core

22   components that are most related to the invention that

23   Dr. Chu claims.

24             You've heard them referred to as a chipset and

25   the switch or the hub controller.  I considered the

1     value or the sale value of those subcomponents.

2             In addition to that, I considered IBM

3     licenses.  I considered an offer that was made back in

4     2000 as part of an ongoing negotiation between ACQIS and

5     IBM, for ACQIS to license all of its modular computing

6     technology to IBM for a flat fee.

7             And I also considered that the BladeCenter

8     product line for IBM has never been profitable.  And all

9     of those were things Misters Murtha and Vellturo

10    ignored.

11        Q.    So you said that you were here in the

12    courtroom to hear Mr. Murtha and Mr. Vellturo testify.

13            Are there any points on which you agree with

14    Mr. Murtha and Mr. Vellturo?

15        A.    Yes.  In fact, I've prepared some slides, and

16    if you want to go ahead and put those up.  I think it's

17    the first slide.

18        Q.    Okay.  Could you please tell the jury about

19    the areas in which you agree with Mr. Murtha and

20    Vellturo?

21        A.    So the core assumption that I had to make,

22    which I just discussed a moment ago, was I'm assuming

23    for purposes of my work that the patents are valid,

24    enforceable, and infringed.

25            Second, I used that same Georgia-Pacific

1    framework.  I don't know if you remember hearing those

2    words from last week.  But it was a long list of factors

3    that damages experts consider to determine what a

4    reasonable royalty would be.  I considered those.

5              And I also assumed that these parties did this

6    hypothetical negotiation in early 2008.

7         Q.   Let's talk about this hypothetical

8    negotiation.

9              MS. CANDIDO:  If you would bring up the

10   next slide, Ryan.

11        Q.   (By Ms. Candido) Mr. Ratliff, what does this

12   depict?

13        A.   So I don't know how clear this was last week,

14   because, again, everybody has been hurrying their

15   evidence along; but what you're going to be instructed

16   to do is to consider, if you get to the issue of

17   damages, what the parties would have agreed to in a

18   hypothetical negotiation.

19              So I put the picture of the table here.  I've

20   shown the patent.  I've shown those Georgia-Pacific

21   Factors as an icon that we'll talk more about.  But you

22   have ACQIS as the licensor, and what they bring to the

23   table is a bare patent license to these three

24   continuation patents.

25              They are negotiating what a fee would be to

1    give IBM the right to use those.

2             And if we go to the next slide, we'll see what

3    IBM brings to the table.

4             IBM brings its successful modular computing

5    system that already existed in 2008.   IBM had been on

6    the market with that since 2004.

7             You've heard about the software that it takes

8    to run these systems.   You know that IBM's got to go out

9    there and sell these and support these and market these

10   products in order to make the sales so that entire sales

11   force gets on the ground.

12            The customer support facilities and all their

13   business processes and systems and, of course, the IBM

14   name, its brand value and reputation.   And you've heard

15   over and over again about its thousands and thousands

16   and thousands of patents that are part of this

17   portfolio, both for things it makes and to protect the

18   things that it makes.

19       Q.    Now that we know what both parties bring to

20   the table, what happens next?

21       A.    So the next slide is the Georgia-Pacific

22   Factors.   So once we're all at the table, we consider

23   these factors, considerations -- lots of words you can

24   use for it -- that parties who are doing licenses in the

25   business world as opposed to in court, but they do them

1    in the business world, what do they think about.

2          All I've done that's different than what you

3    saw last week is I've organized them in categories to

4    make them a little easier to talk about.

5          So some of the factors relate to licensing.

6    That first factor, licenses by ACQIS of the

7    patents-in-suit.  You've heard about those settlement

8    agreements.

9          The second factor, rates paid by IBM to others

10   for technologies similar to the patents-in-suit.  We're

11   going to hear about some of IBM's licensing related to

12   BladeCenter.

13         You look at financial considerations, and

14   those financial considerations will include things like

15   were the products profitable?  If there were any

16   profits, how much were they and how much did IBM

17   benefit?

18         And then on the technical side, I'm certainly

19   not going to go back through all the claims you heard

20   earlier today.  That's not my job.  I'm not an engineer.

21   But I have to understand the commercial significance of

22   the technology and whether it's important and how

23   significant it is.

24         And those are the kinds of things that people

25   who are negotiating a license typically consider.

 1      Q.    Okay.  Let's start with the technical product

 2   considerations.

 3      A.    All right.  If you will pull up the next

 4   slide.

 5      Q.    What is this?

 6              MR. FRIEL:  Your Honor, objection.  May

 7   we approach?

 8              THE COURT:  Yes, you may.

 9              MR. FRIEL:  If you will take the slide

10   down.

11              (Bench conference.)

12              MR. FRIEL:  Your Honor, here is the slide

13   in question.  Our objection is to the last bullet, and

14   it leads to a number of the other exhibits or

15   demonstratives as well.  And the problem that we see

16   with it is it's violating Your Honor's order motion in

17   limine.

18              And I have it here, if you want to

19   refresh your memory.

20              MS. CANDIDO:  Your Honor, the purpose of

21   this motion in limine was to exclude prejudicial large

22   billion-dollar numbers from the jury's ears with respect

23   to IBM's total revenues or IBM's total server revenues.

24              But all the use in the slide that

25   Plaintiff is objecting to are these market share figures

1    to show the relative size of IBM or HP.

2                    THE COURT:  All right.  The objection is

3    overruled.

4                    MS. CANDIDO:  We will, from the other

5    side as well, if I can go for it.

6                    MR. FRIEL:  That's right.

7                    MS. CANDIDO:  Thank you.

8                    MR. FRIEL:  And Your Honor, will it

9    continue -- may we have a continuing objection to those

10   demonstratives that have the financial information

11   outside of the accused products as well?

12                    THE COURT:  Now, I mean, if they start

13   talking about how much versus percentage, then --

14                    MS. CANDIDO:  We don't intend to do that.

15                    MR. FRIEL:  All right.  Thank you.

16                    (Bench conference concluded.)

17                    MS. CANDIDO:  Ryan, if you can please

18   bring back up that last slide.

19        Q.   (By Ms. Candido) So, Mr. Ratliff, would you

20   explain what you have prepared on this slide?

21        A.   So it's a quick summary.

22             You've heard direct testimony in court that

23   ACQIS did not invent serial PCI or switches, much less

24   blade servers or computer modules.  That's not what this

25   case is about.

1          What you've also heard about is some very

2    small subcomponents of the entire BladeCenter system

3    that directly involve the invention that Dr. Chu has

4    claimed.

5          You've heard those again referred to as the

6    chipset and the hub controller or the switch.  And what

7    we know is what's alleged; there's been some minor

8    improvement in taking things that were known in other

9    contexts and trying to bring them to a BladeCenter

10   environment.

11         We know that's a very, very small part of a

12   very, very big product.  You've seen pictures of it.

13   You know what they look like.  You've seen the small

14   parts that are impacted.

15         And finally, what we know is that there's

16   other products that serve the same purpose.  And for

17   IBM, those other products are about 96 percent, and in

18   some years a little more, of the total servers it sells,

19   meaning these BladeCenter products that you're hearing

20   about are something less than 5 percent of the servers

21   that it sells.

22   Q.   The jury has been hearing this term,

23   acceptable non-infringing alternatives.  What's the

24   significance of that in connection with the hypothetical

25   negotiation?

1        A.    So, again, I told you I'm not an engineer, so

2    I'm not going to give you a technical definition.

3    From a commercial perspective, an acceptable

4    non-infringing alternative means a product which you

5    could sell instead of the product that's been accused of

6    infringement that customers would accept.

7        Q.    And do you have some examples of the available

8    non-infringing alternatives?

9              I believe that's the next slide.

10       A.    Yes.  If you turn to the next slide there,

11   I've taken pictures.  You've seen already in talking

12   with Mr. Yost from IBM and in talking with the technical

13   experts you've heard from.  You've seen discussions on

14   the -- far left of your screen -- the iDataPlex, which

15   is a form of rack server; on the far right-hand side, a

16   tower server; and then certain types of BladeCenter

17   servers that have not been accused of infringement,

18   these are all alternatives.  And as I said, that

19   represents over 96 percent of the server systems that

20   IBM sells.

21             And the next slide shows us quantitatively --

22   the blue is all the other server systems, and the yellow

23   is the small part associated with the accused blade

24   servers.

25       Q.    In your opinion, what impact on the royalty

1    rate would these hypothetical -- I'm sorry -- would

2    these available non-infringing alternatives have?

3         A.   As a general proposition, because, remember,

4    we're at the table negotiating, right?  You're going to

5    see lot of data, but keep reminding yourself this is

6    information you're exchanging as you're negotiating a

7    license.

8             So if you are the one being asked to take a

9    license, but you know you have alternatives that you

10   could sell instead, that's going to make you less

11   interested in taking a license generally, but we have to

12   assume that the license is done here.  That's how you're

13   going to determine damages, but you're going to pay less

14   for that than if you didn't have those alternatives.

15        Q.   Let's turn now to commercial considerations.

16             MS. CANDIDO:  If you could bring up the

17   next slide, Ryan.

18        Q.   (By Ms. Candido) The first bullet you have

19   relates to ACQIS and IBM were not competitors.

20             Why is that significant?

21        A.   So now we're moving on from technical things

22   to more business and finance kind of topics.  And at the

23   outset, I point out that a party who's got technology

24   who's licensing to another party, but they're not

25   competing with that party in the marketplace.

1          So ACQIS wasn't making a product that was
2     competing with the BladeCenter products.  So if ACQIS or
3     if IBM makes a sale, ACQIS doesn't lose a sale.
4          Whereas in other settings, you have
5     competitors that are trying to license.  You might have
6     HP and Dell.  You might have IBM and Dell and they're
7     trying to negotiate a license.
8          Well, it may be that if a license is granted,
9     that other company is going to be making sales using
10    your technology and taking sales away from you.  In that
11    instance, you'd have to get a higher royalty to offset
12    those lost sales.
13         Here, we don't have that, though, because
14    ACQIS isn't making a product.  Anything IBM sells that
15    they would get the royalty on, they benefit with no
16    detriment.
17    Q.   And what are the other commercial
18    considerations that you looked at?
19    A.   The other three, very quickly, you've heard
20    about ACQIS' early version and early efforts to create a
21    sort of blade server type of technology, the Interputer.
22    You heard that that was not a commercial success.  They
23    pulled it off the market and focused on licensing.
24         You also heard Mr. Yost testify last week that
25    IBM had not yet been profitable on its blade server

1    products.  Now, they have been profitable overall on

2    their rack and their tower products, but not on their

3    blade server products.

4              In fact, if you look at the actual financial

5    information, basically IBM's losing -- for every million

6    dollars they sell of blade server products, they lose

7    about a hundred thousand dollars in the current

8    environment.  It's about 10 percent.

9              And then the last subject that I raised

10   there -- and this was really because I think you may

11   have heard some testimony last week that wasn't quite

12   clear.

13             In 2004, IBM had 40 percent of the U.S. blade

14   server market, meaning that 4 out of every 10 blade

15   servers sold in the U.S., IBM was the one who sold it.

16             By 2008, at the hypothetical negotiation, IBM

17   was only selling about 2 out of every 10.  HP had

18   surpassed it.

19        Q.   And what impact would these factors have on

20   the royalty rate that you had as the outcome of the

21   hypothetical negotiation in 2008?

22        A.   Again, generally speaking, when you're

23   licensing technology that hasn't been proven successful

24   before you license it, you're not going to be sure it's

25   really worth paying a royalty on.  It's going to drive

1   the royalty down.

2           And for products that are not profitable, you

3   have no room to pay a royalty, right?  You're already

4   losing money.  The royalty is going to make the loss

5   worse.

6       Q.   Let's change here and talk about the last

7   category, the licensing.

8           MS. CANDIDO:  Ryan, would you pull up the

9   next slide, please?

10      Q.   (By Ms. Candido) Mr. Ratliff, this references

11  a license proposal by ACQIS to IBM in 2000.

12          What was that proposal?

13      A.   So just to give you a little roadmap, we're

14  going to talk about two subjects here under licensing

15  this offer and then the actual IBM licenses.

16          So there was an offer made by ACQIS in 2000 to

17  IBM to license to it all of ACQIS' patents and other

18  intellectual property related to modular computing that

19  existed then and in the future.

20          And in exchange for that grant of rights, IBM

21  was going to pay $5 for each module and $2 for each

22  peripheral device.  And so you know this Interputer

23  ended up not being a commercial success, but still

24  relevant to what we're doing here, because it does

25  represent an early stage of the blade type of

1    technology.

2              And in today's BladeCenter products, there is

3    a module -- it's that blade, the blade server itself --

4    and there are peripheral devices.  You've heard about

5    the chassis and the switch.

6              So, in effect, this is telling us on that type

7    of structure that IBM would be expected to pay $5 for

8    each blade and $2 for each chassis and switch that it

9    sold.

10       Q.    Before you move off this actual proposal, in

11   ACQIS' proposal, did the proposed royalty rate change,

12   if ACQIS got additional patents?

13       A.    It did not.

14       Q.    Was the ACQIS' proposal a bare patent license?

15       A.    It was not.  And you've heard that phrase

16   before, the bare patent license, meaning all you're

17   doing is granting the patent rights.  But out in the

18   business-world licenses, I'll tell you it's very, very

19   rare that a license only contains a grant of patent

20   rights in exchange for a fee.  They almost always

21   include other things going both ways.

22             So in this particular proposal, in addition to

23   ACQIS offering its patents that include both its present

24   and future patents, it also included other intellectual

25   property.  That could be trade secrets, trademarks,

1    copyrights, any other type of intellectual property it

2    had, plus they were also going to provide design

3    assistance in helping IBM develop these products for

4    commercialization.

5         Q.   All right.  Going back to the rate you

6    mentioned earlier, have you calculated what royalty IBM

7    would have had to pay ACQIS for its sale of BladeCenter

8    during the damages period using the rates in ACQIS'

9    licensing proposal?

10        A.   Yes.  If you pull up the next slide, what I

11   did was take the products that have been accused of

12   infringement, and I took the count of the blades and the

13   count of the chassis and the account of the switches,

14   and I applied $5 per blade and $2 per chassis and switch

15   to those accused sales from 2008, April through first

16   quarter of 2011, here we are at trial, and that came to

17   a total of $1.3 million.

18        Q.   How does that compare with ACQIS' damages

19   demand in this case?

20        A.   I denote a little bullet point.  So if you

21   convert the $27 million, that works out to about $115

22   per module as opposed to $5.  And depending on which --

23   whether it's a chassis or a switch, anywhere from 207 to

24   $312 as opposed to $2.

25        Q.   So the 1.3-million-dollar royalty figure, does

1    that reflect the maximum that IBM would have had to pay

2    ACQIS for the accused products in this case had the

3    parties entered into this license agreement?

4         A.   Yes.

5              MR. FRIEL:  Objection.  Outside the

6    scope.

7              THE COURT:  Outside what?

8              MR. FRIEL:  The scope.  I'm sorry.  The

9    scope of his report.

10             THE COURT:  Oh, the scope of his report?

11   Counsel, is that covered in his report?

12             MS. CANDIDO:  Yes, it is, Your Honor.

13             THE COURT:  All right.  Y'all approach.

14             (Bench conference.)

15             MR. FRIEL:  I think based on the ACQIS

16   license offer in 2000 whether that meets the maximum

17   amount, and it's not what he testified to.

18             MS. CANDIDO:  I can't find the exact

19   spot, Your Honor, but I know that he said that he

20   believes it sets a ceiling for what ACQIS would have

21   expected from IBM and the ceiling of what IBM would have

22   had to pay.

23             MR. FRIEL:  But not for the accused

24   products.  That was for the Interputer license.

25             MS. CANDIDO:  The figures are right here

1    in Paragraph 66?

2                    MR. POWELL:  It's right here in his

3    report.

4                    MR. FRIEL:  Can I have my exhibit back,

5    please?

6                    THE COURT:  Overruled.

7                    (Bench conference concluded.)

8        Q.   (By Ms. Candido) Mr. Ratliff, I am not sure

9    you got a chance to answer that question.  Let me ask

10   you, does this $1.3 million reflect the maximum in your

11   opinion that IBM would have had to pay had they entered

12   into the license proposal with -- from ACQIS?

13       A.   Yes.

14       Q.   We've looked at this licensing proposal from

15   ACQIS.

16            Did you otherwise look at IBM's licensing

17   practices and some of its actual licenses?

18       A.   I did.

19       Q.   Did you consider --

20       A.   Go ahead.

21       Q.   Sorry.  Did you consider your interview with

22   Michele Baumgartner, IBM's Director of Licensing, and

23   her testimony here at trial?

24       A.   I did, as well as the numerous IBM licenses

25   that were produced in this case that I reviewed and

1    other IBM licenses that are publicly available.

2              MS. CANDIDO:  Could you bring up the next

3    slide, please, Ryan?

4              MR. FRIEL:  Your Honor, I believe we have

5    an objection to this one, too.  May we approach?

6              THE COURT:  Yes, you may.

7              (Bench conference.)

8              MR. FRIEL:  Your Honor, that one is not

9    in his report.

10              THE COURT:  Where, right here

11    (indicates)?

12              MR. FRIEL:  Any of it.  This is the

13    question and answer from the trial.  He relied on an

14    interview, and there were couple of other spots of

15    testimony that was not included in his report.

16              MS. CANDIDO:  He relied on an interview

17    with her and the deposition transcript.  And as I

18    understand, both parties have been allowing their

19    experts to testify with the respect to previous

20    testimony in this case as it's relevant to their

21    previously formed opinions that were disclosed in their

22    reports, which this is.

23              THE COURT:  Had you heard about this

24    before, though, either by report or deposition?

25              MS. CANDIDO:  The jury has heard about

1    this from Ms. Baumgartner, and it's in his report about

2    IBM's customary licensing practices, from his

3    discussions with Michele Baumgartner --

4                    THE COURT:  Okay.  Overruled.

5                    MS. CANDIDO:  IBM taking a single

6    license.

7                    MR. FRIEL:  Your Honor, one moment if I

8    may.

9                    The problem is that these are not

10   statements that are in his report.  He's using the trial

11   testimony in a way that hasn't been previously

12   disclosed.  He can rely on his report.  I have no

13   problem with that, but to put this up where we have not

14   been able to --

15                   THE COURT:  Well, how does that prejudice

16   you?

17                   MR. FRIEL:  Well, we weren't able to

18   cross-examine him on it.

19                   THE COURT:  Well, cross-examine him, you

20   mean in deposition?

21                   MR. FRIEL:  Correct, and the other

22   remaining --

23                   MS. CANDIDO:  It's no different than

24   letting Mr. Gafford testify about --

25                   THE COURT:  Overruled.

1                MR. FRIEL:  Thank you.

2                (Bench conference concluded.)

3                MS. CANDIDO:  Ryan, if you could bring

4      that up slide, please.

5           Q.   (By Ms. Candido) Mr. Ratliff, is this

6      testimony that you reviewed and considered?

7           A.   It is.  I put together a few slides with

8      excerpts.  We've got one here and a few more in a

9      minute.

10               So just quickly, you heard IBM's Director of

11     Licensing, Ms. Baumgartner, last week testify that when

12     IBM pays lump sums on licenses to get other people's

13     technology, her experience is that the general range has

14     been 1 to 4 million, and that includes not only a patent

15     or licensing but other continuations of the entire

16     patent family.  They don't pay extra for that.

17          Q.   You mentioned that you reviewed actual IBM

18     license agreements.

19               MS. CANDIDO:  Ryan, would you bring up

20     the next slide, please?

21          Q.   (By Ms. Candido) Does this slide reflect some

22     of those license agreements?

23          A.   It does.  I identified the licenses that

24     either related to BladeCenter or were technology that

25     were related to use in a BladeCenter type of server

1    system.

2              The most recent one you see on the far left

3    was with Netezza.  Netezza makes a product that they

4    wanted to be compatible with IBM's BladeCenter products.

5    And so IBM licensed them the technology so that they

6    could make that compatible.

7              The next one you'll see, Ciena, dealt with the

8    multiplexing of signal communications.  You've heard

9    about the microchips in this case, the chipset and how

10   there's signals going through the wiring on those.  And

11   this deals with the multiplexing that occurs which

12   determines what traffic on those signals is going to go

13   when and where.  They had products related to that that

14   they needed this license for.

15             And then the Systemax license which dealt with

16   personal computer based data storage, data processing

17   types of systems, and you'll see the range here was

18   between 450,000 and 2.9 million, which is very

19   consistent with that 1-to-4-million-dollar range that

20   you heard from Ms. Baumgartner.

21        Q.   These dollar values on this chart relate to

22   lump-sum payments?

23        A.   All of these are lump-sum payments.

24        Q.   Did Mr. Murtha consider these IBM real-world

25   license agreements in his analysis?

1          A.    He did not.

2          Q.    You are familiar with Ms. Baumgartner's

3     testimony about IBM's preference for the type of

4     royalties and IBM licenses, right?

5          A.    Yes.  And from reviewing the licenses,

6     generally it's a cross-license, but when it's not either

7     way, it's a lump-sum payment.

8          Q.    IBM's preference is for lump-sum royalties?

9          A.    That's correct.

10         Q.    You're familiar with the ACQIS settlement

11    agreements that have been discussed in this case and

12    what type of structure they used for a royalty?

13         A.    Yes.  All of them for the past sales were lump

14    sums.

15         Q.    I think you've summarized the parties'

16    approach to the royalty structure in their own licenses

17    in a slide, if we see the next slide.

18         A.    Yes, the next slide.

19              So just to recap, all the ACQIS settlement

20    agreements for the past sales were a lump sum.  And for

21    those where future rights were granted, with one

22    exception, all of those, the lump sum, covered the

23    future sales as well.

24              The three comparable IBM licenses were for

25    lump sums, and IBM's practice, when they don't just do a

1    cross-license, is for a lump sum.

2        Q.    Is it your conclusion, then, that the parties

3    in this case would have agreed on a lump sum in the

4    hypothetical negotiation?

5        A.    Yes.  That is clear from their past practices.

6        Q.    You heard ACQIS' position that they believe

7    that they're entitled to a 1-percent-per-patent royalty

8    for each of their three continuation patents?

9        A.    Yes.

10       Q.    What's your response to that?

11       A.    So based on the IBM licenses I've reviewed,

12   based on the IBM licensing practices, based on what the

13   parties did in their actual agreements, I have not seen

14   any where there was 1 percent paid for a patent and

15   whatever royalty was paid, always included continuations

16   for other patents in the patent family.

17       Q.    Again, on these issues, you've interviewed

18   Ms. Baumgartner, IBM's Director of Licensing, and you're

19   familiar with her testimony at trial; is that right?

20       A.    That's correct.

21       Q.    Did you prepare any slides on that testimony?

22       A.    I did.

23            And if you'll turn to the next one, I'm going

24   to move through these pretty quickly.  This is just to

25   highlight things that you already heard last week.  They

1    were things I had heard by interviewing Ms. Baumgartner

2    and reviewing the documents, but this provides a good,

3    quick summary.

4              In the first slide, in the past 10 years,

5    she's never seen IBM pay 1 percent for a patent in the

6    computer sector.

7              If we move on to the next one.

8              Also, she has not seen people coming to

9    license with IBM who are suggesting that they expect to

10   pay or expect IBM to pay 1 percent per patent with the

11   5 percent, and she has not seen that to be any kind of

12   industry standard or referenced as an industry standard.

13             If we turn to the next one.

14             I pulled out excerpts from a couple of the

15   licenses.  You heard about ACQIS' Fujitsu license last

16   week.  I just mentioned IBM's Systemax license?

17             Remember, it was the third one in the table

18   that I showed you.

19             Both of those I pulled out the definition of

20   what a patent is; and in each case, the patent means

21   continuations.  So if there's a patent and there's four,

22   five, six, seven, however many, continuations, those, as

23   a group, are all one patent for licensing purposes.

24             They're still patents.  They carry whatever

25   weight the patent carries, but for licensing purposes,

1    they're treated as one.

2              If we go to the next slide.

3              Ms. Baumgartner confirming her experience

4    consistent with that.  If she was licensing a patent and

5    a second patent was a continuation of that, she would

6    not expect that she would pay more for that second

7    patent.

8              And I think we have a final slide.  When IBM

9    is in-licensing or out-licensing, either way, they don't

10   expect to pay more or receive more when there's

11   additional patents involved.

12        Q.   So in your opinion, do IBM's licensing

13   practices and actual real-world patent licenses support

14   the 3-percent running royalty rate that ACQIS proposes?

15        A.   They do not.

16        Q.   Does that complete your analysis regarding the

17   direct considerations that you thought were most

18   important to the hypothetical negotiation?

19        A.   Yes.  That addresses the things that I

20   considered affirmatively in trying to understand --

21   remember, we're back at the table.  We're exchanging

22   this information.  What's the royalty we're going to

23   agree on, taking all of that into account.

24              But there were some additional issues raised

25   during the testimony of Mr. Murtha and Vellturo and in

1    their reports that I think require some correction and

2    clarification that I need to address as well.

3         Q.   Okay.  Let's move to the first of those.  I

4    believe that's -- well, actually, may I ask, can you

5    identify the criticisms that you have or the

6    corrections, as I believe the word you used?

7         A.   Two big-picture issues.  The first one has to

8    do with how to properly compare the hypothetical license

9    to those settlement licenses you heard about.  And the

10   other one has to do with what's the proper royalty base

11   you should be considering for this lump sum.

12              I think we have a slide to get us started.

13        Q.   Okay.  So let's start with the ACQIS

14   settlement agreements.

15              MS. CANDIDO:  I believe we have a slide

16   on that, Ryan, DX Demo 1620.

17        Q.   (By Ms. Candido) You said you compared those

18   ACQIS settlement agreements with the hypothetical

19   license between ACQIS and IBM?

20        A.   Yes.  So what we tried to do here is to

21   display on the left what the hypothetical license is

22   going to relate to, and on the right, what we found in

23   the settlement licenses.

24              So this hypothetical license that you're

25   thinking about in this hypothetical negotiation that

1    you're using to determine damages, based on what you

2    have seen and heard, there's going to be a lump sum.

3              It's only going to involve U.S. rights, okay?

4    Only U.S. rights, because that's all these patents

5    cover.

6              And it only covers what's happened in the

7    past.  And in particular, from approximately April of

8    2008 to the end of this trial, that's what you're

9    deciding, is what happens during that time period.

10             What happens in the future is not part of what

11   you're going to be considering at this point.  That's

12   all the hypothetical license is.

13             But if we compare that to the settlement

14   licenses, again, we saw that all of those as to past

15   infringement were lump sums.  And almost all of those

16   that granted future rights also included that in the

17   lump sum.

18             They did grant U.S. rights, but they also

19   granted, in most cases, either foreign or worldwide

20   rights.  They covered the past, but they also covered

21   the future.  It included patents beyond just the three

22   continuation patents that you heard about in this case.

23             And most of those licenses went all the way

24   out until the patents expire in 2020.

25        Q.   Were there any exceptions to this amongst the

1   settlement licenses?

2       A.   There were two agreements you heard about next

3   in Appro where there only a settlement related to

4   what had come before, and neither party was really

5   making any products in the future that were settled as

6   part of that agreement.

7            Then you heard about one other where ACQIS

8   made an investment in the company it settled with and

9   agreed to a small royalty on a small amount of sales in

10  the future.  But for all the rest of them, these

11  basically apply.

12      Q.   So based on all the settlement licenses, which

13  one involved the party that in the blade server market

14  is most like IBM?

15      A.   In the blade server market, you have HP, you

16  have IBM, and you have everybody else.  So HP's really

17  the only other major player.

18      Q.   Okay.  So let's talk about ACQIS' settlement

19  agreement with HP.  I believe you prepared a slide on

20  that.

21      A.   Yes.

22      Q.   What were the terms of HP's settlement with

23  ACQIS?

24      A.   Just so you're clear, HP is in yellow.  IBM is

25  in the blue.  The HP license covered from April 2004 to

1    April 2020.  HP paid $30 million for that license.  They

2    got covered for past and future sales.  They got

3    additional patents that aren't part of the patents that

4    you're considering in this case.  They got worldwide

5    rights, and it was a lump sum.

6         In comparison, what ACQIS has demanded in this

7    case is a running royalty that through this -- you know,

8    through the date of the sales data they have put forth

9    in this case, works out to about $27 million.

10        And the hypothetical license that you're

11   considering only covers that period from April 2008 to

12   February 2011.  So it's less rights, shorter period, but

13   a very similar amount.

14        Q.   Is it possible to compare the HP settlement to

15   the hypothetical license based on the differences

16   between HP and IBM in size and the differences in the

17   timeframes that you've set forth in this slide?

18        A.   Yes, you can do some basic math to compare it.

19   It may be easier for me to hop up to the chart and draw

20   that out.

21             MS. CANDIDO:  Your Honor, may the witness

22   approach the easel?

23             THE COURT:  Yes, he may.

24             THE WITNESS:  Thank you, Your Honor.

25        Q.   (By Ms. Candido) And if you would,

1    Mr. Ratliff, would you please walk us through the

2    comparison between HP and IBM.

3                    THE WITNESS:  You think I need that?

4    Y'all think I need that?

5                    THE COURT:  Yes, you do need the

6    microphone.

7                    THE WITNESS:  You need it.

8                    THE COURT:  The Court Reporter does.

9                    THE WITNESS:  Good point, Your Honor.

10       A.    All right.  So I'm going to write a few things

11   down from this slide just to get us started.

12            So we're starting out at the top with HP, and

13   I'm going to put 30, but we all know that's $30 million.

14   And what we're trying to figure out is how we compare

15   that, which is the long yellow line, to what would be

16   the equivalent of that for IBM -- yes, thank you -- so

17   what would be the equivalent of that for IBM for that

18   short a time period.

19            So the first thing that we know is that longer

20   time period is about 16 years.  I'm going to put that

21   over here for now.  And that shorter time period is not

22   quite 3 years; but just to make the math easier, I'm

23   going to start it out at 3 years.

24            I'm going to come back and do some math with

25   that, but that's what we call the time part of the

1    adjustment.

2              The other adjustment -- if we put up the next

3    slide -- is to understand the relationship between what

4    HP was selling and what it got a license for as opposed

5    to what IBM was selling.

6              And so I pulled from IDC -- and you heard

7    about that source last week; it's the source that

8    financial experts use for industry data -- and we saw in

9    2008, Hewlett-Packard was about 55 percent of the

10   market, and IBM was only about 22 percent of the market.

11             So I'm going to call this market share, but it

12   really has to do with the sales that are being covered.

13   And what I'm going to do over here is put that

14   fraction -- it's 22 out of 55, and we all learned some

15   good reminder math last week.  I can cancel out what's

16   common, so I know the fraction is 2/5ths between IBM and

17   HP.  So that's about 40 percent.

18             And if I multiply that 30 million by 40

19   percent, that gives me 12 million.  So just based on the

20   amount of sales alone, comparing IBM to HP, IBM would

21   only be paying about 40 percent of what HP would be

22   paying, everything else being equal.

23             But it's still for a longer period of time.

24   So over that 16 years, HP is going to have a lot more

25   sales that are being covered compared to IBM, which is

1    only getting a license for about 3 years.

2         Now, this doesn't give us quite as neat a

3    number as the 40 percent, but it's about 20 percent,

4    right?  Because we know 3 goes into 15, 5 times, about

5    1/5th.  So I'm going to use that just for simplicity.

6         That's about 20 percent.  So IBM's term of

7    license is only about 20 percent of what HP's was.

8    So if I do that math, that comes out to about 2.4

9    million comparing IBM to HP in terms of amount and time.

10   Q.   So -- thank you very much.

11        Just based on the difference in time and the

12   difference in market share, comparing the 30 million

13   that HP paid to the hypothetical license tells us that

14   IBM should only have to pay 2.4 million.

15        Is that what you're telling us?

16   A.   If you were doing that comparison, yes.

17   Q.   And just briefly, did you also perform an

18   effective royalty rate calculation for the HP agreement

19   similar to the type of effective reasonable royalty

20   agreement that Mr. Vellturo testified about?

21   A.   Yes.

22        Let's go to the next slide.

23   Q.   Could you explain what you've done in this

24   slide, please?

25   A.   Yes.  So, again, you heard last week about the

1    IDC data, and so what I did was I looked at HP's sales

2    that had happened from 2004 to 2009.  Then there were

3    projections in the IDC data for the amount of sales

4    growth that would occur in 2010, '11, '12, and '13.

5           And then Mr. Vellturo, in one of his

6    computations, made a projection of that continued growth

7    out into the future.  So I used that same growth model,

8    plus the IDC sales data.  I used a discount rate -- you

9    heard about that -- to bring those sales back to the

10   present, because they're out in the future and not worth

11   as much today as they are in the future.

12          And if I compared that amount to the 30

13   million, the 30 million was only about .12 percent of

14   those past and future expected U.S. sales.

15      Q.   And the .25 percent bar in the middle, that's

16   what would be effective royalty rate under your damages

17   calculation; is that correct?

18      A.   Right.  Based on the $3.5 million that I told

19   you about at the start of my testimony that I believe

20   would be the reasonable royalty, that works out to about

21   .25 percent of the IBM accused sales that would have

22   occurred between April 2008 and February of 2011, which

23   is this month.

24      Q.   Well, I'm just going to go through a couple of

25   these last points a little more quickly.

1          MS. CANDIDO:  If you could bring up the

2     next slide, please, Ryan.

3          Q.   (By Ms. Candido) You talked earlier about the

4     fact that you don't think 3 percent is appropriate.

5          Can you explain what this slide tells you?

6          A.   So, again, what we know is that ACQIS has

7     asked for what amounts to a 1 percent per patent, or

8     3-percent royalty, and that's what's necessary to get to

9     the $27 million.  Again, what this is showing is that

10    for purposes of licensing, even if we assumed the proper

11    rate was 1 percent per patent -- and understand, I've

12    not seen any evidence to support that -- but assuming

13    that was the proper rate, again, the continuations

14    wouldn't count.  So at most, it would be that 1 percent.

15         Q.   So even though you don't agree with the 1

16    percent, you've calculated what the damages would be

17    using Plaintiff's royalty base, I think on the next

18    slide?

19         A.   I have.  The next slide just shows some basic

20    calculations.  What you can see in the first row is the

21    amount of accused sales that Mr. Vellturo included in

22    his report.  And if that was at 1 percent, that would be

23    $9 million as opposed to 27 million.

24         However, that includes the blades, the

25    chassis, and the options.  And you've heard testimony

1    about the core components that are most directly

2    affected by the invention that's been asserted by ACQIS.

3           And if we just focus on the blade and the

4    chassis, that number goes down dramatically, over $300

5    million in base, and would give you a royalty of only

6    about 5.8 million.

7        Q.   And then in the last two rows, you've

8    recalculated the first two rows, but this time excluding

9    the unassembled sales that the jury's heard about

10   earlier today; is that right?

11       A.   Yes.  You heard from Professor Conte about the

12   unassembled sales and the infringement.

13          Just so you're clear, now talking more from a

14   business perspective than a technical perspective, IBM's

15   sales of these blade server products, but about 46

16   percent of those sales are not sold as complete systems.

17   They are only sold as components.

18          And since it takes a system working together

19   to be accused of infringement, I've done a separate

20   calculation here showing what would happen if you took

21   46 percent out of that.  And you see those two

22   calculations there on the options; blade and chassis.

23   That's about 4.9 million; and just on the blade and

24   chassis, 3.1 million.

25       Q.   Okay.  I think we've covered everything.  I'm

1    just going to bring up your last slide briefly, and

2    without running through these items again, I just want

3    to confirm it's your opinion that a reasonable royalty

4    in this case would be 3.5 million or less; is that

5    right?

6         A.    That's correct.

7               MS. CANDIDO:  I pass the witness.

8               THE COURT:  All right.

9               Cross-examination.

10                   CROSS-EXAMINATION

11   BY MR. FRIEL:

12        Q.    Good afternoon.  How are you, Mr. Ratliff?

13        A.    I'm good.  How are you?

14        Q.    I'm doing very well.  A little warm today,

15   but...

16              Let me ask you a few questions about your

17   background.  You have an accounting degree, you said; is

18   that correct?

19        A.    Yes.

20        Q.    You have a law degree?

21        A.    Yes.

22        Q.    You don't have any electrical engineering

23   degrees?

24        A.    No.

25        Q.    No computer engineering or computer science

1    degrees?

2         A.    No.

3         Q.    So no type of engineering degree at all?

4         A.    Correct.

5         Q.    So you wrote an expert report in this case in

6    November of last year; is that right?

7         A.    Yes.  My first report was in November.

8         Q.    Okay.  And then you did a supplement a little

9    while ago, right?

10        A.    Yes.

11        Q.    And your report contains your opinions about

12   what IBM should pay to use Dr. Chu's inventions; is that

13   correct?

14        A.    Yes.  At those different timeframes, yes.

15        Q.    And you agree that your expert reports are a

16   very important document or documents in these matters,

17   right?

18        A.    Yes.

19        Q.    And you were truthful in writing these

20   reports?

21        A.    That's my belief.

22        Q.    You were as thorough and complete as could be

23   because you knew that mistakes could cost one side or

24   the other literally millions of dollars, right?

25        A.    I don't know that we really think of it that

1    way when we're writing reports.  I think we're trying to

2    do the best job we can based on the information

3    available and the time constraints we have.  So that's

4    what I attempted to do.

5         Q.   All right.  Fair enough.

6              Now, you opined in your report that rack

7    servers are alternatives to blade servers that are

8    commercially acceptable, right?

9         A.   I make that statement, but the opinions

10   actually came from my discussions with others.

11        Q.   Okay.  Well, you didn't -- let's talk about

12   the others.  You didn't talk to any IBM customer and ask

13   them why they purchase blade servers instead of a rack,

14   right?

15        A.   No.  Instead, it was information that was

16   produced in the case about the benefits and features in

17   discussions with IBM sales personnel.

18        Q.   Okay.  So the answer is, no, you didn't,

19   right?

20        A.   Not to the customer directly, that's correct.

21        Q.   And you didn't talk to any IBM customer

22   directly as to why they would purchase a rack instead of

23   a blade server, right?

24        A.   Correct.

25        Q.   And you didn't directly talk to any IBM

1    customer about whether they considered rack servers to

2    be a commercially acceptable alternative to blade

3    servers?

4         A.   Yeah.  I don't know how that would work.

5    Those aren't really the kind of questions you ask

6    customers.

7         Q.   Well, more importantly, that's not the kind of

8    questions you asked anyone, right, any IBM customer

9    directly.

10        A.   I didn't ask an IBM customer that question,

11   no.

12        Q.   And at the time you wrote your report, you

13   didn't have any information on the benefits of a blade

14   server over a rack server; is that right?

15        A.   I believe at the time of my deposition, when I

16   was asked specific questions, I didn't have things at

17   hand to answer that.  I believe in the materials I

18   reviewed, there were promotional brochures about all the

19   products.

20        Q.   Okay.  Now, your deposition was taken in this

21   case the 1st of November; is that right?

22        A.   Yes.

23             MR. FRIEL:  Could we play, let's see,

24   from Page 58, Lines 10 through 20?

25             (Video playing.)

1              QUESTION:  So when you formed your

2     opinion in this case, you didn't have any information on

3     the benefits of a rack server over a blade server?

4              ANSWER:  That's correct.  I did not

5     discuss or consider that issue.

6              (End of video clip.)

7     Q.   (By Mr. Friel) Now --

8     A.   Just to be clear, that's not a complete

9     answer.  There was a discussion that follows that.  I

10    think you're --

11             MS. CANDIDO:  Your Honor, if I may, for

12    optional completeness?

13             THE COURT:  Excuse me?

14             MS. CANDIDO:  May I read additional

15    testimony for optional completeness?

16             THE COURT:  Yes, you may.

17             MS. CANDIDO:  This is Page 58 from Line

18    17 through Page 59, Line 3.

19             MR. FRIEL:  Your Honor, I'll allow the

20    next question to be read, but this should be done on

21    Counsel's own time as a matter of redirect.

22             THE COURT:  All right.  You may go ahead.

23             QUESTION:  What are the benefits of a

24    blade server over a rack server?

25             ANSWER:  Again, I would say the same

1    answer.  I think they can all be used for similar

2    studies.  They all provide many similar functionalities.

3              There can be differences that maybe for a

4    particular customer, may be more consistent with their

5    past practices or existing structure or the environment

6    in which they plan to store it or perhaps the use they

7    plan to make of it; but I don't have particular

8    engineering knowledge to do that kind of comparison.

9              MR. FRIEL:  Thank you.

10        Q.   (By Mr. Friel) You recite in your report that

11   tower servers are alternatives to blade servers, right?

12        A.   Yes, again, based on conversations with

13   others.

14        Q.   And similarly, you didn't talk to any IBM

15   customers directly to determine whether -- or why they

16   would purchase a blade server instead of a tower?

17        A.   Correct.

18        Q.   Or a tower server instead of a blade?

19        A.   Correct.

20        Q.   Or you didn't talk to a single IBM customer

21   directly as to whether they considered tower servers to

22   be acceptable alternatives to blade servers?

23        A.   Same answer as before.  Again, I wouldn't

24   understand a customer answering a question in that

25   context.

1      Q.   And at the time you wrote your report, you

2   didn't have any information on the benefits of a blade

3   server over a tower server; is that correct?

4      A.   Being consistent with both the clip you just

5   played and the further testimony, that's my knowledge.

6      Q.   Well, I'm not sure I understand your question

7   (sic).  Can you answer yes or no?

8      A.   I don't think it's a yes or no question.

9   My belief is, it's one of those loaded questions where

10  you've made an assumption that there are benefits and

11  advantages; and in fact, I'm not aware that there are

12  unique benefits and advantages.  Rather, they provide

13  the same benefits and advantages, but someone's

14  particular context where they might need this storage

15  capability may differ, and that may cause an initial

16  preference for a blade.

17     Q.   Okay.  That's your answer now.

18          MR. FRIEL:  Can we play --

19     A.   That was in the depo as well, if you look at

20  it.

21          MR. FRIEL:  Let's play Page 59 starting

22  at Line 8 and going to Page 60, Line 9.

23          (Video playing.)

24          QUESTION:  What are the benefits of a

25  blade server over a tower server?

1                    ANSWER:  I don't know.  Again, the focus

2      of my answer is on technical engineering capabilities.

3                    QUESTION:  But when you formed your

4      opinion in this case, you didn't have in mind the

5      benefits of a blade server over a tower server?

6                    ANSWER:  Actual benefits, no.  Initial

7      perceived benefits, I described to you my general

8      understanding.

9                    QUESTION:  And when you formed your

10     opinion in this case, you didn't have in mind the

11     benefits of a blade server over a rack server?

12                   ANSWER:  Other than the general benefits

13     that were initially perceived, no.

14                   (End of video clip.)

15         Q.    (By Mr. Friel) All right.

16         A.    I agree -- I agree with that answer.

17         Q.    Thank you.

18              You -- in your opinion, you assume that

19     Dr. Chu's inventions, the inventions of the

20     patents-in-suit are a minor improvement over the prior

21     art; is that correct?

22         A.    Again, I relied on the conversations with

23     technical experts for that conclusion.

24         Q.    So you assumed that conclusion, right?

25         A.    I guess you can call it an assumption; but

1    when it's an opinion of another expert, I don't really

2    consider that an assumption.

3         Q.   Thank you.

4              Now, you didn't do anything to test that

5    opinion or assumption, did you?

6              For instance, you didn't interview any IBM

7    blade server customers about the importance of Dr. Chu's

8    inventions?

9         A.   It wouldn't be my field.  That sounds like a

10   technical field to me.

11        Q.   Okay.  So you didn't talk to any IBM customers

12   about the importance of any aspects of Dr. Chu's

13   inventions at issue in the case, right?

14        A.   Yes.  I wouldn't do that, no.

15        Q.   Okay.  Now, you're working for IBM in this

16   case.  We all know that, right?

17        A.   I was retained by IBM, but I'm here to provide

18   my own independent opinion.

19        Q.   Okay.  Is that a yes then?

20        A.   No, that's a no, based on the way you phrased

21   the question.

22        Q.   All right.  Is IBM paying your bills?

23        A.   They are.

24        Q.   Okay.  And you bill at $600 an hour; is that

25   correct?

1        A.    My current rate is 595 an hour.

2        Q.    Okay.  And how much of IBM's money have you

3    spent so far?

4        A.    What are the total bills in the case?

5        Q.    Yes.

6        A.    Since last summer, it's probably in the

7    neighborhood of 4 -- $450,000, something like that, for

8    me and those employees working under my direction and

9    control.

10        Q.    Okay.  And in addition to the 450,000, I

11    assume you have some unbilled time and expenses?

12        A.    Just this stub period of time before trial.

13        Q.    And what period of time would that cover?

14        A.    Just the last couple of weeks.

15        Q.    And what would you estimate your billings will

16    be to IBM for that period?

17        A.    Another 40, 50 hours of my time, so 20,

18    $25,000.

19        Q.    All right.  So IBM has blade server customers,

20    right?  In fact, it's got lots of them.

21        A.    Yes.  In other words, you're saying it sells

22    blades to customers, yes.

23        Q.    Okay.  And you didn't interview any one of

24    them to form your opinions?

25        A.    No, I did not.

1          Q.    All right.  Now, you used the Georgia-Pacific

2     Factors in writing your reports.  We saw that, the

3     15-factor test, right?

4          A.    Yes.

5          Q.    And you considered every factor, right?

6          A.    Yes.

7          Q.    And Factor 9, you're familiar with the utility

8     and advantages of the patented property over the old

9     modes or devices, if any, that have been used for

10    working out similar results?

11         A.    Yes.

12         Q.    All right.  And you considered that factor in

13    writing your opinion?

14         A.    I did.

15         Q.    And you considered previously existing

16    technology?

17         A.    Again, I asked about previously existing

18    technology and conferred with the technical experts

19    about that.

20         Q.    Okay.  So you considered the old mode of

21    parallel PCI; is that right?

22         A.    I knew of that.

23         Q.    And you considered the advantages of the

24    improvements that Dr. Chu made over the previously

25    existing technology; is that right?

1      A.    Based on my discussions with the technical

2   experts, I understand -- I tried to understand what

3   benefits were being claimed.

4      Q.    And you, of course, wanted to know all of the

5   benefits that were being claimed or that resulted from

6   the claims, right?

7      A.    Again, I would have tried to understand that,

8   based on the claimed contentions that were made and the

9   explanations provided to me by the technical experts.

10      Q.    Okay.  You didn't consider any advantages

11   around computing density that blade servers may offer

12   over racks, did you, in your report?

13      A.    I don't recall considering that as a

14   standalone.  My knowledge was focused on what components

15   of the product were the ones most directly related to

16   the claimed incremental invention.  I understood these

17   other benefits, including what you just asked about,

18   would come from the combination of the prior art and the

19   claimed invention, not just the claimed invention alone.

20      Q.    Okay.  You were asked a question about this in

21   your deposition, also, weren't you?

22      A.    Yes.

23      Q.    Do you recall that?

24      A.    I think I said I did not consider that as a

25   standalone item.  I didn't know anything about it as a

1    standalone item.

2         Q.   Thank you.

3              So in writing your report, you -- in addition

4    to not considering the computing density advantage, you

5    didn't consider whether there were computing power

6    advantages, in other words, lowered power usage?

7         A.   Not as a standalone item apart from how the

8    parts function together.

9         Q.   And you didn't consider power savings as an

10   advantage of blades over racks?

11        A.   Again, same answer.

12        Q.   And the same answer with respect to cooling

13   benefits, not considered?

14        A.   Correct.

15        Q.   And you didn't consider the advantage of lower

16   setup costs for blades over racks because you don't have

17   to pay for each of the cables to be connected, right?

18        A.   I was aware of that from some analyses that

19   were done in the case.  As you added more blades, the

20   cost went down.  So I was generally aware of that.

21             But, again, the invention, as I understood it,

22   was not of blades; it was not of modular computing; it

23   was of something that purportedly provided some

24   advantages or improvements over that.

25        Q.   The answer --

1      A.    And so I didn't consider it as standalone.

2      Q.    Okay.  The answer to my question is, no, you

3  didn't consider it?

4      A.    Not as a standalone.

5      Q.    Well, let's play your deposition then at Page

6  98, Lines 17 through 20.

7                (Video playing.)

8                QUESTION:  And in forming your opinions

9  in this case, did you consider any of the setup costs

10  that could be saved by using blade servers over rack

11  servers?

12               ANSWER:  No.

13               (End of video clip.)

14     Q.    (By Mr. Friel) In writing your reports, did

15  you consider any of the lower maintenance cost that

16  could be achieved using blade servers over racks?

17     A.    Again, the same as the others.  Not as a

18  standalone consideration.

19     Q.    That's no, right?

20     A.    Correct.

21     Q.    And you didn't consider, in writing your

22  reports, the space savings offered by blade servers

23  compared to rack servers; is that correct?

24     A.    Same answer.

25     Q.    No?

1      A.    Correct.

2      Q.    In writing your reports, you didn't consider

3   cable reduction advantages offered by blade servers over

4   tower servers, right?

5      A.    Same answer again.  No, not as a standalone.

6      Q.    Okay.  And that's true for the other benefits

7   that blades offered over towers, such as density

8   advantages, computer power advantages, power savings,

9   cooling, and lower setup costs; is that correct?

10     A.    Again, yes, based on my understanding of the

11  difference between the incremental invention as opposed

12  to the product as a whole.  I did not consider that

13  standalone, no.

14     Q.    So the answer is no?

15     A.    I just said that.

16     Q.    So Factor 9 we've talked about some.  And you

17  did consider that, right?

18     A.    Yes.

19     Q.    And you did not form any independent opinions

20  about what type of modular computer systems existed

21  before Dr. Chu's inventions and contribution to the art.

22     A.    Again, I didn't.  I relied on other experts

23  for that.

24     Q.    Okay.  So let me ask you a little bit more

25  about your background.

1            So you said that you went to SMU Law, right?

2       A.   Yes.

3       Q.   And you clerked for a judge for a couple of

4   years --

5       A.   Yes.

6       Q.   -- is that right?

7            And then you were with a law firm, Weil

8   Gotshal in Houston --

9       A.   Yes.

10      Q.   -- for about six years; is that right?

11      A.   Yes.

12      Q.   And that's a New-York-based law firm?

13      A.   Yes.  I was in the Houston office.

14      Q.   Okay.  And you worked in patent litigation,

15   right?

16      A.   I worked in commercial litigation, which

17   included at that time IP, including patents.

18      Q.   Okay.  And you were not a partner at Weil

19   Gotshal; is that right?

20      A.   That's correct.

21      Q.   You were an associate attorney?

22      A.   That's correct.

23      Q.   All right.  And you never were made a partner

24   at Weil Gotshal; is that right?

25      A.   I left before I was up for partner, that's

1    correct.

2         Q.   Okay.  And your work as an associate was,

3    naturally, supervised by a partner at Weil Gotshal; is

4    that right?

5         A.   It was.  I did have clients in cases of my

6    own.

7         Q.   Now, have you ever been a lead negotiator on a

8    patent licensing negotiation while you were at Ernst &

9    Young?

10        A.   Yes.

11        Q.   You were the lead negotiator?

12        A.   Yes.

13        Q.   All right.  Let me take a look here.

14             MR. FRIEL:  Can we play from your

15   deposition Page 22, Lines 14 through 21?

16             (Video playing.)

17             QUESTION:  Would you have considered

18   yourself lead negotiator for any of these patent

19   licenses when you were at Ernst & Young?

20             ANSWER:  I think I would have been

21   deferential and acknowledged that the -- either general

22   counsel or chief IP counsel who I was working for was,

23   in fact, the lead negotiator.  Then they would have had

24   outside counsel and me as well.  So we were the

25   negotiating team, but I would not presume to label

1    myself as the lead.

2                    (End of video clip.)

3        Q.   (By Mr. Friel) And at IntaCap, would you give

4    the same answer with respect to not being the lead?

5        A.   I would.  So I played the role, but I was

6    subject to my client's final decisions.

7        Q.   And at StoneTurn, isn't it true that you've

8    never been a lead negotiator in a patent licensing

9    negotiation?

10       A.   Again, the same context.  I was always

11   deferring to my client for final decisions, but I would

12   do the negotiating.

13       Q.   So I want to make sure that I understand why

14   you're here.

15            You're here to give an opinion on how IBM and

16   Dr. Chu would have acted during a hypothetical

17   negotiation in 2008, right?

18       A.   Yes.

19       Q.   But you've never actually led a patent

20   negotiation yourself; you've always deferred to others

21   and wouldn't presume to be the lead, right?

22       A.   If you want to interpret it that way, that's

23   fine.

24       Q.   All right.  And you don't have an engineering

25   degree?

1        A.    Correct.

2        Q.    And you spent half your professional life

3    working as a lawyer?

4        A.    I've been a CPA for 25 years, and I practiced

5    law for about 7 years.

6        Q.    And you didn't talk to a single IBM customer

7    before writing your opinion as to the desirability of

8    the features or benefits enabled by the inventions

9    Dr. Chu gave the world.

10       A.    No.

11       Q.    Thank you.

12            MR. FRIEL:  Pass the witness.

13            THE COURT:  Redirect?

14            MS. CANDIDO:  Ryan, would you put up DX

15    Demo 1608?

16                   REDIRECT EXAMINATION

17    BY MS. CANDIDO:

18       Q.    Mr. Ratliff, what does this slide tell you

19    about the preferences of IBM's customers, in terms of

20    the types of servers that they prefer?

21       A.    96 to 98 percent of what their customers

22    purchase are racks, towers, and non-accused blades.

23       Q.    So this shows that in 2008 to 2009, a

24    majority -- significant majority of IBM server customers

25    perceived there to be advantages of rack and tower

1    servers over blade servers; is that right?

2         A.    Yes.

3         Q.    Mr. Friel asked you about some licensing

4    negotiations and whether you were the lead negotiator or

5    you deferred to the client.

6              At the risk of sort of letting false modesty

7    pollute your answer, could you explain what you meant by

8    deferring to the client?

9         A.    Yes.   Both as a lawyer and as a consultant, I

10   was retained by companies or individuals who owned the

11   intellectual property or who were being asked to license

12   the intellectual property.   In that role, I am helping

13   them achieve an objective.

14             In contrast perhaps to Mr. Yost here with IBM,

15   who, as the client, would be the one negotiating and

16   working out the solution, he could also hire someone

17   like me to help them to do the negotiating.   But at the

18   end of the day, they're the ones that are going to be

19   paying or granting the rights, and it's ultimately their

20   decision.

21             So my view would be that I am ultimately

22   subordinate to the ultimate client's interest; but I, in

23   fact, did negotiate, reach agreements, provide my client

24   with where we were, and they would make the decision to

25   accept it or reject it.

1    Q.   You were at the heart of dozens of patent

2  license negotiations --

3    A.   Yes.

4    Q.   -- is that fair?

5         Have you seen evidence -- any evidence in this

6  case that adjusted for time and market share that IBM

7  should be required to pay over 12 times as much as HP

8  paid for a license to the ACQIS patents?

9    A.   No.

10   Q.   Have you seen any evidence in this case that

11 supports a 3 percent reasonable royalty for the three

12 ACQIS continuation patents asserted against IBM in this

13 case?

14   A.   No.

15   Q.   Would ACQIS's damages demand of a 3 percent

16 running royalty leave IBM a reasonable profit on the

17 blade servers?

18   A.   No.  As I said earlier, they're already losing

19 about a hundred thousand dollars on every million

20 dollars of blade servers they're selling.

21   Q.   So have you seen any evidence in this case

22 that supports a royalty to ACQIS of $27 million for less

23 than a three-year license from IBM?

24   A.   No.

25   Q.   So if all of IBM's accused products were found

1    to infringe and ACQIS's patents were found to be valid,

2    contrary to IBM's view, in your opinion, what is the

3    maximum reasonable royalty that the jury should award?

4         A.    $3.5 million.

5         Q.    Thank you.

6                   THE COURT:  All right.  Any further

7    examination of this witness?

8                   MR. FRIEL:  No, Your Honor.

9                   THE COURT:  All right.  Very well.  You

10   may step down.

11                  THE WITNESS:  Thank you, Your Honor.

12                  THE COURT:  All right, Ladies and

13   Gentlemen of the Jury, we're going to take our afternoon

14   break at this time.  We'll be in break -- on break until

15   2:45.  Be in recess.

16                  COURT SECURITY OFFICER:  All rise.

17                  (Jury out.)

18                  (Recess.)

19                  COURT SECURITY OFFICER:  All rise.

20                  (Jury in.)

21                  THE COURT:  Please be seated.

22                  All right, Counsel.  You may proceed.

23                  MR. BROGAN:  Your Honor, we would call

24   Mr. Thomas Gafford.

25                  THE COURT:  All right.  Mr. Gafford?

1                    MR. VERHOEVEN:  Your Honor, for the

2    record, should I announce that we've rested?

3                    THE COURT:  That would be very nice.

4    Thank you.

5                    MR. VERHOEVEN:  Okay.  IBM rests, Your

6    Honor.

7                    THE COURT:  You rest.  Very good.

8                    This will be the rebuttal, Plaintiff's

9    rebuttal case, and then the testimony will be over,

10   so...

11    THOMAS GAFFORD, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

12                    DIRECT EXAMINATION

13   BY MR. BROGAN:

14       Q.   Mr. Gafford, welcome back.

15       A.   Thank you.

16       Q.   Now, we talked a little bit about claim

17   construction in this case.  You're familiar with the

18   Court's claim constructions, right?

19       A.   I am.

20       Q.   Okay.  And did you use those -- well, we

21   talked about the first three constructions, the

22   construction for console, computer module, and slot.

23                    Did you have the Court's constructions of

24   those before you prepared your expert report?

25       A.   I did, and I used them.

1      Q.   And you used them.

2           Now, with respect to other terms at the time

3    that were not construed by the Court, what did you do?

4      A.   I used the plain and ordinary meaning in the

5    art of those terms.

6      Q.   And is it your understanding that Drs. Conte

7    and McClure did the same?

8      A.   That's my understanding.

9      Q.   How do you know that?

10     A.   I read their reports, and they say so.

11     Q.   Do you know where in Dr. McClure's report it

12   says so?

13     A.   Couldn't give you a memory test on what

14   paragraph.

15           MR. BROGAN:  Can you put up Paragraph

16   197, please?

17     Q.   (By Mr. Brogan) Is this the paragraph that

18   you're referring to?

19     A.   Yes, it is.

20     Q.   Does that indicate that, like you, he applied

21   the plain and ordinary meaning?

22     A.   Yes, it does.

23     Q.   And did you-all apply the plain and ordinary

24   meaning as that meaning would be to a person of ordinary

25   skill in the art?

1        A.    Yes.

2        Q.    Do you have an opinion on what the person of

3    ordinary skill in the art would be like?

4        A.    Yes.   That's a person with a Bachelor of

5    Science Degree in electrical engineering and three to

6    five years of industry experience.

7        Q.    And despite applying the level of ordinary

8    skill in the art, did you agree with Mr. -- Dr. McClure

9    and Dr. Conte in each instance?

10       A.    At the level of skill or --

11       Q.    The application of the claim terms.

12       A.    Having applied the level of skill, no.  We

13   certainly don't agree on what that means, on what some

14   of these terms mean.

15       Q.    Okay.

16            MR. BROGAN:  Would you please go back to

17   the claim construction?

18       Q.    (By Mr. Brogan) Now, the term PCI bus

19   transaction, the Court's construed that term, right?

20       A.    Yes.

21       Q.    Would you please explain for the jury why PCI

22   bus transactions, as construed by the Court, do not

23   appear in ethernet transmissions?

24       A.    The basic reason is that ethernet is utterly

25   incapable of carrying such a transaction.  The -- you

1    get that from a look at the first page of the PCI spec

2    and the first page of the standards document for

3    ethernet.

4            The key phrase here is interconnected

5    peripheral component.  PCI is a master slave system.  An

6    interconnected component is something that it directly

7    controls.  It has to have the ability to have that

8    device jump to its bidding whenever it sends a command

9    out.

10           If you substitute between the CPU and one of

11   these interconnected components, that is, for the most

12   part, found on the blade itself, if you substitute

13   ethernet for that connection, you prevent -- the

14   component is no longer interconnected.  You have

15   prevented the CPU from having the control it requires to

16   do the job of sending out a PCI bus transaction.

17       Q.   Using Dr. Chu's drawings, could you illustrate

18   that for the jury?

19       A.   Yes.

20               THE WITNESS:  If I can get up?

21               THE COURT:  Yes, you may.

22       Q.   (By Mr. Brogan) And while doing so, can you

23   identify the interconnected peripheral components?

24       A.   Yes.  For the old computer, the inter -- the

25   interconnected components are the northbridge, the -- a

1    couple of input/output devices shown here as in/out, and

2    the southbridge and the ethernet controller.

3            For the new computer, again, the

4    interconnected components are the northbridge, the --

5    one of these controllers, the PCI A controller, the PCI

6    B controller, the southbridge, and the -- pardon me --

7    the ethernet controller over here on the side.  These

8    are all interconnected components.

9        Q.   Are the interconnected peripheral components

10   of one computer also the interconnected peripheral

11   components of another computer?

12       A.   No.  They cannot be.  That's why you use

13   ethernet here instead of using a PCI connection.

14   Ethernet is a peer-to-peer connection.  It is meant to

15   connect lots of computers over distances up to thousands

16   of feet, and they all have the same rank as each other.

17   There are no masters and slaves.

18           That's appropriate for a connection among the

19   computers.  It is inappropriate for the connection in

20   here (indicates).

21       Q.   Now, does this explain why Drs. McClure and

22   Conte couldn't find those PCI address bits that I was

23   asking about?

24       A.   On ethernet, yes.  They can't be carried.

25       Q.   Would you explain what those address bits are

1    and why they don't appear on ethernet?

2         A.   The address bits are the -- the way the

3    processor decides which of these interconnected

4    components it's going to communicate with, and they are

5    sent out at the beginning of a command over PCI, from

6    the processor, whether it's conventional PCI or PCI

7    Express, and they're how the processor determines which

8    device to talk to, after which the data is exchanged.

9         Q.   And do those same address bits show up in the

10   ethernet packets?

11        A.   No.   There is no mechanism in ethernet for

12   sending those address bits out over the network.

13        Q.   Now, with respect to the prior art that's been

14   identified in this case, have you seen any prior art

15   that uses ethernet to connect a northbridge and a

16   southbridge?

17        A.   No, it's not done, and it wouldn't be done.

18        Q.   Have you seen any prior art that has ethernet

19   coupled directly to a northbridge?

20        A.   No.

21        Q.   What would happen if you replaced the PCI bus

22   in the old computer with ethernet?

23        A.   You would break it.   You wouldn't have a

24   working machine anymore.

25        Q.   Why not?

063cedc6-2243-4bae-a397-41862974c2af

1      A.   Because -- because an ethernet would not

2   permit the processor to exert the control it needs to

3   make this system work.  And in the terms of the Court's

4   construction, any device on the other side of ethernet,

5   such as if you put ethernet between the northbridge and

6   the southbridge, the southbridge would cease to be an

7   interconnected peripheral component.

8      Q.   You've heard bottlenecks discussed in this

9   case.  Would using ethernet between the northbridge and

10  southbridge create bottlenecks?

11     A.   If you could even make it work, it would be a

12  monstrous bottleneck.

13     Q.   Is it fair to say that you agree with

14  Dr. Conte's opinion expressed in his report that

15  ethernet does not serial encode PCI bus transactions?

16     A.   Yes.

17     Q.   Would you explain that for the jury?

18     A.   Ethernet has the ability to encode data for

19  moving to another computer as a peer in a conversation.

20  That's all it has the ability to do.

21          The address part of a PCI transaction stops at

22  this edge, the interface edge of an ethernet controller.

23  It's merely used by the processor to decide to talk to

24  this interface instead of this interface.  It's not

25  meant for and it does not get transmitted over the

1    network.

2         Q.    In this case, if ethernet doesn't carry PCI

3    bus transactions, can there be anticipation of the

4    asserted claims?

5         A.    No.

6         Q.    Why not?

7         A.    Because if you don't have that element, you

8    don't have anticipation.  And that element is in every

9    asserted claim.

10        Q.    Thank you, Dr. Gafford -- or Mr. Gafford.

11   Sorry.  Like I say, I keep upgrading you.

12        A.    (Witness seated.)

13        Q.    Now, you talked a little bit about obviousness

14   in this case.  Would you explain for the jury why, in

15   your opinion, it would not be obvious to combine the

16   Hong reference with any of the RLX, Ketris, or

17   QuantumNet references?

18        A.    Sure.  In order for a combination to be

19   obvious and to avoid the hindsight problem of looking at

20   a claim and then saying, all I have do is use that as a

21   shopping list to go find things in the prior art, the

22   idea of -- or the prospect of combining two things has

23   to look like a good idea to an engineer at the time.

24             And the problem with Hong is that when you add

25   it to any of these blades, you get a poorer blade as a

 1    result.

 2         Q.    You say you get a poorer blade as a result.

 3    What do you mean?

 4         A.    Well, these blades are designed -- if I can

 5    just grab one of these for a minute.

 6              These blades are designed very compactly.

 7    There's no spare room on here.  There's no spare heat to

 8    give away, and there's no spare power to give -- to

 9    apply.  It's not going to do you any good.  These are

10    the kinds of decisions engineers make in the course of

11    doing their job every day.

12              So what Hong does is to take you from, let's

13    say, the PCI conventional bus coming out of the

14    northbridge, and using the Hong circuit would serialize

15    it, and then using the rest of the Hong circuit would

16    de-serialize it, and then connect it to some other

17    conventional PCI device on the board.

18              You still have the bottleneck in the PCI.  You

19    don't add something to a chain of equipment and make it

20    faster.  The most you could do is not affect it at all.

21    In fact, Hong slows it down a little.

22              And it costs power, it costs space on the

23    board to mount the thing, and you have to buy the

24    silicon.  You have to buy the part to perform the Hong

25    function.  There's simply no reason to put it on.

1        Q.    And do the claims in this case call out a

2     traditional parallel PCI bus?

3        A.    No, they do not.

4        Q.    And does Dr. Chu's invention provide any

5     advantages over what would be the use of Hong in a blade

6     server?

7        A.    Yes.

8        Q.    Could you explain what those are, for the

9     jury?

10       A.    Dr. Chu, through his Figure 8, shows a way to

11    connect this serialized encoded PCI bus directly to a

12    northbridge and southbridge and remove the bottleneck

13    and provide for an easily scalable length for the

14    future.

15       Q.    And in Figure 8, is there an interface

16    controller in Figure 8?

17       A.    It is part of the northbridge.  It's no longer

18    a separate thing and is no longer a requirement for a

19    parallel PCI bus in that figure.

20       Q.    And in your view, is that the interface

21    controller that's called out in the claims?

22       A.    Yes.

23       Q.    And in your view, is that interface controller

24    different from an ethernet controller?

25       A.    Yes, completely, because it's sending, as I

1    said before, PCI transactions, and it's sending them to

2    interconnected peripheral components, such as the

3    southbridge in his Figure 8, which is something ethernet

4    cannot do.

5        Q.   Now, are you familiar with the term secondary

6    indicia of non-obviousness?  I know it's a mouthful.

7        A.   Yes.

8        Q.   Can you explain what that is to the jury?

9        A.   Secondary indicia of non-obviousness are ways

10   to take another look at the -- an obviousness case to

11   see whether it really would have been obvious to combine

12   the references that someone -- in this case, IBM, for

13   every one of ACQIS's asserted claims -- says would be

14   obvious to combine, because it applies typically

15   non-technical information to the analysis.

16       Q.   Why is real-world proof important to consider

17   when determining whether a patent claim is obvious?

18       A.   It's a cross-check that helps avoid the

19   hindsight reconstruction danger in any obviousness.  You

20   can't -- you can't not look at the claim again once

21   you've read the patent.  So you have to be carefully

22   disciplined in not using that as a guide to what to pick

23   in the prior art.

24       Q.   Can you provide the jury with some examples of

25   the real-world proof that you've been talking about?

1        A.    Yes.  Evidence such as skepticism by others

2    that the invention was even a good idea or that should

3    have been made, commercial success, and the taking of

4    licenses by others to the patented inventions.

5        Q.    You mentioned licensing by others.  Did you

6    find any evidence of that in this case?

7        A.    Yes.

8        Q.    Let me back up here just a second.

9              Is secondary indicia of non-obviousness always

10   relevant to an obviousness analysis?

11       A.    Yes.

12       Q.    Is it mandated?

13       A.    Yeah, I believe so.

14       Q.    Does the secondary indicia of non-obviousness

15   need to be tied to the claimed invention in any way?

16       A.    Yes, it does.

17       Q.    In fact, can you explain why that is?

18       A.    Well, you need to distinguish the things such

19   as commercial success from being a result of great

20   salesmanship as compared to the features of the claimed

21   invention.

22       Q.    And now we sort of get back on line here.

23   Did you find any real-world proof indicating that

24   ACQIS's asserted patent claims are not obvious?

25       A.    Yes.

1       Q.    What did you find?

2       A.    Well, to start with, the skepticism.  The IBM

3    BladeCenter paper has several incidents in it, several

4    places in it where they report -- the authors, including

5    Mr. Hong, report that people, at the time this project

6    was being proposed, were skeptical that it was a good

7    idea to make.

8       Q.    And when you say skeptical, what do you mean?

9       A.    They thought in some cases -- the cases that I

10   think I can remember that -- I'm picturing the three

11   places I highlighted on that page, and I'm drawing a

12   complete blank as to what they say.  I'm sorry.

13          They basically had to do with whether it would

14   be ever a good idea to build this thing instead of keep

15   making what they were making, which were things like

16   racks and towers.

17      Q.    How about licensing?  Did you find any

18   evidence of licensing that's relevant in this case?

19      A.    Yes.

20      Q.    What did you find?

21      A.    Just about everybody in this business has

22   taken a license to these claims.

23      Q.    At what percentage of the market in your view?

24      A.    I think we're up to everyone's part.  I don't

25   remember the number now, but --

1          MR. VERHOEVEN:  Objection, Your Honor.

2          May we approach?

3          THE COURT:  Yes, you may.

4          (Bench conference.)

5          MR. VERHOEVEN:  This is a technical

6   witness.  What market share of the folks that have taken

7   litigation licenses out of total market is there?  And I

8   don't think that's in his report anywhere.  He has no --

9   any expertise to talk about financial issues.  They're

10  just trying to -- what they're doing --

11         MR. BROGAN:  I withdraw the question.

12         THE COURT:  Okay.

13         (Bench conference concluded.)

14         MR. BROGAN:  Sometimes I get a little

15  carried away.  I'm going to withdraw that question.

16     Q.   (By Mr. Brogan) A number of licenses have been

17  issued by ACQIS to others.

18     A.   Yes, as we've heard.

19     Q.   Do you have an understanding of whether those

20  licenses were issued because the products those

21  companies are selling are covered by ACQIS's claims?

22     A.   As far as I know, they all were.

23     Q.   Do you believe that to be the case?

24     A.   Yes.  I've analyzed the products from those

25  licensees, and they practice the claims.

1          Q.    So we've covered licensing by others and

2     skepticism by others.

3               Have you seen any evidence of Dr. Chu's

4     invention solving a long-felt need in the marketplace?

5          A.    Yes.  It has made some major contribution to

6     the thing that people most like about blades, which is

7     keeping -- giving a lot of compute power in a very

8     compact, trouble-free package.

9          Q.    And do you have any evidence that Dr. Chu's

10    invention has done that?

11         A.    Yes.

12         Q.    What's that evidence?

13         A.    Well, the evidence is -- the evidence includes

14    the fact that the -- the way IBM -- the way everybody in

15    this business pitches these blades is the space-saving,

16    the power-saving, the amount of computer you get for

17    your dollar.

18         Q.    Does the Dell white paper impact the long-felt

19    need?

20         A.    The Dell white paper is a very great example

21    of Dell stating those very things as advantages.

22         Q.    And is there a nexus between Dr. Chu's claimed

23    invention and that long-felt need?

24         A.    Yes, absolutely.  The Dell paper talks about

25    these kinds of advantages that you get from these

1   claimed elements.

2        Q.    Does it talk about the prior bottlenecks of

3   PCI?

4        A.    Yes.  PCI Express being one of them.  Not the

5   only one, but it focuses on that.

6        Q.    Does it talk about the bottlenecks with PCI?

7        A.    Absolutely.

8        Q.    And does it show that PCI Express, the thing

9   that Dr. Chu says is his serialized -- uses his

10  serialized invention, does it show that as the solution?

11       A.    Yes.

12       Q.    Is that the solution that people knew about,

13  you know, way back when in the late 1990s?

14       A.    The bottleneck, no.  That solution to the

15  bottleneck was not something that anyone had at hand

16  before Dr. Chu's patents.

17       Q.    Did they know about the problem, the

18  bottleneck, back in the late 1990s?

19       A.    Some of them could see it coming; and the

20  things we've heard about Band-Aid buses, like AGP and so

21  on, were an example of them seeing this problem coming,

22  but they hadn't come up with that solution.

23       Q.    I'm just going to ask you one more question.

24  With all the things you've seen in this courtroom and

25  all the things you've heard, do you still think that Dr.

1    Chu's invention is a big deal?

2          A.    I do.

3                    MR. BROGAN:  Thank you.

4                    THE COURT:  All right.  Cross-exam?

5                    MR. VERHOEVEN:  May we approach very

6    briefly, Your Honor?

7                    THE COURT:  All right.  Counsel?

8                    MR. BROGAN:  I'm sorry.

9                    (Bench conference.)

10                   MR. VERHOEVEN:  I just wanted to check

11   the clock and also see if you still want -- or you guys

12   are still intending -- well, first, what's the clock?

13                   MR. BROGAN:  I was just told I've got 7

14   minutes.

15                   MR. VERHOEVEN:  Okay.

16                   MR. BROGAN:  So I don't know what you

17   were doing, but --

18                   MR. VERHOEVEN:  Well, I just -- we need

19   to know if we need to reserve for willfulness.  Can you

20   tell us at this point?

21                   MR. BROGAN:  Reserve like 2 or 3 minutes.

22   I don't -- I've got 7.  I don't have a whole lot of

23   time.

24                   MR. VERHOEVEN:  Can't you just tell me?

25   Are you going to use those 7 or not?

1          MR. BROGAN:  I don't know.  That took

2    longer than I thought it would.  I mean, I'll save 2 and

3    you save 2.

4          MR. VERHOEVEN:  I just want to know if I

5    should reserve, and I can't tell if he won't tell me

6    whether he's going to put on a willfulness case.

7          THE COURT:  Well, he'll make a decision.

8    I don't think he's got much time for that, but...

9          MR. VERHOEVEN:  All right, Your Honor.

10   Thank you.

11          (Bench conference concluded.)

12          CROSS-EXAMINATION

13   BY MR. VERHOEVEN:

14   Q.   Good afternoon, Mr. Gafford.

15   A.   Good afternoon, Mr. Verhoeven.

16   Q.   Let me start by putting up a demonstrative

17   slide, DX Demo 1009, and this is just a graphic that

18   we've created.  And I'm going to go over here next to

19   this monitor so that I can point to things.

20          This is a graphic we've created of a computer,

21   the CPU, a northbridge, an ethernet interface

22   controller.

23          You see that, sir?

24   A.   Yes.

25   Q.   And then below that, in the second box, we

1    have a printer, which is a peripheral device, right?

2    Are printers peripheral devices sometimes?

3         A.    In the sense -- as a ethernet connection, no,

4    it's not a peripheral device.  It's just another note on

5    the network.

6         Q.    So a printer, in your view, is not a

7    peripheral device?

8         A.    Not in this kind of connection, no, it's not.

9         Q.    Okay.  What about keyboard?  A keyboard with

10   an ethernet connection, that's not a peripheral device

11   in your opinion?

12        A.    It's not an interconnected peripheral

13   component if it's connected by ethernet.

14        Q.    Well, my question is just whether it's a

15   peripheral device.  You know what it means to say

16   something is a peripheral device.

17        A.    Well, yes.  Merriam-Webster gives us that

18   peripheral is on the outer -- outskirts of something.

19             In this case, this printer and a keyboard

20   interface connected by an ethernet is certainly on the

21   outskirts of the entire computer system.

22        Q.    So generally speaking, setting -- let's get

23   away from the claim language for a second.  People of

24   ordinary skill understand, when you're talking about

25   peripheral devices to a computer, you're talking about

1    things like printers, keyboards, mouses, screens, right?

2         A.    They are --

3         Q.    Those are peripherals.

4         A.    They are generally peripheral to an entire

5    computer system, yes.

6         Q.    Okay.  But it's your opinion that a printer is

7    not a peripheral device?

8         A.    It is not -- you've got the claim language

9    here as presided (sic) the Court.  As defined by the

10   Court, it is not an interconnected peripheral component.

11        Q.    If I have a computer here in a box and I've

12   got a printer in a separate box and I've got an ethernet

13   cable -- you'll agree that's a serial data signal, an

14   ethernet cable?

15        A.    Yes, it is.

16        Q.    Okay.  And so this little squiggly line here

17   is a serial data signal, correct?

18        A.    Yes, it is.

19        Q.    Okay.  And it's interconnected between the

20   printer and the computer, right?

21        A.    It is.

22        Q.    And that serial data signal permits the

23   computer to communicate with the printer.

24        A.    It does permit that, yes.

25        Q.    Okay.  So it's serial, it permits

1    communication, and the printer is interconnected with

2    the computer, right?

3         A.    In some sense other than the planet we're

4    living on today, it might be; but not here, not in that

5    sense, for the very good reason that interconnected

6    peripheral component is something that comes right off

7    of Page 1 of the PCI spec, which talks about PCI is used

8    for highly integrated peripherals, such as ethernet

9    controllers themselves, memory, and other types of

10   peripheral devices on the board.

11             This doesn't meet that limitation.  This

12   doesn't meet -- it doesn't -- it doesn't meet that --

13   the Court's definition in the sense of how one of

14   ordinary skill would use this.

15             The idea of pitching ethernet as a substitute

16   for PCI is -- I'm sorry, Counsel.  It's nuts.

17        Q.    This printer here is interconnected with the

18   computer, right, sir?

19        A.    It is interconnected.

20        Q.    Thank you.

21             MR. VERHOEVEN:  Go to the next slide.

22   Not that one.  The next one.  Sorry.

23             Let's go to DX Demo 1011, please.

24        Q.    (By Mr. Verhoeven) Okay.  And this is another

25   graphic that I've created, and you see that it's the

1    same basic scenario.  It's got a computer in a box.

2            Do you see that, sir?

3        A.   Yes.

4        Q.   And then it's got a printer in a separate box.

5            Do you see that, sir?

6        A.   Yes.

7        Q.   And it's connected by a USB interface

8    controller with a wire between the two.

9            Do you see that?

10       A.   I do see that.

11       Q.   Tell the jury, what does USB stand for?

12       A.   Universal serial bus.

13       Q.   So that -- this would be -- this little

14   squiggly line between the computer and the printer would

15   be a serial data signal, correct?

16       A.   It is a serial data signal, yes.

17       Q.   And the printer here, by virtue of this

18   squiggly line, is interconnected to the computer,

19   correct?

20       A.   Not in any sense of how the PCI bus operates,

21   but there is an interconnection.

22       Q.   A person of ordinary skill looking at this

23   would say:  Yeah, this is interconnected between the

24   printer and the computer, right, sir?

25       A.   You cannot deny that there is an

1    interconnection.  It just isn't what the Court requires.

2         Q.    Right.  And printers are often thought of as

3    peripheral components to computers, aren't they, sir?

4         A.    In the sense, as I described before, that they

5    live on the outskirts of the computer system, yes.

6         Q.    Okay.  So a person of ordinary skill looking

7    at this and knowing that this is -- this little squiggly

8    line here is a universal serial bus would understand

9    that this thing here is a serial data communication

10   between the computer and the printer, which is a

11   peripheral component, correct?

12        A.    Basically, no, because you -- your drawing

13   here has got the imprimatur of the Court's construction

14   on it, and it isn't that, and the difference is

15   important.

16        Q.    A printer is a peripheral component?

17        A.    It is peripheral to the computer system.

18        Q.    Okay.

19        A.    It is not a peripheral --

20        Q.    USB is a serial -- USB is a serial data

21   signal, yes?

22        A.    Yes, it is.

23        Q.    And this scenario allows the CPU and the

24   computer to communicate with the printer, right?

25        A.    In some broad sense, but you will never find a

1    printer on this board.  That's why this doesn't --

2        Q.   Sir, I'm not -- I'm not asking you about that

3    board.  I'm asking you about what's on the screen.

4        A.   I see what's on the screen.

5        Q.   Okay.  And a person of ordinary skill, looking

6    at the screen, would understand that this squiggly line

7    here being a USB serial bus between a USB interface

8    controller and a USB interface controller is a serial

9    data signal communication, right?

10       A.   There's no doubt about that.

11       Q.   And this squiggly line shows an

12   interconnection between the computer and the printer,

13   right?

14       A.   Yes, sir.  There's an interconnection between

15   the printer --

16       Q.   And the printer is a peripheral component --

17                MR. BROGAN:  Excuse me.  Can the witness

18   be allowed to answer?

19                THE COURT:  Please allow the witness to

20   answer.

21       Q.   (By Mr. Verhoeven) Is that right?

22       A.   Well, it's -- let me make sure --

23       Q.   The printer is -- is a printer a peripheral

24   component, sir?

25       A.   To a computer system, it is a peripheral

1    component.

2        Q.    Okay.

3            MR. VERHOEVEN:  Now let's go to DX Demo

4    1013.

5        Q.    (By Mr. Verhoeven) And here we have Claim 12,

6    and we've got this -- I've pulled out the element here:

7    Interface controller coupled to a differential signal

8    channel for communicating an encoded serial bit stream

9    of PCI bus transaction.

10           Do you see that, sir?

11       A.    Yes.

12       Q.    And you would agree with me that the

13   highlighted-in-red phrase has been construed by the

14   Court to mean a data signal communication with an

15   interconnected peripheral component, yes?

16       A.    Yes.

17       Q.    And you would agree with me, wouldn't you,

18   sir, that under the Court's claim construction order,

19   the Court found that the phrase PCI bus transaction is

20   not limited to be specific to a specific PCI protocol;

21   isn't that true, sir?

22       A.    In the sense -- as long as we understand that

23   by protocol, you mean serial or parallel, yes.

24           MR. VERHOEVEN:  Let's go to DX Demo 1015.

25       Q.    (By Mr. Verhoeven) This is a depiction from

1    Figure 7 of the patent.  We've looked at that before.  I

2    asked you about this when you testified the first time.

3          Do you remember that generally?

4    A.    Yes.

5    Q.    And then pulled out from Column 5, Lines 26

6    through 28, an excerpt from the '415 patent

7    specification, which appears in all three patents.  And

8    I'll just read it for the record.

9          It says:  The present invention overcomes the

10   aforementioned disadvantages of the prior art by

11   interfacing two PCI or PCI-like buses using a non-PCI or

12   non-PCI-like channel.

13         Do you see that?

14   A.    Yes.

15   Q.    And in Figure 7, the two PCI buses are the

16   northbridge parallel bus and the secondary PCI bus.

17   They're both parallel, right, sir?

18   A.    They are.

19   Q.    Okay.  And those are the things that are

20   interfaced using the patent's own description, using a

21   non-PCI or non-PCI-like channel, right?

22   A.    Yes.  In this sense, the patent is talking

23   about non-PCI, meaning non-parallel because it goes on

24   to describe --

25   Q.    Sir?

1        A.    You cannot read four words from the patent and

2    ignore the balance of the four corners of the patent.

3              And in context, this is referring to the fact

4    that the -- what is going on over the serial interface

5    is an encoded serial PCI transaction.

6              When they say non-PCI in this context, in this

7    part of the patent at Column 5, they're talking about

8    it's non-PCI in the sense that it's not parallel.

9        Q.    It says, quote, using a non-PCI or

10   non-PCI-like channel.

11             Do you see that?

12       A.    Yes.

13       Q.    That's what it says, right?

14       A.    Yes, it does.

15       Q.    And that's referring to the little squiggly

16   line here, right?

17       A.    The serial -- the squiggly line in this

18   non-PCI channel is the serially encoded PCI disclosed

19   elsewhere in this patent.

20       Q.    So this is -- this is not referring to the

21   squiggly line, this phrase, non-PCI or non-PCI-like

22   channels?  That's not referring to this squiggly line?

23   Is that what your testimony is?

24       A.    It is referring to that squiggly line.

25       Q.    Okay.  It is.

1          MR. VERHOEVEN:  Let's go to DX Demo 1016.

2     Q.   (By Mr. Verhoeven) Now, what I've done on this

3     slide, sir, is I've pulled out from your expert rebuttal

4     report a statement that you have --

5          MR. VERHOEVEN:  Do we have a paragraph

6     from this?

7     Q.   (By Mr. Verhoeven) I'll get to the paragraph

8     in a second, sir.

9          It says, quote:  I know from my experience

10    that a transaction on the PCI bus is defined as, quote,

11    an address phase followed by one or more data phases.  I

12    hereby incorporate by reference the PCI revision 2.2

13    standard.

14         Do you see that?

15    A.   Yes.

16    Q.   You remember quoting that in your report?

17    A.   I certainly do.

18    Q.   So you defined this phrase PCI bus by

19    incorporating information from the PCI protocol, didn't

20    you, sir?

21    A.   Yes.

22    Q.   But the Court's construction below does not

23    incorporate any reference to the PCI revision protocol

24    at all.  It just says:  As such, the Court construes PCI

25    bus transaction as a data signal communication with an

1    interconnected peripheral component, doesn't it, sir?

2         A.   Before I answer that, let me -- that's part of

3    my answer, but let me just be clear that what we're

4    talking about here, in the sense of the Court's ruling

5    and with the context the Court gave us, is that we're

6    not stuck with the parallel protocol, but we are moving

7    PCI information, and that's how the Court chose to

8    describe that.

9         Q.   For the record, this sentence, that comes out

10   of Paragraph 269 of your rebuttal report, sir.

11             Isn't it true, sir, that you used a different

12   definition for PCI bus transaction in your rebuttal

13   report addressing validity than the Court used when it

14   construed that phrase?

15        A.   Yes.

16             MR. VERHOEVEN:  Let's go to DX -- well,

17   let's go to --

18        Q.   (By Mr. Verhoeven) Let's change subjects.

19             MR. VERHOEVEN:  Your Honor, may I

20   approach the drawing here?

21             THE COURT:  Yes, you may.

22        Q.   (By Mr. Verhoeven) Now, you testified --

23        A.   I'm not going to be able to see that.

24        Q.   -- on direct examination -- is that better?

25        A.   Yes.

1      Q.   You testified both on your first session where

2   you brought in testimony on direct and also in this

3   stage of the proceedings on direct about this picture

4   here.   This says:   Computer old and computer new?

5      A.   Yes.

6      Q.   And this is a subject (sic) that Dr. Chu drew?

7      A.   Yes.

8      Q.   Okay.   And computer new is what he said his

9   invention is?

10     A.   Yes.

11     Q.   Okay.   That's not -- that picture never

12   appears in the patent, does it, sir?

13     A.   Right.

14     Q.   There's no picture of that in any of the

15   illustrations in the patent, is there, sir?

16     A.   All that you find in the patent is the middle

17   green line.   You don't find the extra green lines.

18     Q.   Can you show me where in this patent there's

19   anything even remotely similar to this?

20     A.   Yes.   Figure 8.

21     Q.   All right.   Figure 8.

22              MR. VERHOEVEN:   What's the exhibit

23   number?

24              One minute, Your Honor.

25              THE COURT:   Yes.

1          MR. VERHOEVEN:  Do you have Figure 8?

2          MR. POWELL:  259.  DX259.

3          MR. VERHOEVEN:  DX259.

4      Q.   (By Mr. Verhoeven) Okay.  Your testimony is

5  that this picture is the same as that new computer

6  picture there?

7      A.   That wasn't your question.  Your question was

8  remotely like.  And what I said before you asked your

9  question was that the center green line is right out of

10  Figure 8.  The connection -- the green connection

11  between the southbridge and the northbridge is what

12  Figure 8 depicts.

13      Q.   Okay.  Well, let's look at this.  This is Dr.

14  Chu's drawing, which isn't in the patent, and this is

15  the northbridge and the southbridge, right?

16      A.   Yes.

17      Q.   Yes?

18      A.   That's right.

19      Q.   And he puts it all in this box here, correct?

20      A.   Yes.

21      Q.   Okay.  Well, let's look at Figure 8.

22           There's the northbridge, right, up here in the

23  top?

24      A.   Yes.

25      Q.   And that says computing system, and it has a

1    box around it, right?

2        A.   Yes.

3        Q.   And then there's a separate box called

4    peripheral system.

5             Do you see that?

6        A.   That's right.

7        Q.   And the squiggly line goes between the

8    computing system and the peripheral system, doesn't it,

9    sir?

10       A.   That's right.

11       Q.   That's different than what Dr. Chu says his

12   invention is here, isn't it, sir?

13       A.   No, not at all.

14       Q.   In this picture, there's two boxes, and the

15   squiggly line goes between those two boxes, between a

16   computer and a peripheral component, right?

17       A.   In this case, a peripheral system that's

18   tightly integrated to the computer system, yes.

19       Q.   Now, you also testified when you were talking

20   about Figure 8 as part of your testimony, you addressed

21   this little line here between the CPU and the

22   northbridge.

23            Do you see that?

24       A.   I do.

25       Q.   Isn't it true, sir, that that line there is an

1    old-fashioned parallel PCI bus?

2         A.    Between the CPU and the northbridge?

3         Q.    Yeah.

4         A.    Absolutely not.

5         Q.    Well, I'd like you to look at your deposition

6    from --

7               MR. VERHOEVEN:  Just a second, and I'll

8    get you the date.  November 17th.  If we could bring up

9    Page 203, Ryan.

10              And if we could pull up towards the

11   bottom this answer here, beginning at Line 15 through

12   21.

13        Q.    (By Mr. Verhoeven) You refer here to:   In

14   those days, a very wide, very fast parallel bus that

15   connects the CPU address and data lines between several

16   other command and management lines between the CPU and

17   the northbridge.

18              Do you see that?

19        A.    Yes.  Let me recall what I was thinking of.

20        Q.    That's a parallel bus, right?

21        A.    Excuse me?  I'm sorry?

22        Q.    That's a parallel bus you're referring to.

23        A.    Let me finish reading the citation back there

24   and refresh my recollection about what I had in mind,

25   which I still can't tell you about, but I can describe

1   it.

2                    MR.  BROGAN:   What page?

3                    MR.  VERHOEVEN:   Page 403.

4      A.    Yes.   Okay.   I have it in mind.

5                    MR.  VERHOEVEN:   Okay.   Let's go back to

6   Figure 8.   Can I have Figure 8, please?

7      Q.    (By Mr. Verhoeven) That's this line right here

8   between the CPU and the northbridge, right?

9      A.    I'll mark it for you.   And the answer is --

10   that is the kind of connection I was talking about in my

11   deposition is reflected in this line here (indicates).

12                    MR.  VERHOEVEN:   Now, if we could put up

13   Claim 12 on the board.

14                    If I may approach, Your Honor?

15                    THE COURT:   Okay.

16                    MR.  VERHOEVEN:   Do I need to unscrew

17   this?  Well, we need to make sure the jury can see it.

18      Q.    (By Mr. Verhoeven) Can you see that, sir?

19      A.    I can.

20                    MR.  VERHOEVEN:   Can everyone see that?

21   Okay.

22      Q.    (By Mr. Verhoeven) So this, again, is

23   Claim 12.

24                    Now, you testified on direct examination about

25   the northbridge, and I want you to tell me -- tell the

1    jury, where does the word northbridge appear in this

2    claim.

3         A.   It does not.

4         Q.   Where does the word southbridge appear in this

5    claim?

6         A.   It's not there.

7         Q.   These claims aren't limited to specific

8    functionality on the northbridge or the southbridge, are

9    they, sir?

10        A.   They're limited, as the Court has construed

11   them, to a very high level of integration between

12   whatever talks over the peripheral component in a net --

13   interconnect.

14        Q.   So the answer to my question, these claims

15   here that we're looking at, they don't have the words

16   northbridge or southbridge in them, right?

17        A.   That's right.

18        Q.   And they're not limited to a northbridge or a

19   southbridge, are they, sir?

20        A.   No.

21        Q.   Now, you remember giving a deposition in this

22   case, right?

23        A.   Yes.

24        Q.   And you were asked at your deposition whether

25   any other court had ever criticized any of your

1    opinions.

2             Do you remember that, sir?

3        A.    Yes, I do remember that.

4        Q.    And you testified that that had only happened

5    on one occasion, the Default Proof Credit Card System

6    versus Home Depot case.

7        A.    One case, two courts.

8        Q.    Okay.  But in truth, sir, isn't it true that

9    your opinions have been criticized on numerous other

10   occasions?

11       A.    Not that I'm aware of.

12       Q.    You don't remember, in 1999, that District

13   Judge Feikens of the Eastern District of Michigan

14   rejected your opinions because they were conclusory and

15   unreliable?

16       A.    I believe that's the ++Quervo case, isn't it?

17       Q.    I'm sorry?

18       A.    I don't know which case you're talking about,

19   but I -- it sounds like the conclusory complaint that

20   the Court made sounds like the Quervo case.

21       Q.    Have you heard of the Relume Court versus

22   Dialight court case?

23       A.    Relume, yes.  That's a different matter.

24       Q.    That's a different matter.

25       A.    Yes, it is.

1        Q.    And in that case, the Court said that it

2    rejected your opinion because your assessment was

3    conclusory and was without reliable factual foundation.

4              Do you remember that?

5        A.    I do remember that.

6        Q.    Okay.  You forgot that at your deposition?

7        A.    I had.

8        Q.    The Court said:  Gafford's opinion on this

9    issue is not significantly probative, right?

10       A.    That sounds familiar.

11       Q.    Okay.  But that's not it -- all.  Do you

12   remember Judge Arterton in 2002 in Connecticut from the

13   Sony Electronics versus Soundview Technologies case?

14       A.    I'm aware of the case.

15       Q.    You were retained as an expert in that case,

16   too, weren't you?

17       A.    Yes.

18       Q.    And did you -- do you remember that Judge

19   Arterton found that your opinion was based on a flawed

20   definitional premise?

21       A.    That sounds familiar.

22       Q.    Do you remember that the Court said:  Because

23   they are based on a broad definitional premise, the

24   Gafford and Snell declarations are insufficient to rebut

25   the factual content of the other declarants.

1               Do you remember that, sir?

2        A.    I do.

3        Q.    Okay.  And in the Default Proof case, the one

4    that you remembered in your deposition, District Judge

5    Altonaga also found your opinions to be without

6    sufficient evidentiary foundation, didn't he?

7        A.    Yes, he did.

8        Q.    He said:  Mr. Gafford offers no evidence to

9    show that one of ordinary skill, at the time of the

10   patent application, would have considered either of

11   these devices to be capable of defensing, or as Default

12   Proof argues, handing over a debit card.

13              Do you remember that opinion?

14       A.    Yes.

15       Q.    And Judge Altonaga found that your opinions

16   and statements were contradicted by the intrinsic

17   record, correct?

18       A.    Yes.

19       Q.    And that went up on appeal, correct?

20       A.    It did.

21       Q.    And the Federal Circuit appellate court agreed

22   with Judge Altonaga, right?

23       A.    Yes.

24       Q.    That your opinions were either unsupported or

25   contradicted by the express language of the written

1    description in that patent in that case, right?

2         A.   Yes.

3         Q.   And, in fact, there's another Federal Circuit

4    case, the Octel Corp. versus Theis Research case.

5              Do you remember that case?

6         A.   Yes.

7         Q.   And in that case, the Federal Circuit Appeal

8    Court ruled that the trial court was absolutely correct

9    in dismissing your testimony in that case, because your

10   testimony was premised on an unduly broad

11   interpretation.

12             Do you remember that?

13        A.   Yes.

14        Q.   And the Federal Circuit Appeal Court in that

15   case, the Octel case, found your testimony provided to

16   the jury -- quote, the jury with an incorrect yardstick

17   with which to measure the prior art.

18             Do you remember that, sir?

19        A.   Yes.

20             MR. VERHOEVEN:  I think I'll pass the

21   witness at this time, Your Honor.

22             THE COURT:  All right.  Recross -- or

23   redirect?

24                    REDIRECT EXAMINATION

25   BY MR. BROGAN:

1        Q.    Mr. Gafford, to the extent that you've been

2    criticized by other courts, have you learned from those

3    mistakes?

4        A.    Absolutely.

5        Q.    In this case, when we were talking about the

6    construction of the term PCI bus transaction, was it

7    IBM's possession -- position that the only way you could

8    have one of those transactions was to have an old

9    parallel PCI bus present?

10       A.    Yes, that was the position IBM took.

11       Q.    And what did the Court do with that?

12       A.    It threw it out.

13       Q.    Do you call that a form of criticism?

14       A.    Yes.

15       Q.    Is it common when experts are in cases like

16   this for the experts to propose constructions and have

17   the courts adopt one, adopt the other, or adopt

18   something else?

19       A.    That is what always happens.

20       Q.    Counsel showed you -- or talked about ethernet

21   and USB.  Ethernet or USB have those PCI data bits we

22   were talking about earlier?

23       A.    Address bits.

24       Q.    The address bits?

25       A.    No.  No.

1        Q.   Do they have PCI bus transactions as defined
2    by the claims?
3        A.   No.
4        Q.   Does Figure 8 of the Chu patent teach that you
5    can have a serialized PCI interface between a
6    northbridge and southbridge?
7        A.   Yes.
8        Q.   Has that been found in any of the prior art
9    that's been presented by IBM?
10       A.   No.  No internal serialized PCI bus between
11   anything and anything else in any of the prior art.
12       Q.   Now, does Dr. Chu have in his claims -- or
13   not --
14            MR. BROGAN:  Strike that.
15       Q.   (By Mr. Brogan) Does Dr. Chu have in his
16   patent, for instance, Figure 1, any described system
17   that doesn't have serialized PCI in it at all?
18       A.   I've honest to God forgotten what Figure 1 has
19   in it.
20            MR. BROGAN:  Can you put up Figure 1 of
21   the '415?
22            How about Figure 2?
23       Q.   (By Mr. Brogan) In Figure 2, do you see
24   serialized PCI anywhere?
25       A.   Could you blow this up a little?

063cedc6-2243-4bae-a397-41862974c2af

 1      Q.   Sure.

 2              MR. BROGAN:  Can you blow it up and bring

 3   it up?

 4      Q.   (By Mr. Brogan) Do you see serialized PCI in

 5   Figure 2?

 6      A.   No, it's not there.

 7      Q.   It's got the old PCI bus?

 8      A.   That's right.

 9      Q.   Okay.  Dr. Chu could have written claims to

10   cover that as well, right?

11      A.   He could have.

12      Q.   But in this case, he wrote claims that covered

13   the use of a serialized PCI bus, right?

14      A.   That's right.

15      Q.   And in this claim limitation and in thinking

16   about Figure 8, does this interface controller exist in

17   that northbridge circuit?

18      A.   Yes.

19      Q.   And do each of the accused products in this

20   case have a PCI Express interface on their northbridge

21   circuit?

22              MR. VERHOEVEN:  Objection, Your Honor.

23              May I approach?

24              THE COURT:  Yes, you may.

25              (Bench conference.)

1            MR. VERHOEVEN:  Your Honor, the question

2     was:  Do each of the accused products in this case have

3     the element he's pointing at?  That's infringement.

4     That's not a proper rebuttal on validity, Your Honor.

5            MR. BROGAN:  My next question is going to

6     be:  And do any of the prior art products identified by

7     them have that?

8            MR. VERHOEVEN:  That's a different

9     question.  I mean, this is invalidity rebuttal.

10           THE COURT:  Why don't you ask that

11    question.

12           MR. BROGAN:  Okay.

13           (Bench conference concluded.)

14       Q.   (By Mr. Brogan) Dr. Gafford, do any of the

15    prior art products that have been identified here have a

16    northbridge with a serialized PCI interface?

17       A.   No.

18           MR. BROGAN:  I'll pass the witness, Your

19    Honor.

20           THE COURT:  All right.  Any recross?

21           MR. VERHOEVEN:  No recross, Your Honor.

22           THE COURT:  Okay.  Very well.

23           Who will Plaintiff's next witness be?

24           MR. BROGAN:  Let me confer quickly.

25           (Sotto voce discussion.)

1            MR.  BROGAN:   That's it, Your Honor.   Good

2     news for the jury.

3            THE COURT:   Okay.   Plaintiff rests?

4            MR.  BROGAN:  Yes, Your Honor.

5            THE COURT:  All right.   Then Defendant

6     finally closes?

7            MR.  VERHOEVEN:  Yes, Your Honor.

8            THE COURT:  All right.  Very well.

9            All right, Ladies and Gentlemen of the

10    Jury, we have now completed the evidence phase of the

11    case.  That's all the evidence that you're going to need

12    to hear in this case.

13            And good news for you.  You're going

14    to -- getting to go home a little bit early today.  I

15    have some work I have to do with the attorneys on the

16    Court's Charge.  We'll work on that this afternoon.

17            Then we'll come back in the morning at

18    9:00 o'clock.  I will give you the Court's Charge, the

19    final instructions.  Then we'll hear closing arguments

20    from Counsel.  And then you'll retire to begin your

21    deliberations on the verdict.

22            Please remember my instructions again

23    tonight.  Do not discuss this case among yourselves or

24    with anyone else.  The first time that you'll discuss

25    the case will be when you begin deliberating tomorrow.

1                    Also, don't do any independent

2      investigation of any type, as I've told you previously.

3                    With the Court's thanks for your

4      attention today and your presence, we'll see you back

5      here at 9:00 o'clock in the morning.  Please have a safe

6      drive home.

7                    The jury is excused.

8                    COURT SECURITY OFFICER:  All rise for the

9      jury.

10                   (Jury out.)

11                   THE COURT:  Please be seated.

12                   All right.  Does Plaintiff have any

13     objections to the Court's Charge?

14                   MR. FRIEL:  Your Honor, we haven't seen

15     the Charge.

16                   LAW CLERK:  I gave both parties a copy.

17                   MR. VERHOEVEN:  Well, we have a copy.  I

18     thought you gave it to the other side.

19                   LAW CLERK:  I did.

20                   MR. VERHOEVEN:  Oh, okay.  We have a

21     copy.

22                   THE COURT:  I think you have a copy.  One

23     was handed out to both sides when we came back after

24     lunch.

25                   MR. FRIEL:  Your Honor, I didn't realize

1    that -- I thought you said we would have a couple of

2    hours this afternoon after the jury --

3                 THE COURT:  Well, you've had it since --

4    I gave to it you right after lunch.

5                 MR. FRIEL:  Sorry.

6                 THE COURT:  That's why I indicated you

7    needed to get your legal people looking at it in case

8    you had any objections.

9                 MR. FRIEL:  If I could confer for a

10   moment.

11                THE COURT:  Okay.  And if y'all would

12   like, I'll give you a 10-minute recess.  Would that be

13   helpful to you?

14                MR. FRIEL:  That would be very helpful.

15                THE COURT:  Okay.  We'll have a 10-minute

16   recess.

17                COURT SECURITY OFFICER:  All rise.

18                (Recess.)

19                (Jury out.)

20                THE COURT:  Be seated.

21                Let me say this about the charge.  There

22   may be some items in there that need to come out that I

23   don't recall hearing any evidence about, but the

24   Defendant wasn't through with their case at the time, so

25   they're in there, so we can deal with those when we get

1    to them.

2                    All right.  Plaintiff's objections to the

3    Court's Charge?

4                    MR. FRIEL:  Ten minutes, Your Honor, has

5    convinced me that Ms. Guske is the one to handle it.

6                    THE COURT:  Probably a good choice.

7    You've been busy.

8                    MR. FRIEL:  Mr. Smith will handle the

9    interrogatories to the jury, special interrogatories.

10                   THE COURT:  Oh, okay.  All right.

11                   MR. SMITH:  Your Honor, while Ms. Guske

12   gets set up back here, we only have two requests with

13   respect to the verdict form.

14                   The first is, we would like to have a

15   separate column for anticipation and invalidity.  So we

16   would go from one column to three, with the first being

17   infringement, the second being anticipation, and the

18   third being obviousness.

19                   THE COURT:  And what is Defendant's

20   response to that?  He requests --

21                   MR. STONE:  I don't think there's any

22   reason to deviate from the standard form, Your Honor.

23                   THE COURT:  Okay.

24                   MR. SMITH:  Your Honor, the standard form

25   I'm looking at is the form that this Court -- and I'm

1    trying the get the overhead going here -- but in the

2    Forgent case, Your Honor submitted invalidity there with

3    three columns:  A, lack of adequate written description;

4    B, anticipation; and C, obviousness.

5              And since there are different prior art,

6    we think it would be clearer if the jury had an

7    anticipation question and then an obviousness question.

8              THE COURT:  Okay.  I'll take that under

9    advisement.  I've submitted it every which way.

10             MR. SMITH:  And, Your Honor, the specific

11   form I'm looking at should be on the overhead here, if I

12   can get it to pull up.  It is docket entry 853 in the

13   Forgent case, 6:06-CV-20.

14             As it should reflect there, there are

15   three columns for the three different invalidity

16   defenses in that case.

17             THE COURT:  Okay.  I'll take a look at

18   it.  If I do that, I may go to one question and just the

19   infringement, then a separate question with the two

20   invalidity columns underneath it.  It may get a little

21   crowded there to try to do all three, but we'll look at

22   it.

23             MR. SMITH:  Thank you, Your Honor.

24             The only other request that we would have

25   on the form is under Question 3.  In order to make the

1   question for past infringement, we would propose

2   inserting the word "past" between the two words "IBM's"

3   and "infringement" on the second line.  So that the

4   first sentence would read:  What sum of money, if paid

5   now in cash, do you find from a preponderance of the

6   evidence would fairly and reasonably compensate ACQIS

7   for IBM's past infringement?

8             THE COURT:  Any objection to that?

9             MR. STONE:  So where exactly would you

10  add the word, Counsel?

11            MR. SMITH:  At the end of the first

12  sentence, before the word "infringement," so the first

13  sentence would end "for IBM's past infringement."

14            MS. CANDIDO:  Your Honor, by definition,

15  there is only past infringement, so I think that's

16  redundant and unnecessarily confusing for the jury.

17            THE COURT:  Okay.  All right.  The Court

18  will grant the request.  I don't think -- I think it

19  might be clearer.

20            MR. STONE:  Your Honor, if I may, are

21  there any other comments on the --

22            MR. SMITH:  That's all we had on the

23  verdict form.

24            THE COURT:  Do the Defendants have

25  anything on the verdict form?

1              MR. STONE:  We're looking at Claims 11,

2    73, and 56 were dropped, so I take it -- we talked about

3    agreeing to drop those claims that are extraneous from

4    both the instructions and from the verdict form.

5              MS. GUSKE:  Correct.

6              THE COURT:  11 and 73 of the '415 --

7              MR. STONE:  Correct.

8              THE COURT:  -- and 56 of the '779 are

9    dropped; is that correct?

10              MR. STONE:  That's correct, Your Honor.

11              THE COURT:  Is that correct, Mr. Smith?

12              MR. SMITH:  Yes, Your Honor.

13              THE COURT:  All right.  We'll take those

14    out, and we'll take out -- we'll change it where it's

15    referenced.  I believe it's in the contentions section

16    of the charge.  We'll change that reference, as well,

17    back.

18              Anything else on the verdict form from

19    either side?

20              MR. SMITH:  Not from the Plaintiff.

21              MR. STONE:  Not from the Defendant.

22              THE COURT:  All right.  Let's go through

23    the charge.  Does Plaintiff have any objections to the

24    Court's Charge?

25              MS. GUSKE:  Yes, we do, Your Honor.

1    Just based on what we were just talking about, do you

2    mind if I just go through in order?  Is that --

3                    THE COURT:  No, that's fine.  Just tell

4    me what page and paragraph you are referencing.

5                    MS. GUSKE:  Sure.  So starting with the

6    contentions of the parties what we were just

7    discussing -- is this even visible?

8                    THE COURT:  Which is on Page 5?

9                    MS. GUSKE:  Yes, Your Honor.

10                   THE COURT:  Okay.  We'll take out 11.

11                   MS. GUSKE:  Right.

12                   THE COURT:  You've got something -- your

13   book is over --

14                   MS. GUSKE:  Yeah, I think the book is

15   over the lamp.  Here we go.

16                   THE COURT:  Blow it up a little bigger,

17   if you will.

18                   We're taking out 11, 73, and 56, right?

19                   MS. GUSKE:  Correct.  56, to be clear, of

20   the '779 patent.

21                   THE COURT:  Right.  All right.

22                   MS. GUSKE:  Also, on that next paragraph

23   on the same page, we're removing our request for a

24   contributory infringement instruction.

25                   THE COURT:  Removing your request for

063cedc6-2243-4bae-a397-41862974c2af

1    what?

2              MS. GUSKE:  Contributory infringement.

3              THE COURT:  Okay.  Where is that

4    reference now?

5              MS. GUSKE:  That's the very next

6    paragraph.

7              THE COURT:  Oh, the next paragraph.  All

8    right.

9              MS. GUSKE:  Skipping forward to Page 7,

10   and this is the basically the lower quarter --

11             THE COURT:  If Defendant objects to any

12   of these things, please feel free to say so.

13             MR. STONE:  Thank you, Your Honor.

14             THE COURT:  I'll take it by your silence

15   that you agree if you don't object.

16             MR. STONE:  No.  With this, Your Honor,

17   what I was going to ask with respect to the burden of

18   proof is that we'd like to have the charge reflect the

19   difference.

20             THE COURT:  Well, she hasn't gotten to

21   that yet.

22             MR. STONE:  Okay.  Thank you.

23             MS. GUSKE:  He's anticipating my

24   argument.

25             This particular sentence begins with

1   "evidence of prior art which was not reviewed by the

2   PTO" and addresses whether it's more probative or not.

3   ACQIS objects to that based on the current state of the

4   law, but there is no distinction currently.

5               THE COURT:  Do you have any law that says

6   that instruction is improper?

7               It's not talking about the burden of

8   proof.

9               MS. GUSKE:  Not right now, Your Honor.

10              THE COURT:  Well, what's Defendant's spin

11   on that?  You want your instruction about burden of

12   proof, right?

13              MR. STONE:  That's correct, Your Honor.

14              THE COURT:  All right.  Both objections

15   are overruled.

16              MR. STONE:  Thank you, Your Honor.

17              Just so we're clear, we're asking for the

18   burden of proof to reflect the fact that it should be

19   different if the art is considered by the offers and not

20   considered by the offers.

21              THE COURT:  All right.

22              MR. STONE:  Thank you.

23              MS. GUSKE:  So ACQIS' objection to this

24   particular sentence is clear on the record, we object to

25   the sentence that reads:  Evidence of prior art which

1    was not reviewed by the PTO may be more probative of

2    meeting the standard than prior art which was reviewed

3    by the PTO.

4                    THE COURT:  Okay.  Your objection is

5    noted.  Thank you.

6                    MS. GUSKE:  Next page, Your Honor, we

7    would like to request an additional instruction on

8    continuations and the importance of continuations in

9    light of testimony that was provided during the course

10   of the trial.

11                   And in particular -- I don't have a

12   printout right now, but I can read it into the record

13   what we would request.

14                   THE COURT:  All right.

15                   MS. GUSKE:  And it would come right after

16   Section 4.1.

17                   Continuation is a patent application

18   filed by an applicant who wants to pursue additional

19   claims to an invention disclosed in a current

20   application.

21                   The continuation uses the same

22   specification as the parent application.  Claims the

23   priority date of the parent and generally names at least

24   one or the same inventor as the parent.

25                   A continuation application is filed to

1    pursue the inventions that were disclosed by the parent

2    application but not claimed in the parent -- parent

3    patent.  Thus, each claim in the parent application and

4    each continuation application defines a unique invention

5    and must be considered separately for your

6    determinations of infringement, validity, and damages.

7                    THE COURT:  Okay.  And what does that

8    come out of?

9                    MS. GUSKE:  It's a summary or a

10   paraphrasing of the law regarding what continuations are

11   allowed to be claimed, and it clarifies the fact that --

12                   THE COURT:  Yeah, but -- I mean, is it

13   coming out of any of the model patent jury instructions?

14                   MS. GUSKE:  No, Your Honor.  It's based

15   on case law.

16                   THE COURT:  Okay.  Response?

17                   MR. STONE:  We would object to that, Your

18   Honor.  I believe that what they're proposing with

19   respect to continuations actually completes

20   continuations and continuations in part.

21                   And we have a proposed jury instruction

22   with respect to continuations that I would like to read

23   into the record.

24                   THE COURT:  All right.

25                   MR. STONE:  Your Honor, if you see this

1   slide, it's a continuation is a patent issued from a

2   second application for the same invention claimed in a

3   prior non-provisional application and filed before the

4   original prior application becomes abandoned or

5   patented.

6                    Parent and continuation patents are

7   considered together, and the invention disclosed therein

8   viewed as a singular whole.  The disclosure presented in

9   the continuation must be the same as that in the

10  original application.

11                    A continuation patent may not include

12  anything that would constitute new matter and must rely

13  on the same specification.  A patent shares the same

14  priority date as the related parent application.

15                    And what we're relying on for support,

16  Your Honor, is the provision from the MPEP regarding

17  continuation applications, as well as two cases,

18  application of DeFano 480 F.2d 892 and 893, and Truth

19  Hardware Corp. versus Ashland Products.

20                    THE COURT:  Okay.  Response?

21                    MS. GUSKE:  We -- the Plaintiff believes

22  that the Defendant's proposed instruction is confusing

23  and tries to conflate all of the individual claims into

24  one claimed invention.

25                    And I just pulled the case cites to

1    support Plaintiff's proposed instruction, if you'd like

2    those.

3                    THE COURT:  All right.

4                    MS. GUSKE:  So the cases in particular

5    are Combined Tactical System, Inc. versus Defense

6    Technology Corp. of America, 589 F.Supp.2d 260,

7    Pages 264 to 265, styled Southern District of New York

8    in 2008.

9                    And it cites Transco, which I'm sure this

10   Court's familiar with, and also to Chisum.

11                   THE COURT:  Okay.  What is -- what is

12   Plaintiff's position with regard to if we just don't

13   include any instructions on continuation applications?

14                   Let me ask you:  Did you request any

15   instructions in your meet-and-confer with Defendants and

16   in the charge that you proposed to us earlier?

17                   MS. GUSKE:  Previously today, I had a

18   meet-and-confer with Defendants about continuation

19   instructions, and it was at that time that it was

20   brought up by both parties.

21                   THE COURT:  No.  I mean, what you filed

22   with the Court earlier that we've been working from, is

23   this the first we've heard about this?

24                   MS. GUSKE:  This is the first you've

25   heard about it, Your Honor.

1            THE COURT:  All right.  I'll take this
2    under advisement, and it will either -- something will
3    either be in there or it won't.
4            MS. GUSKE:  Same page of the charge, 4.2,
5    so this is Page 9.
6            THE COURT:  Let me ask you, the both of
7    you:  The copies of your proposed instructions, if you
8    would, reduce those to writing and leave them with my
9    Law Clerk so that we'll have the benefit of having those
10   in a tangible form, just a copy of your request to sign.
11           MR. STONE:  Will do, Your Honor.
12           THE COURT:  All right.  What's next?
13           MS. GUSKE:  Same page, Page 9, the
14   previous paragraph, so it's Charge 4.2 in the Court's
15   proposed charge.
16           ACQIS would request clarification that
17   the same construction should be applied for both
18   infringement and validity.  And previously, the parties
19   had agreed on including that sentence in this portion of
20   the charge.  It just didn't make it into Your Honor's
21   charge.
22           THE COURT:  Okay.  Tell me specifically
23   what you're asking me to put where.
24           MS. GUSKE:  Sorry.  This is chicken
25   scratch, I'm sure.

1            Following the sentence:  You must accept

2    the meanings I give you and use those meanings when

3    you --

4            THE COURT:  I'm sorry.  I can't hear you.

5    If you could slow down, please.

6            MS. GUSKE:  Sure.  So immediately

7    following the sentence of:  You must accept the meanings

8    I give you and use those meanings when you decide

9    whether or not the patent claims are infringed and

10   whether or not they are invalid.

11           THE COURT:  All right.

12           MS. GUSKE:  ACQIS would propose the

13   sentence be added:  The instructions must be the same --

14   applied the same for both infringement and validity.

15           THE COURT:  The what must be?

16           MS. GUSKE:  The constructions.

17   Or if you prefer:  The definitions of the claim terms

18   must be applied the same as -- for invalidity as for

19   infringement.

20           THE COURT:  Okay.  Quote for me as in

21   quote marks you want inserted after the word "invalid"

22   the following sentence.  Quote, slowly.

23           MS. GUSKE:  The claim constructions must

24   be applied the same for infringement as invalidity.

25           THE COURT:  Okay.  Any objection from

1    Defendant with regard to that?

2              MR. STONE:  I think Your Honor's sentence

3    already suggests that, the previous sentence, saying

4    accept the meanings for both invalidity and with respect

5    to infringement.  So it seems surplusage.

6              THE COURT:  The Court agrees.  That

7    request is denied.

8              What's next?

9              MS. GUSKE:  Page 9, Your Honor, ACQIS

10   would request a new instruction addressing the claim

11   constructions not taken up during trial for this case.

12   I can provide you with the language that we would

13   propose.

14             THE COURT:  Tell me what you're

15   requesting.  You're asking for another paragraph?

16             MS. GUSKE:  Yes, Your Honor.

17             THE COURT:  That says what?  See, I can't

18   read your handwriting very well on the slide you have up

19   there.

20             MS. GUSKE:  It's small.

21             So what we would request is an

22   instruction entitled meaning of plurality operates a PCI

23   bus transaction, and the instruction would read:  As

24   used in the asserted claims, plurality means two or

25   more --

1            THE COURT:  Now, won't that be included

2      in the claim -- isn't it included in the claim charge at

3      the end of the charge?

4            MS. GUSKE:  No, it's not, Your Honor.

5      This was -- these were the terms that we had -- the

6      parties have briefed midweek last week.

7            THE COURT:  We will add them to -- now,

8      these are the ones I've already ruled on.

9            MS. GUSKE:  These are the ones you

10     declined to rule on.

11           MR. STONE:  And given that, Your Honor, I

12     don't see why we'd be arguing claim construction at this

13     stage of the case.

14           THE COURT:  So what --

15           MR. SMITH:  Your Honor, to preserve the

16     point, we would like to ask -- formally ask the Court to

17     include the two additional constructions that we

18     previously asked for and the Court denied.

19           THE COURT:  Well -- yeah.  I deny them

20     again.

21           MR. SMITH:  Thank you, Your Honor.

22           MS. GUSKE:  Can I clarify for the record

23     the constructions or the terms we would like construed?

24           THE COURT:  Yes, you may.

25           MS. GUSKE:  We would like constructions

1    of the terms plurality as used in the claims, operates

2    as used in the asserted claims, and clarification on the

3    Court's construction of PCI bus transaction.

4                    THE COURT:  Okay.  What are you asking me

5    to do?

6                    MS. GUSKE:  Would you like the proposed

7    instructions, Your Honor?

8                    THE COURT:  Well, are these that were

9    already in briefing and I already overruled your

10   position?

11                   MS. GUSKE:  Yes.

12                   THE COURT:  All right.  I'm overruling

13   your position again.  Let's move on to something else.

14                   MS. GUSKE:  Okay.  Next page, this is

15   a -- the Court's Charge relating to independent and

16   dependent claims.

17                   THE COURT:  What page are you on?

18                   MS. GUSKE:  Pardon?

19                   THE COURT:  What page are you on?

20                   MS. GUSKE:  I'm on Page 10.

21                   THE COURT:  Page 10, all right.  Okay.

22                   MS. GUSKE:  And no objections to the

23   language that's in this charge; however, it was moved

24   from relating specifically to the infringement charge to

25   a more general charge.  So we would request at the end

1    of the second-to-last paragraph on Page 10, a parallel

2    sentence be added relating to what must be proven to

3    show invalidity for a dependent claim.

4              THE COURT:  Response?

5              MR. STONE:  My response, Your Honor, is

6    that these paragraphs refer to your instructions

7    concerning infringement, and to add that at the end

8    would seem to invite confusion.

9              MS. GUSKE:  My response to that would be

10   that they no longer apply just to infringement based on

11   their position within the charge currently.

12             THE COURT:  And you want to repeat the

13   paragraph subsetting the word to find invalidity for

14   infringement?

15             MS. GUSKE:  Correct.  The current charge

16   addresses what is required to show infringement.  We

17   would want to repeat that or include a sentence that

18   says it's the same standard for demonstrating invalidity

19   of a dependent claim.

20             THE COURT:  Okay.  Dictate the sentence

21   that you would like to have included.

22             MS. GUSKE:  There will be several

23   sentences.

24             In order to find invalidity of Dependent

25   Claims 12 and 74 of the '415 patent, you must first

1    determine -- you must first determine whether

2    Independent Claims 11 and 73, respectively, of the '415

3    patent are invalid.

4                    In order to find invalidity of Dependent

5    Claim 57 of the '779 patent, you must first determine

6    whether Independent Claim 56 of the '779 patent is

7    invalid.

8                    If you decide that the independent claim

9    has not been proven to be invalid, then the dependent

10   claim cannot be found to have been invalid.

11                   If you decide that the independent claim

12   has been shown to be invalid, then you must separately

13   determine whether each additional requirement of the

14   dependent claim has also been shown in the prior art.

15                   If each additional requirement has been

16   proven, then the dependent claim has been shown invalid.

17                   THE COURT:  All right.  I will take a

18   look at that.

19                   MS. CANDIDO:  Your Honor, if I may

20   address that for one moment?

21                   THE COURT:  Yes.

22                   MS. CANDIDO:  IBM objects to that.  I was

23   only taking it in by hearing it; but one of the issues

24   is that seems to suggest that if the jury were to find

25   an independent claim, the independent aspect of it to be

1    valid, then they have to stop, which is not true, of

2    course, because if the missing element is the element in

3    the dependent claim, then the independent claim would be

4    invalid.

5              So I think that's actually not an

6    accurate statement of what the jury is charged with.  So

7    we would object to that proposed instruction, Your

8    Honor.

9              THE COURT:  All right.  What's next?

10             MR. STONE:  Your Honor, with respect to

11   this paragraph, there's also reference to a patent that

12   has been dropped, patent claims.

13             THE COURT:  Okay.  Which ones need to be

14   excluded?

15             (Sotto voce discussion between parties.)

16             MR. STONE:  We're okay.  Thank you, Your

17   Honor.

18             MS. GUSKE:  Okay.  Turning to Page 11,

19   the Section 5.3, indirect infringement, in light of

20   ACQIS withdrawing its request for contributory

21   infringement, this paragraph needs to be amended.

22             MR. SMITH:  Your Honor, the specific

23   amendment would be to add the words at the end of the

24   first sentence, quote, by inducing infringement by

25   another, period.  Then delete the next sentence which

1    carries over to the top of the next page.  Delete the

2    sentence beginning, the act of encouraging.  And delete

3    the final sentence of this section.

4                THE COURT:  All right.  That's granted.

5    We will make that change.

6                What's next?

7                MS. GUSKE:  Same -- or moving on to the

8    inducement instruction itself, in particular the last

9    sentence of that instruction on Page 13, it reads:

10   Finally, ACQIS must prove that there is direct

11   infringement for each instance of indirect infringement.

12               ACQIS maintains its objection to the

13   inclusion of this sentence as it's redundant.

14               THE COURT:  All right.  That's overruled.

15               MS. GUSKE:  So it's the last sentence of

16   that paragraph, which I just read, that begins with,

17   finally ACQIS must prove that there is direct

18   infringement for each instance of indirect infringement,

19   we would like our objection noted.

20               THE COURT:  It's noted.

21               MS. GUSKE:  Defense Counsel has confirmed

22   that it's dropping all 112 related defenses, so starting

23   on Page 14, Section 6.2 through -- through 6.3 that

24   begins on Page 15, we ask those instructions be stricken

25   in their entirety.

1          THE COURT:  Is that correct, Counsel?

2          MR. STONE:  That's correct.

3          THE COURT:  All right.  6.2 and 6.3 will

4     be taken out.

5          MS. GUSKE:  All right.  Moving on to

6     anticipation instructions, 6.4 on Page 17, ACQIS

7     requests clarification that this instruction and IBM's

8     anticipation theories are limited to the Ketris art per

9     its agreement.  This came up earlier today.

10          In particular, two -- two clarifications

11     based on an error that was made in the court record

12     by -- I think inadvertently by Mr. Verhoeven.

13          One, we would like -- at the end of the

14     first sentence of this section to -- the full sentence

15     would read:  IBM contends that the asserted claims are

16     invalid, because the claimed invention is not new based

17     on the Ketris prior art.

18          And then at the end of that instruction

19     on the next page, on Page 18, we would request that the

20     following statement be read to the jury as a corrective

21     measure:

22          You may only consider the Ketris prior

23     art in making your decision regarding the alleged

24     anticipation of the asserted claims.

25          You are instructed to disregard any

1    testimony and evidence relating to the alleged

2    anticipation by any other prior art.

3              THE COURT:  Okay.  Response?

4              MR. STONE:  So, Your Honor, I don't think

5    this is a jury instruction issue.  I believe that the

6    model and what the Court has proposed should be adopted,

7    and it should control.

8              The evidence is now in.  During their

9    rebuttal, they were making arguments about art that

10   anticipated or did not, art that was obvious or was not.

11   And if we permit -- if we permit lawyer argument as part

12   of these instructions, I think it's going to lead to

13   jury confusion.  That's not the proper place for it.

14   The evidence is now in concerning various invalidity

15   theories.

16             THE COURT:  Are you objecting to their

17   first request at the beginning of the section --

18             MR. STONE:  I am, Your Honor.

19             THE COURT:  -- that says based on the

20   Ketris prior art?

21             MR. STONE:  Yes, I am, Your Honor.

22             THE COURT:  Are you claiming that you're

23   entitled for the jury to consider anything other than

24   the Ketris prior art with regard to your anticipation

25   defense?

1            MR. STONE:  I believe they can now, Your

2    Honor, based on the evidence that's been provided to

3    them and the arguments that Counsel for ACQIS has made.

4            THE COURT:  Response?

5            MS. GUSKE:  My response is that Your

6    Honor was very clear this morning that the Defendants

7    were confined to the agreement that they had made with

8    respect to any 102 arguments; and our concern is that if

9    there isn't some sort of corrective instruction on the

10   record, it actually will be more confusing for the jury,

11   since I believe Mr. Verhoeven elicited testimony from

12   IBM's expert, Dr. McClure, this morning regarding an

13   opinion of anticipation based on the RLX art, which is

14   outside of the agreement and Your Honor's instruction.

15           THE COURT:  I will -- I will grant your

16   request as to inserting the word -- after the first

17   sentence of the 6.4 instruction, adding the clause:

18   Based on the Ketris prior art.

19           In all other respects, your request is

20   denied.

21           MS. GUSKE:  Thank you, Your Honor.

22           THE COURT:  All right.  What's next?

23           MR. STONE:  And, Your Honor, just

24   briefly.

25           They did make the argument in connection

1    with Mr. Gafford's rebuttal that Ketris and RLX and

2    QuantumNet did not anticipate based on Mr. Gafford's

3    analysis.  And so I think that by doing this, it does

4    lead to the possibility of the jury being confused.

5                    THE COURT:  Okay.  Thank you.

6                    All right.  What's next, Counsel?

7                    MS. GUSKE:  This will look familiar as it

8    relates to the next anticipation instruction on Page 19,

9    Instruction 6.5.  We request that a similar statement be

10   added at the end of the first sentence confining

11   anticipation to the Ketris prior art.

12                    So what we request would be that the full

13   first sentence reads:  IBM contends that each of the

14   asserted claims of the patents-in-suit are invalid as

15   anticipated, because the invention was first made or

16   invented by someone else, hyphen, namely, the Ketris

17   prior art.

18                    THE COURT:  You say mainly the Ketris --

19                    MS. GUSKE:  Namely.

20                    THE COURT:  Namely.

21                    MS. GUSKE:  Or specifically.

22                    THE COURT:  Response?

23                    MR. STONE:  We have the same objections

24   to this, Your Honor.

25                    THE COURT:  All right.  I'll grant the

1    request saying:  Hyphen, specifically the Ketris prior

2    art, period.

3                   MS. GUSKE:  Thank you.

4                   THE COURT:  Okay.

5                   MS. GUSKE:  Next is the same issue for

6    the Instruction 6.6 on Page -- on Page 20.

7                   I finally figured out how to use the

8    overhead.

9                   Similar issue here needs to be clarified

10   to confine to Ketris.  This is -- the opening paragraph

11   here is structured a little differently, so what we are

12   requesting is a modification to the -- the last or the

13   third sentence of the first paragraph, so that it would

14   read:  For a patent claimed to be invalid because of a

15   statutory bar, all of its requirements must have been

16   present in one of the prior art references, in this

17   case, Ketris, dated more than one year before the

18   effective filing date of the patent application.

19                   THE COURT:  Okay.  Response?  Same

20   objection?

21                   MR. STONE:  I have the same objections,

22   Your Honor, and I also believe that by adding it here,

23   it's also misleading.

24                   THE COURT:  All right.  The Court will

25   insert the last sentence -- in the last sentence of the

1      6.6, anticipation statutory bars, first paragraph

2      between reference and dated in this case, quote, in this

3      case, comma, Ketris, comma, dated more than one year.

4                     MS. GUSKE:  Thank you.

5                     THE COURT:  All right.  What's next?

6                     MS. GUSKE:  Next is Instruction 6.7 on

7      Page 22, and this is a similar issue, although it's

8      relating to the limited obviousness theories that IBM

9      agreed to.

10                    So we would request the first sentence in

11     this instruction to read is:  In this case, IBM contends

12     that the asserted claims of the patents-in-suit are

13     invalid as obvious based on Ketris, QuantumNet, RLX, and

14     Hong and combination of them -- combinations of them.

15                    THE COURT:  Okay.  Based on Ketris,

16     Quantum --

17                    MS. GUSKE:  QuantumNet.

18                    THE COURT:  Okay.  How do you spell that?

19                    MS. GUSKE:  Q-U-A-N-T-U-M and same word

20     but capital N-E-T.

21                    THE COURT:  Comma, RLX, comma, and Hong,

22     parentheses, in combinations --

23                    MS. GUSKE:  Of them.

24                    THE COURT:  Of them or combinations

25     thereof.

1          MS. GUSKE:  Thereof is fine.

2          THE COURT:  Close parenthesis.

3          All right.  Response?

4          MR. STONE:  So, Your Honor, since this

5   deals with the balance of the prior art that was

6   presented to the jury, I don't think it's necessary to

7   have any limiting instruction.  And we go back to the

8   objections that we had with regard to anticipation as

9   well.

10          In addition, IBM did reserve the right to

11   argue single preference obviousness as well, and so I

12   think this leads to confusion.  I don't think this is

13   necessary to add anything to the jury.

14   The rest of the parts are for obviousness.

15          THE COURT:  All right.  The Court will

16   add the instruction as dictated by Plaintiff's Counsel.

17          MR. STONE:  And, Your Honor, could we

18   have a separate instruction to identify that single

19   reference, obviousness is also available?

20          THE COURT:  Response?

21          MS. GUSKE:  I would consider any

22   proposal, but I have not yet seen one.

23          MR. STONE:  Well, I'm responding to what

24   you just said.

25          So what I would propose, Your Honor, is

1   that a single reference can also form the basis for a

2   finding of obviousness.

3                    THE COURT:  Response?

4                    MS. GUSKE:  Can I have that read back?

5                    MR. STONE:  I can say it again.

6                    THE COURT:  Say it again.

7                    MR. STONE:  A single reference can also

8   form the basis for a finding of obviousness.

9                    MS. GUSKE:  I think facially that

10  statement is fine, although IBM limited its single

11  reference obviousness arguments to certain single

12  references for the claims.  I think it was actually the

13  only single reference argument that they agreed to when

14  limiting their theories with Ketris.

15                   THE COURT:  All right.  I will give the

16  instruction as requested by Defense Counsel.

17                   MS. GUSKE:  We reserve our -- any

18  objections to the extent that it does bring in art

19  outside of --

20                   THE COURT:  I'm sorry.  What?

21                   MS. GUSKE:  I'm still -- to clarify, I'm

22  a little concerned that now the jury is going to go back

23  and consider single reference arguments that were not

24  included by IBM when it limited its invalidity theories.

25                   THE COURT:  Well --

1          MS. GUSKE:  It should be limited to

2     Ketris for single reference.

3          THE COURT:  Do you agree with that,

4     Counsel?

5          MR. STONE:  No.  We reserve our right

6     with respect to single reference obviously in the

7     communication.

8          THE COURT:  All right.  The Court's going

9     to leave it as I just stated.

10         What's next?

11         MS. GUSKE:  Moving forward to damages

12    instructions starting on Page 33, based on testimony

13    provided in this case, I would request an additional

14    request for hypothetical negotiation and specifically

15    the book of wisdom.

16         And I can read the proposed language.

17         It would come right before Instruction

18    7.5.

19         THE COURT:  Before 7 -- okay.  I can't

20    see it on the overhead.

21         MS. GUSKE:  Oh, I'm sorry.  There's no --

22    all I have is a place holder so --

23         THE COURT:  You're requesting an

24    instruction -- what's the caption?

25         MS. GUSKE:  The caption would be damages,

1    evidence after the hypothetical negotiation, and the

2    instruction would read:  Evidence of things that

3    happened after the date of hypothetical negotiation can

4    and should be considered in evaluating the reasonable

5    royalties.

6                    THE COURT:  Response?

7                    MS. CANDIDO:  Your Honor, IBM objects to

8    that instruction.  I don't think that's an accurate

9    statement of the state of the law.

10                   My understanding is that at a minimum you

11   can only look prospectively forward if it was

12   information that was known or could reasonably have been

13   known at the time of the hypothetical negotiation.  And

14   that's not what that instruction would suggest.

15                   THE COURT:  All right.  The Court is not

16   going to give that instruction.

17                   What's next?

18                   MS. GUSKE:  Same page, the Instruction

19   7.6, government sales, there's been no evidence

20   presented by IBM relating to its government sales

21   defense in this trial.

22                   THE COURT:  Response?

23                   MS. GUSKE:  And we would ask that it be

24   struck.

25                   MS. CANDIDO:  Your Honor, my

1   understanding is that the damages base that was

2   presented does not include revenue from government

3   sales.  If that is inaccurate, then I might have an

4   issue with that.  But, obviously, if you're not accusing

5   us, then it's not an issue.

6             MS. GUSKE:  Let me confer, so I can

7   clarify that.

8             THE COURT:  All right.

9             (Sotto voce discussion.)

10             MS. GUSKE:  We can agree to that, Your

11   Honor.

12             THE COURT:  You can agree to leaving it

13   in?

14             MS. GUSKE:  We can agree that there's no

15   government sales in our space.

16             THE COURT:  Okay.  So --

17             MS. CANDIDO:  In that case, Your Honor,

18   we believe that there should be an instruction that

19   government sales are not appropriate to include in the

20   case.

21             THE COURT:  All right.  It may be late in

22   the day, but y'all are talking past me.  I'm not

23   understanding what -- it sounds like you're about to

24   agree; then it sounds like you're disagreeing.

25             So what's going on?  Does -- Plaintiff

1   wants the instruction 7.6 taken out; is that correct?

2              MS. GUSKE:  I'm sorry.  Can you repeat

3   your question?

4              THE COURT:  All right.  You need listen

5   to me when I'm speaking.

6              MS. GUSKE:  Yes, Your Honor.

7              THE COURT:  Do I understand that

8   Plaintiff wants 7.6 taken out of the charge?

9              MS. GUSKE:  Yes.

10             THE COURT:  Does Defendant agree to that?

11             MS. CANDIDO:  No, Your Honor.  We object

12  to the basis that I've just been instructed that, in

13  fact, the damages base does include sales to the United

14  States Government upon which they're not entitled to

15  recover.

16             THE COURT:  Okay.  But I don't recall any

17  testimony by anybody attempting to raise that issue or

18  segregate it out.  I mean, how is this going to have any

19  meaning to the jury?  Did any witness opine about what

20  the amount of those were or that they're in there?

21             MS. CANDIDO:  I don't think that they

22  did, Your Honor.

23             THE COURT:  All right.  We'll take out

24  7.6 as requested.

25             What's next?

 1            MS. GUSKE:  Same page.  I overlooked one,

 2   Your Honor.  Page 33, instruction 7.5 relating to entire

 3   market value.  In general, the language is fine, though

 4   it excludes the notion of a single functional unit.

 5   That's pretty clear from the case law.  It was included

 6   in ACQIS's proposed instruction.

 7            THE COURT:  Okay.  What proposed change

 8   do you recommend -- are you requesting be made to 7.5?

 9            MS. GUSKE:  We would prefer the

10   instruction to read:  Under the entire market value

11   rule, a patent owner may recover damages based on the

12   value of an entire apparatus or product containing

13   several features, even though only one feature is

14   patented, where the unpatented components function

15   together with the patented components in some manner to

16   produce a desired end product or result.

17            For the entire market value rule to

18   apply, ACQIS must prove that the patented invention was

19   the basis of customer demand for the product.

20            And that would replace the existing 7.5

21   in its entirety.

22            THE COURT:  Response?

23            MS. CANDIDO:  Your Honor, we would

24   strongly object to that instruction.  As I have already

25   addressed with the Court earlier, over the entire market

063cedc6-2243-4bae-a397-41862974c2af

1    value rule, that there's a three-part test, for example,

2    set out in Cornell -- in the Cornell case.

3              One of those prongs of the three-part

4    test is the functional unit.  The other one is the

5    demand standard that's already in here, and there's a

6    third.

7              So to carve out, you know, only one of

8    them is improper.  If anything, there should be all

9    three prongs in there.

10             THE COURT:  All right.  Your request to

11   modify 7.5 is denied.

12             What's next?

13             (Sotto voce discussion.)

14             MS. GUSKE:  I'm sorry, Your Honor.  Just

15   to also preserve the record, we object to the inclusion

16   of this instruction at all, because there's been

17   absolutely zero evidence presented by Plaintiffs with

18   respect to the entire market value rule.

19             There hasn't even been lip service paid

20   to the concept that the patented features drive demand

21   for the entire product, including the blade's unique

22   options that are not even sold necessarily with blades

23   and chassis.

24             THE COURT:  All right.  Your objection is

25   overruled.

1          What's next from the Plaintiff?

2          MS. GUSKE:  Nothing else from the

3     Plaintiff, Your Honor.

4          THE COURT:  All right.  What about the

5     Defendant?  Defendant have any objections?

6          MS. CANDIDO:  Your Honor, we're a bit of

7     two minds, frankly, because with the changes that the

8     Plaintiff has requested with respect to prior art and

9     listing in detail all these different permutations,

10    we're, frankly, inclined to say that the same should be

11    true on infringement and that the instructions should

12    specify that they have to carry the burden of proof with

13    respect to each of the accused products and not treat

14    them as a lump.  Because they do bear that burden, so...

15         However, you know, I'm of two minds

16    because I think that complicating the jury instructions

17    by elaborating on all of the prior art is not remedied

18    by further complicating the jury instructions by adding

19    in all these products.

20         THE COURT:  Well, I don't think the

21    products, that there's the potential for confusion like

22    there is with the prior art based upon the -- the status

23    of the case, so...

24         MS. CANDIDO:  Perhaps -- I guess, what

25    maybe we would request in one spot is just to list that

1    the asserted products are the following products, and

2    they have to meet this burden with respect to each

3    product.

4                    THE COURT:  Okay.  Well -- okay.  So what

5    are you -- do you have a -- let's go to a line and page,

6    and let's just go through it.  Start at the front, and

7    if you have an objection or a request, state it to me

8    specifically.

9                    MS. CANDIDO:  On Page 11, Your Honor,

10   this is the section -- the heading is Section 5 on

11   infringement.  The first reference that's made to

12   IBM's -- IBM product is in the first paragraph under

13   Section 5.2.

14                   So we would propose perhaps either a

15   parenthetical or a separate sentence that defines the

16   term IBM product or IBM accused products and list the

17   actual accused products individually.

18                   THE COURT:  And how many are there?

19                   MS. CANDIDO:  There's a total of six

20   products, Your Honor.

21                   THE COURT:  What's Defendant's (sic)

22   position with regard to that?

23                   MS. GUSKE:  Your Honor, in part of the

24   horse trading that went on before trial, we negotiated

25   representative products; and with respect to the

063cedc6-2243-4bae-a397-41862974c2af

1    representative products, there are six, although the

2    body of accused products that those cover -- I'm just a

3    little confused what this instruction that they're

4    proposing is trying to insinuate about the remaining

5    blades that are represented by the six accused blades.

6                    THE COURT:  All right.  I'm going to

7    overrule that request or deny it.

8                    What's next?

9                    MS. CANDIDO:  That's all the Defendant

10   has, Your Honor.

11                   THE COURT:  Goodness gracious.  I usually

12   get all the objections from the Defendant and none from

13   the Plaintiff, and y'all flip-flopped on me today.

14                   All right.  Very good.

15                   Well, we'll-- we will get the charge in

16   final shape.  It will be available to you in the morning

17   shortly before trial.  And to the extent -- those that I

18   took under advisement, your objections will be noted

19   based on what you said on the record, and it will be

20   obvious from whether I give an instruction or don't that

21   I've granted it or denied it, okay?

22                   MS. CANDIDO:  Your Honor, there's just

23   one point, if I may, that the parties wanted to clarify.

24                   Mr. Stone had, I think, inadvertently

25   said that the parties had agreed to file their JMOL

1    briefs by the close of evidence, and I think the

2    standard is that they're filed prior to the case being

3    given to the jury.  And that's what the parties had

4    intended.

5              So I just -- we wanted to make sure that Your

6    Honor was okay with that.

7              THE COURT:  Just file them under the

8    rules, and you'll be fine.

9              MS. CANDIDO:  Great.  Thank you very

10   much.

11             THE COURT:  All right.  Now, with regard

12   to willfulness, you have two minutes, if you would like

13   to --

14             MR. BROGAN:  All that, Your Honor.

15             THE COURT:  -- pursue your willfulness

16   case after the verdict comes in.  It would be helpful to

17   the Court to know whether you intend to do that or not.

18             MR. FRIEL:  In the two quality minutes,

19   Your Honor, the answer is no.

20             THE COURT:  Okay.  So --

21             Okay.  All right.  So we will not be

22   having the second half of the submission or the second

23   half of the bifurcated trial, if we get to that stage,

24   right?

25             MR. FRIEL:  Yes, Your Honor.  Correct.

1           THE COURT:  And that's agreeable with

2   Plaintiff, of course --

3           MR. STONE:  Yes, Your Honor.

4           THE COURT:  I mean Defendant.

5           Okay.  Very well.  In light of that, we

6   should get this to the jury by late morning or

7   lunchtime.

8           Would the parties have any objection if

9   Magistrate Judge Love were to sit on this case after it

10  goes to the jury and receive the jury's verdict?

11          I have an Eastern District Judges Meeting

12  and the interviewing of magistrate judges for the

13  Beaumont Division tomorrow afternoon in Dallas that I

14  need to be at.

15          MR. CHANDLER:  Plaintiff has no

16  objection.

17          MR. STONE:  No objection, Your Honor.

18          THE COURT:  All right.  Very well.

19          Well, we'll plan to -- I'd love to stay

20  here with you to see the outcome, but I'll hear about

21  it, so...

22          MR. FRIEL:  Your Honor, there's one small

23  housekeeping matter, just to make sure.  Closing, we

24  would like to split -- Mr. Chandler would like to take

25  part of the closing, and Mr. Stacy will take --

1              THE COURT:  Okay.  That's fine.  Yeah,

2     you can split it up however you'd like to.

3              MR. STONE:  And then one last

4     housekeeping matter.  Can we confirm the time for the

5     closing, whether it's 45 minutes or one hour?

6              THE COURT:  What did I give you in the

7     order?  Do you remember?

8              MR. FRIEL:  There's one here.

9              MR. STONE:  My recollection was, Your

10    Honor, it was 45 minutes.

11             THE COURT:  Nicole, what was it?  Do you

12    remember?

13             Okay.  Let us check the order.

14             MR. STONE:  Thank you, Your Honor.

15             THE COURT:  While she's checking on that,

16    let me remind the parties to get your exhibits marked

17    and ready for the jury in conformance with the Court's

18    order.

19             And don't we have in that order now,

20    Ms. Ferguson, for them to label them?  So you'll need to

21    exchange that.

22             COURTROOM DEPUTY:  Yes, Your Honor.

23             THE COURT:  Yeah.  So the exhibits should

24    be labeled as to what they are.

25             And I think we require an index now, too,

1    don't we?

2                    COURTROOM DEPUTY:  Yes, sir.

3                    THE COURT:  Yeah.  Yeah.  We had that in

4    a case.  The jury complained that we had all these

5    exhibits, and we just dumped them all on them, and they

6    couldn't find anything.  So if you will please try to

7    have that.

8                    What did we find out the time?  I may

9    have it here.  I recall it was 45 minutes, but I may be

10   wrong.

11                   MR. STONE:  We were just looking at the

12   transcript online, Your Honor, and it appears to be one

13   hour.  That's what you said in opening remarks.

14                   THE COURT:  I usually enter an order

15   confirming that.  Anybody found it yet?

16                   MS. GUSKE:  Yes, I have, Your Honor.

17   It's Docket No. 592.

18                   THE COURT:  What did I say?

19                   MS. GUSKE:  You said one hour.

20                   THE COURT:  Okay.  One hour it is then.

21                   All right.  Well, we ought to get it to

22   them by noon then, right at -- right about 12:00

23   o'clock.

24                   All right.  I want to compliment both

25   sides.  It's been a long week, but both sides have done

1    a very professional job and gotten along well in the

2    court, and I'm sure the jury appreciates that.

3                    So be in recess till tomorrow.

4                    COURT SECURITY OFFICER:  All rise.

5                    (Court adjourned.)

6

7                         CERTIFICATION

8

9                    I HEREBY CERTIFY that the foregoing is a

10   true and correct transcript from the stenographic notes

11   of the proceedings in the above-entitled matter to the

12   best of our abilities.

13

14   /s/_____

     SHEA SLOAN, CSR                    Date

15   Official Court Reporter

     State of Texas No.:  3081

16   Expiration Date:  12/31/12

17

18

     /s/_____

19   JUDITH WERLINGER, CSR              Date

     Deputy Official Court Reporter

20   State of Texas No.:  731

     Expiration Date  12/31/12

21

22

23

24

25