```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                      TYLER DIVISION
 3   ACQIS, LLC                 )
                                     DOCKET NO. 6:09cv148
 4       -vs-                   )
                                     Tyler, Texas
 5   APPRO INTERNATIONAL,       )     9:00 a.m.
     ET AL                            February 23, 2011
 6
                      TRANSCRIPT OF TRIAL
 7           BEFORE THE HONORABLE LEONARD DAVIS,
                 UNITED STATES DISTRICT JUDGE
 8                          and
               THE HONORABLE JOHN D. LOVE,
 9           UNITED STATES MAGISTRATE JUDGE
10                 A P P E A R A N C E S
11   FOR THE PLAINTIFF:
12   MR. GEORGE CHANDLER
     CHANDLER LAW OFFICES
13   P.O. Box 340
     Lufkin, TX  75901
14
     MR. MICHAEL SMITH
15   SIEBMAN BURG
     P.O. Box 1556
16   Marshall, TX  75671-1556
17   MR. THOMAS FRIEL, JR.
     COOLEY
18   3175 Hanover Street
     Palo, Alto, CA  94304-1130
19
     MR. JAMES P. BROGAN
20   MR. WAYNE STACY
     COOLEY
21   380 Interlocken Crescent
     Broomfield, CO  80021-8023
22
     COURT REPORTERS:
23   MS. JUDY WERLINGER
     MS. SHEA SLOAN
24
     Proceedings taken by Machine Stenotype; transcript was
25   produced by a Computer.
```

```
 1   FOR THE DEFENDANTS:
 2
     MR. CHARLES K. VERHOEVEN
 3   MS. AMY CANDIDO
     QUINN EMANUEL
 4   50 California St., 22nd Floor
     San Francisco, CA  94111
 5
 6
     MR. ROBERT W. STONE
 7   MR. MICHAEL D. POWELL
     QUINN EMANUEL
 8   555 Twin Dolphin Dr., 5th Floor
     Redwood Shores, CA  94065
 9
10
     MR. ERIC ALBRITTON
11   ALBRITTON LAW FIRM
     P.O. Box 2649
12   Longview, TX  75606
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                 P R O C E E D I N G S
 2                 (Jury out.)
 3                 COURT SECURITY OFFICER:  All rise.
 4                 THE COURT:  Bring the jury in.
 5                 (Jury in.)
 6                 THE COURT:  Please be seated.
 7                 All right.  Good morning, Ladies and
 8      Gentlemen of the Jury.  Welcome back.  Y'all all look
 9      refreshed and bright-eyed; have your notebooks and ready
10      to get to work.
11                 So we're nearing the end of this case.
12      I'm going to give you some instructions just so you'll
13      know what's going on this morning.  This will probably
14      take 30 minutes, maybe a little longer.  Then I'm going
15      to give you a short break, probably five or ten minutes
16      just to stretch your legs and use the facilities.
17                 Then you will come back and hear the
18      closing arguments.  Each side has one hour, so it will
19      be about a two-hour sit to hear the closing arguments.
20      Plaintiff will go first and then Defendant, and then
21      Plaintiff will have a short time for rebuttal evidence.
22                 We may have to take like a minute break
23      in between.  We're having a little trouble with the
24      electronics, so when they go to change sides, we may
25      need to do that.
```

1          But if you would now, listen to my

2    instructions.  Please remember you're going to have a

3    copy of these to take with you to the jury room.  So you

4    are welcome to take notes, but realize you will have a

5    copy.

6          Members of the Jury:  You have now heard

7    the evidence in this case.  I will now instruct you on

8    the law that you must apply.  It is your duty to follow

9    the law as I give it to you.  On the other hand, you,

10   the jury, are the sole judges of the facts.

11         Do not consider any statement that I may

12   have made during the trial or make in these instructions

13   as any indication that I have any opinion about the

14   facts of this case.  Again, that is your sole province.

15         And you and your collective wisdom will

16   decide those facts.

17         After I instruct you on the law, the

18   attorneys will have an opportunity to make their closing

19   arguments.  Again, the statements and arguments of the

20   attorneys are not evidence and are not instructions on

21   the law.  They are intended only to assist you in

22   understanding the evidence and the parties' contentions.

23         Answer each question from the facts as

24   you find them.  Do not decide who you think should win

25   and then answer the questions accordingly.  Your answers

1   and your verdict must be unanimous.

2                   In determining whether any fact has been

3   proved in this case, you may, unless otherwise

4   instructed, consider the testimony of all witnesses,

5   regardless of who may have called them, and all exhibits

6   received in evidence, regardless of who may have

7   produced them.

8                   Now, with regard to witnesses' testimony,

9   again, you, the jurors, are the sole judges of the

10  credibility of all witnesses and the weight and effect

11  of all evidence.  By the Court allowing testimony or

12  other evidence to be introduced over the objection of an

13  attorney, the Court did not indicate any opinion as to

14  the weight or effect of such evidence.  Again, that is

15  your sole province.

16                  When the Court sustained an objection to

17  a question addressed to a witness, you must disregard

18  the question entirely and may draw no inference from the

19  wording of it or speculate as to what the witness would

20  have testified to, if he or she had been permitted to

21  answer the question.

22                  Again, you're only to consider and base

23  your case (sic) on the legally admissible evidence that

24  is admitted in this case.

25                  At times during the trial, it was

1    necessary for the Court to talk with the lawyers here at

2    the bench out of your hearing or by calling a recess.

3              We met because often, during the trial,

4    something comes up that does not involve the jury.  You

5    should not speculate on what was discussed during such

6    times.

7              In determining the weight to be given the

8    testimony of a witness, you should ask yourself whether

9    there was evidence tending to prove that the witness

10   testified truthfully or falsely and whether --

11   whether -- if you think that they testified falsely, you

12   need to consider whether that was with regard to some

13   important fact or whether there was evidence that at

14   some other time the witness said or did -- let me start

15   over.  That's not making sense.

16             In determining the weight to give to the

17   testimony of a witness, you should ask yourself whether

18   there was evidence tending to prove that the witness

19   testified falsely concerning some important fact or

20   whether there was evidence that at some other time the

21   witness said or did something or failed to say or do

22   something that was different from the testimony the

23   witness gave before you during the trial.

24             You should keep in mind, of course, that

25   a simple mistake by a witness does not necessarily mean

1    that the witness was not telling the truth as he or she

2    remembers it, because people sometimes forget some

3    things or remember other things inaccurately.

4              So if a witness has made a misstatement,

5    you need to consider whether that misstatement was an

6    intentional falsehood or simply an innocent lapse of

7    memory, and the significance of that may depend on

8    whether it has to do with an important fact in the case

9    or only with an unimportant detail.

10              Now, with regard to examining the

11   evidence.  Certain testimony in this case has been

12   presented to you through a deposition.  As I told you

13   earlier, a deposition is sworn, recorded answers to

14   questions asked of a witness in advance of trial.  Under

15   some circumstances, if a witness cannot be present to

16   testify from the witness stand, the witness' testimony

17   may be presented under oath in the form of a deposition.

18              Sometimes before the trial, the attorneys

19   representing the parties in this case question this

20   witness under oath.  This deposition testimony is

21   entitled to the same consideration and is to be judged

22   by you as to credibility and weight and otherwise

23   considered by you, insofar as possible, the same as if

24   the witness had been present and had testified from the

25   witness stand in court.

1           While you should consider only the

2   evidence in this case, you are permitted to draw such

3   reasonable inferences from the testimony and exhibits as

4   you feel are justified in light of common experience.

5           In other words, you may make deductions

6   and reach conclusions that reason and common sense lead

7   you to make -- lead you to draw from the facts that have

8   been established by the testimony and evidence in the

9   case.

10          Unless you are instructed otherwise, the

11  testimony of a single witness may be sufficient to prove

12  any fact, even if a greater number of witnesses may have

13  testified to the contrary, if, after considering all the

14  other evidence, you choose to believe that single

15  witness.  Again, you're the sole judges of the witnesses

16  and their credibility.

17          There are two types of evidence that you

18  may consider in properly finding the truth as to the

19  facts in this case.

20          The first is direct evidence, such as the

21  testimony of an eyewitness.

22          The other is indirect or circumstantial

23  evidence; that is, the proof of a chain of circumstances

24  that indicates the existence or nonexistence of certain

25  other facts.

1            As a general rule, the law makes no

2   distinction between direct and circumstantial evidence,

3   but simply requires that you find the facts from a

4   preponderance of all of the evidence, both direct and

5   circumstantial.

6            Now, with regard to expert witnesses.

7   You've heard several testify in this case.  When the

8   knowledge of a technical expert -- when the knowledge of

9   a technical subject may be helpful to the jury, a person

10  who has special training or experience in that technical

11  field is called an expert witness and is permitted to

12  state his or her opinion on those technical matters.

13            However, you are not required to accept

14  that opinion.  As with any other witness, it is up to

15  you to decide whether to rely upon it or not.  In

16  deciding whether to accept or rely upon the opinion of

17  an expert witness, you may consider any bias of the

18  witness, including any bias you may infer from evidence

19  that the expert witness has been or will be paid for

20  reviewing the case and testifying, or from evidence that

21  he or she testifies on a regular basis as an expert

22  witness; and that income from such testimony represents

23  a significant portion of the expert's income.

24            Now, with regard to the contentions of

25  the parties.  Let me go over those with you again,

1   although I know you're familiar with them.

2               ACQIS contends that IBM makes, uses,

3   offers to sell, sells, or imports products that infringe

4   at least one of Claims 12 and 74 of the '415 patent,

5   Claim 56 of the '416 patent, and Claims 16, 26, and 57

6   of the '779 patent.

7               IBM denies that it has infringed any

8   claims of the patents-in-suit, whether directly or

9   indirectly, by inducing infringement of any of the

10  asserted claims.

11              IBM also denies that ACQIS is entitled to

12  any damage award.

13              IBM, on the other hand, contends that the

14  claims of the '415 patent, the '416 patent, and the '779

15  patent are invalid.  Invalidity is a defense to

16  infringement.  Therefore, even though the PTO Examiner

17  has allowed the asserted claims, you, the jury, must

18  decide whether the asserted claims are invalid.

19              Your job is to decide -- is to decide

20  whether the asserted claims have been infringed and

21  whether any of the asserted claims are invalid.  If you

22  decide that any claim of the patent has been infringed

23  and is not invalid, then you will need to decide any

24  money damages to be awarded to ACQIS as compensation for

25  the infringement.

1          At this time, I'd like to ask my -- the

2    Court Security Officer to pass out to you the verdict

3    form that you will be receiving in this case.  And I

4    want to take a moment and go over that with you to sort

5    of give you an overview.

6          These are the questions you're going to

7    be answering in your verdict, and I think by going over

8    the verdict form, it will give you sort of an overview

9    to the remainder -- remainder of my instructions.

10         You will see on the first page is the

11   name of the case, verdict form, and then it says:  In

12   answering these questions, you are to follow all of the

13   instructions I have given you in the Court's Charge.

14         Question No. 1:  Did ACQIS prove, by a

15   preponderance of the evidence -- and that's that

16   standard of proof that I will visit with you about in a

17   minute -- did ACQIS prove, by a preponderance of the

18   evidence, that IBM infringed any of the asserted claims

19   of the ACQIS patents identified below.

20         Then you'll see each of the patents

21   listed and for each patent the claims that are asserted,

22   and you will answer yes or no for each listed claim.

23   That's infringement.

24         Now, if you'll turn to the next page, is

25   the issue dealing with the invalidity.  And this -- you

1    are first instructed for each listed claim, you answer

2    yes to in Question 1 -- in other words, if you found,

3    yes, there was infringement, then you will answer as to

4    that claim, but only those claims that you answer yes to

5    in the first question.

6              If you answered no to any of the claims

7    in Question 1, then you don't answer that portion of

8    Question 2.  Everybody understand that?

9              Okay.  And the question in Question 2 is:

10   Did IBM prove, by clear and convincing evidence --

11   there's that standard of proof -- that such claim of the

12   patents-in-suit is invalid?  Then answer yes or no for

13   each invalidity theory.

14             And as you'll recall, there were two:

15   Invalidity by anticipation or invalidity by obviousness.

16   So you see each of the three patents listed, each of the

17   claims relating to that patent, and then you will answer

18   whether IBM proved by clear and convincing evidence as

19   to, say, Claim 12, that it was invalid by anticipation.

20   You will answer yes or no.

21             Then as to obviousness, you will answer

22   yes or no, and you'll do that for each of those claims

23   listed.

24             All right.  Then after you have answered

25   that question, what sum of money -- the next question,

1   No. 3, is the damage question.  What sum of money, if

2   paid now in cash, do you find from a preponderance of

3   the evidence -- that evidence standard -- would fairly

4   and reasonably compensate ACQIS for IBM's patent

5   infringement.

6                 Only award damages for those claims you

7   find infringed by IBM and not proven invalid by IBM.  In

8   other words, you would be answering only to those claims

9   that you find -- answered both yes to infringement and

10  no as to invalidity, both anticipation and obviousness,

11  okay?

12                Only award damages for those claims you

13  find infringed by IBM and not proven invalid by IBM.  In

14  other words, do not award damages for claims that you

15  did not find infringed by IBM or those claims where IBM

16  proved the claim invalid.

17                Everybody follow that?

18                Okay.  Then the place for your answer,

19  signed this blank day of February 2011.  Date it; your

20  jury foreperson will sign the verdict form.

21                So that's an overview of the questions.

22                Now let me visit with you about burdens

23  of proof.  As I told you in any legal action, facts must

24  be proved by a required amount of evidence known as the

25  burden of proof or standard of proof.

1            In a patent case such as this, there are

2    two different burdens of proof that are used.  The first

3    is the preponderance of the evidence standard, and the

4    second is the clear and convincing evidence standard.

5            The preponderance of the evidence

6    standard means that the evidence persuades you that a

7    claim is more likely true than not true.

8            The clear and convincing evidence

9    standard means that the evidence produces in your mind a

10   firm belief or conviction as to the matter at issue.

11           The clear and convincing evidence

12   standard requires greater proof than is necessary for

13   the preponderance of the evidence standard.

14           ACQIS has the burden of proving

15   infringement by a preponderance of the evidence, as you

16   noted in Question 1.  In determining whether any fact

17   has been proved by a preponderance of the evidence, you

18   may, unless otherwise instructed, consider the

19   stipulations, the testimony of all witnesses, regardless

20   of who may have called them, and all exhibits received

21   into evidence, regardless of who may have produced them.

22           If the proof establishes that all

23   essential parts of ACQIS' infringement claim is more

24   likely true than not true, then you should find for

25   ACQIS as to that claim.

1          As issued, United States patent --

2    patents that are issued by the United States Patent &

3    Trademark Office, as ACQIS' patents were, they are

4    presumed to be valid.

5          IBM has the burden of overcoming that

6    presumption and proving invalidity of the ACQIS patent

7    claims by clear and convincing evidence.  There's that

8    other evidence standard that you saw in Question 2.

9          In determining whether any fact has been

10   proved by clear and convincing evidence, you may, unless

11   otherwise instructed, again consider the stipulations,

12   the testimony of all witnesses, regardless who have may

13   have called them, and all exhibits received into

14   evidence, regardless of who may have produced them.

15         Evidence of prior art which was not

16   reviewed by the PTO may be more probative of meeting

17   this standard than prior art which was reviewed by the

18   PTO.

19         The clear and convincing evidence

20   standard requires a greater degree of proof than is

21   necessary for the preponderance of the evidence

22   standard.  The proof must establish a firm belief or

23   conviction in your mind that the invalidity claims are

24   correct for you to find that ACQIS' patents are invalid.

25         Now, turning to the claims, the patent

1    claims.  At the beginning of the trial, I gave you some

2    general information about patents and the patent system

3    and a brief overview of the patent laws relevant to this

4    case.  I will now give you more detailed instructions

5    about the patent laws that specifically relate to this

6    case.

7              If you would like to review my

8    instructions at any time during your deliberations, they

9    will be available to you in the jury room.

10             The claims of a patent are the numbered

11   sentences at the end of the patent.  The claims describe

12   the claimed inventions and define what the patent owner

13   may prevent others from doing.  Claims may describe

14   products, such as machines or chemical compounds, or

15   methods for performing the function.  Each of the claims

16   must be considered individually.

17             Claims are usually divided into parts or

18   steps called limitations or claim elements.  For

19   example, a claim that covers the invention of a table

20   may recite the table top, four legs, and the glue that

21   secures the legs to the table top.  In this example, the

22   table top, legs, and glue are each a separate element or

23   limitation of the claim.

24             Now, with regard to construction of the

25   claims.  In deciding whether or not an accused method or

1    product infringes the patent, the first step is to

2    understand the meaning of the words used in the patent

3    claims.  It is my job as Judge to determine what the

4    patent claims mean and to instruct you about that

5    meaning.

6              You must accept the meanings I give you

7    and use those meanings when you decide whether or not

8    the patent claims are infringed and whether or not they

9    are invalid.

10             I have interpreted the meaning of some of

11   the language in the patent claims involved in this case.

12             My interpretation of those claim terms

13   appears in Appendix A to this charge.  You will have

14   those attached, and it's a chart, and there's about six

15   different terms that have been interpreted by the Court.

16             The claim language I have not interpreted

17   for you in Appendix A is to be -- to be given its

18   ordinary and a custom meaning as understood by one of

19   ordinary skill in the art.  So if I didn't define a

20   word, then you are to give it its ordinary and customary

21   meaning as understood by one of ordinary skill in the

22   art.  And you've heard testimony about that from various

23   witnesses.

24             Now, open-ended or comprising claims.

25   The beginning or preamble of certain claims use the word

1    comprising.  Comprising means including containing but

2    not limited to.  That is, if you decide that IBM's

3    products include all of the requirements of the claim,

4    then the claim is infringed.  This is true even if the

5    accused products include components in addition to those

6    requirements set forth in the claim.

7                    For example, a claim to a table

8    comprising a table top, legs, and glue would be

9    infringed by a table that includes a table top, legs,

10   and glue, even if that table also includes wheels on the

11   table legs.

12                   Now, with regard to independent and

13   dependent claims.  So far, my instructions on

14   infringement have applied to what are known as

15   independent claims.  The patents also contain dependent

16   claims.  Each dependent claim refers to an independent

17   claim.

18                   A dependent claim includes each of the

19   requirements of the independent claim to which it refers

20   and one or more additional requirements as set forth in

21   the dependent claim.  Therefore, to determine what a

22   dependent claim covers, it is necessary to look both at

23   the dependent claim and the other claim or claims to

24   which it refers.

25                   Asserted Claims 12 and 74 of the '415

1    patent and Claim 57 of the '779 patent are dependent

2    claims.  In order to find infringement of Dependent

3    Claims 12 and 74 of the '415 patent, you must first

4    determine whether Independent Claims 11 and 73,

5    respectively, of the '415 patent are infringed.

6                   In order to find infringement of

7    Dependent Claim 57 of the '779 patent, you must first

8    determine whether Independent Claim 56 of the '779

9    patent is infringed.  If you decide that the independent

10   claim has not been infringed, then the dependent claim

11   cannot have been infringed.

12                   If you decide that the independent claim

13   has been infringed, you must then separately determine

14   whether each additional requirement of the dependent

15   claim has also been included in the accused products and

16   thus infringes.

17                   If each additional requirement has been

18   included, then the dependent claim has been infringed.

19   ACQIS must prove by a preponderance of the evidence that

20   a patent claim has been infringed.  Again, that's the

21   burden of proof.

22                   Now, with regard to infringement.  The

23   first type of infringement I want to discuss with you is

24   direct infringement.  I will instruct you on the rules

25   you must follow to determine whether ACQIS has proven

1    that IBM has infringed one or more claims of the patents

2    involved in this case.

3             You must decide whether IBM has made,

4    used, sold, or offered for sale within the United States

5    or imported into the United States products covered by

6    the asserted claims.  You must compare each claim to

7    each IBM product that ACQIS accuses of infringement to

8    determine whether every requirement of the claim is

9    included in the accused products.

10            To prove literal infringement, ACQIS must

11   prove by a preponderance of the evidence -- there's that

12   standard again -- that IBM's products include every

13   requirement in ACQIS' patent claims.  If a product omits

14   any requirement recited in ACQIS' patent claim, then

15   that product does not infringe that claim.

16            For literal infringement, ACQIS is not

17   required to prove that IBM intended to infringe or even

18   knew of the patent; just that all of the elements of the

19   claim are met in the product.  Now that's direct

20   infringement.

21            Next is what is known as indirect

22   infringement.  ACQIS also alleges that IBM indirectly

23   infringed the patents-in-suit by inducing infringement

24   by another.  The act of encouraging or inducing others

25   to infringe a patent is called inducing infringement.

1               A party includes -- a party includes

2    patent infringement -- oh, excuse me -- a part -- a

3    party induces patent infringement, if it is

4    purposefully -- I better put these back on.

5               A party induces patent infringement if it

6    purposefully causes, urges, or encourages another to

7    infringe the claims of a patent.

8               Inducing infringement cannot occur

9    unintentionally.  This is different from direct

10   infringement, which can occur unintentionally.  To prove

11   IBM induced patent infringement, ACQIS must prove by a

12   preponderance of the evidence that:

13              (1) IBM actively encouraged or instructed

14   another person on how to use a product in a way that

15   infringes at least one patent claim;

16              (2) that IBM knew of the patent at that

17   time;

18              And (3) that IBM knew or should have

19   known that the encouragement or instructions would

20   result in infringement of at least one patent claim;

21              And (4) the other person infringed at

22   least that one patent claim.

23              ACQIS must prove that IBM had a specific

24   intent to induce infringement.  ACQIS must prove that

25   IBM knowingly induced infringement, not merely that IBM

1    knowingly induced the acts that constitute infringement.

2                   Finally, ACQIS must prove that there is

3    direct infringement for each instance of indirect

4    infringement.

5                   And, again, on -- as on direct

6    infringement, ACQIS' burden there is by a preponderance

7    of the evidence.

8                   Now, with regard to invalidity.  Patent

9    invalidity is a defense to patent infringement, and IBM

10   contends that the asserted claims of ACQIS'

11   patents-in-suit are invalid.

12                  An issued patent is accorded a

13   presumption of validity based on the presumption that

14   the United States Patent & Trademark Office acted

15   correctly when it issued the patent.  Even though the

16   Patent Office Examiner has allowed the claims of a

17   patent, however, you have the ultimate responsibility

18   for deciding whether the claims of the patent are valid.

19                  I will now instruct you on the invalidity

20   issues you should consider.  As you consider these

21   issues, remember that IBM bears the burden of proving,

22   with clear and convincing evidence, that the claims are

23   invalid.

24                  The first is anticipation, which you will

25   notice the question that you will be answering in

1    Question 2, Column 1.

2                    IBM contends that the asserted claims are

3    invalid, because the claimed invention is not new, based

4    on the Ketris reference prior art.  You will recall the

5    Ketris reference that was referred to by the witnesses.

6                    For a claim to be invalid based -- or for

7    a claim to be invalid because it is not new, all of its

8    requirements must have existed in a single device or

9    method that predates the claimed invention or must have

10   been described in a single previous publication or

11   patent that predates the claimed invention.

12                    In patent law, such previous device,

13   method, publication, or patent is called a prior art

14   reference.  If a patent claim is not new, then we say

15   that it is anticipated by a prior art reference.

16                    IBM must prove with clear and convincing

17   evidence that the claim was anticipated.  The disclosure

18   in the prior art reference does not have to be in the

19   same words as the claim; but all of the requirements of

20   the claim must be there, either stated or necessarily

21   implied, so that someone of ordinary skill in the art,

22   looking at that one reference, would be able to make and

23   use at least one embodiment of the claimed invention.

24                    Anticipation also occurs when the claimed

25   invention inherently, necessarily results from practice

1    of what is disclosed in the written reference, even if

2    the inherent disclosure was unrecognized or

3    unappreciated by one of ordinary skill in the field of

4    the invention.

5                    Here is a list of the ways that IBM can

6    show that a patent claim was not new.

7                    Here is a list of the ways that IBM can

8    show that a patent claim was not new:

9                    If the claimed invention was already

10   publicly known or publicly used by others in the United

11   States before May 12, 2000 -- that's the critical date

12   that you've heard referred to;

13                   If the claimed invention was already

14   patented or described in a printed publication anywhere

15   in the world before May 12th, 2000;

16                   If the claimed invention was already

17   described in another published U.S. Patent application

18   or issued U.S. patent that was based on a patent

19   application filed before May 12th, 2000;

20                    If a patent claim is not new, as

21   explained above, then you must find it is invalid based

22   on anticipation.

23                   Another way of finding anticipation is if

24   it's made or invented by someone else.

25                   IBM con -- also contends that each of the

1  asserted claims of the patents-in-suit are invalid as

2  anticipated, because the invention was first made or

3  invented by someone else, specifically the Ketris prior

4  art.

5          If someone other than Dr. Chu made or

6  invented the invention described in one or more of such

7  patent claims involved in this lawsuit, then each such

8  claim was anticipated by the other invention and each

9  such claim is invalid.

10          Again, IBM must prove by clear and

11  convincing evidence that each such claim was anticipated

12  by the other invention.

13          Here is a list of the ways that IBM can

14  show that a patent claim was not new, because the

15  invention described in the -- such claim was first made

16  or invented by someone else.

17          First, if the claimed invention was

18  already made by someone else in the United States before

19  the date of Dr. Chu's invention, if that other person

20  had not abandoned -- abandoned the invention or kept its

21  secret;

22          Next, if ACQIS and IBM dispute who is a

23  first inventor, the person who first conceived of the

24  claimed invention and first reduced it to practice is

25  the first inventor;

1          If one person conceived of the claimed

2    invention first but reduced it to practice second, that

3    person is the first inventor, only if that person,

4               (a) began to reduce the claimed invention

5    to practice before the other party conceived of it;

6               And (b) continued to work with reasonable

7    diligence to reduce to it practice from a time just

8    before the other party's conception.

9               In order to prove prior invention in this

10   case, IBM is required to present additional evidence

11   beyond the testimony of the prior inventor.  However,

12   you must evaluate all pertinent evidence, including that

13   testimony, and make a sound determination that the

14   evidence credibly establishes the prior invention.

15              Ultimately, IBM bears the burden of

16   proving with clear and convincing evidence that the

17   patent claims are invalid.  If the invention of a patent

18   claim was first made or invented by someone else, as

19   explained above, you must find that the patent claim is

20   invalid.

21              The next way in which the defense of

22   anticipation can be found is what's called statutory

23   bar.

24              IBM may prove that the asserted claims of

25   the patents-in-suit are invalid by showing by clear and

1    convincing evidence that each such claim failed to meet

2    one of several statutory provisions in the patent laws.

3    These provisions are called statutory bars.

4              For a patent claim to be invalid because

5    of a -- of a statutory bar, all the requirements must

6    have been present in the Ketris prior art reference

7    dated more than one year before the effective filing

8    date of the patent application.

9              Here is a list of the ways that IBM can

10   show that the patent application was not timely filed,

11   that is, filed within one year of the occurrence of any

12   of the following events:

13             If the claimed invention was already

14   patented or described in a printed publication anywhere

15   in the world before the effective filing date of the

16   patent application.

17             A reference is a printed publication if

18   it is reasonably accessible to those interested in the

19   field, even if it is difficult to find.

20             An electronic publication, including

21   online or internet publication, is a printed publication

22   if it is at least reasonably accessible to those

23   interested in the field, even if it is difficult to

24   find.

25             Next, if the claimed invention was

1   already being publicly or commercially used in the

2   United States more than one year before the effective

3   filing date of the patent application and that use was

4   not primarily an experimental use controlled by the

5   inventor to test whether the invention worked for its

6   intended purpose.

7           Also, if a device or method using the

8   claimed invention was sold or offered for sale in the

9   United States, and that claimed invention was ready for

10  patenting more than one year before the effective filing

11  date of the patent application.

12          The claimed invention is ready for

13  patenting if it was actually built or if the inventor

14  had prepared drawings or other descriptions of the

15  claimed invention that were sufficiently detailed to

16  enable a person of ordinary skill in the field of the

17  invention to make and use the invention based on.

18          For a claim to be invalid because of a

19  statutory bar, all of the claimed requirements must have

20  been either (1) disclosed in a single prior art

21  reference; or (2) implicitly disclosed in a single prior

22  art reference as viewed by one of ordinary skill in the

23  art.

24          The disclosure in a reference does not

25  have to be in the same words as the claim, but all the

1    requirements of the claim must be described in enough

2    detail or necessarily implied by or inherent in the

3    reference to enable someone of ordinary skill in the

4    field of the invention looking at the reference to make

5    and use at least one embodiment of the claimed

6    invention.

7                    A prior art reference also invalidates a

8    patent claim when the claimed invention necessarily

9    results from practice of the subject of the prior art

10   reference, even if the result is unrecognized and

11   unappreciated by one of ordinary skill in the field of

12   the invention.

13                   If you find a patent claim failed to meet

14   a statutory bar, you must find that patent claim valid.

15                   All right.  That concludes my

16   instructions with regard to the defense of invalidity

17   based on anticipation, which is Column 1 of Question 2.

18                   I am now going to instruct you with

19   regard to the defense of invalidity by obviousness.

20   That would be in Column 2 of Question 2.

21                   In this case, IBM also contends that the

22   asserted claims of the patents-in-suit are invalid as

23   obvious based on the Ketris, QuantumNet, RLX, and Hong

24   Kong (sic) and combinations thereof references.  A

25   single reference can also form the basis for a finding

1    of obviousness.

2                   A patent claim is invalid if the claimed

3    invention would have been obvious to a person of

4    ordinary skill in the field of the invention at the time

5    the application was filed.

6                   This means that even if all the

7    requirements of the claim cannot be found in a single

8    prior art reference that would anticipate the claim or

9    constitute a statutory bar to that claim, a person of

10   ordinary skill in the field of the invention who knew

11   about all of the prior art would have come up with the

12   claimed invention.

13                  But a patent claim composed of several

14   requirements is not proved obvious merely by

15   demonstrating that each of its requirements was

16   independently known in the prior art.

17                  Although common sense directs one to look

18   with care at a patent application, the claims and

19   innovation -- that claims as innovation, the combination

20   of known requirements according to their established

21   function to produce a predictable result, it can be

22   important to identify a reason that would have prompted

23   a person of ordinary skill in the relevant field to

24   combine the requirements in the way the claims new

25   invention combines them.

1          This is so because inventions in most, if

2     not all instances, rely upon building blocks long since

3     uncovered, and claimed discoveries almost of necessity

4     will be combinations of what in some sense is already

5     known.

6          Accordingly, you may evaluate whether

7     there was some teaching, suggestion, or motivation to

8     arrive at the claimed invention before the time of the

9     claimed invention, although the proof -- although proof

10    of this is not a requirement to prove obviousness.

11         Teachings, suggestions, and motivations

12    may be found in written references including the prior

13    art itself.

14         Teachings, suggestions, and motivations

15    may also be found within the knowledge of a person of

16    ordinary skill in the art, including inferences and

17    creative steps that a person of ordinary skill in the

18    art would employ.

19         Additionally, teachings, suggestions, and

20    motivations may be found in the nature of the problem

21    solved by the claimed invention or any need or problem

22    known in the field of the invention at the time of

23    the -- at the time of and addressed by the invention.

24         Therefore, in evaluating whether such a

25    claim would have been obvious, you should consider a

1    variety of factors:

2                    (1) Whether IBM has identified a reason

3    that would have prompted a person of ordinary skill in

4    the field of the invention to combine the requirements

5    or concepts from the prior art in the same way as in the

6    claimed invention.

7                    There is no single way to define the line

8    between true inventiveness on one hand (which is

9    patentable) and the application of common sense and

10   ordinary skill to solve a problem on the other hand

11   (which is not patentable).

12                   For example, market forces or other

13   design incentives may be what produced a change rather

14   than true inventiveness.

15                   (2) Whether the claimed invention applies

16   a known technique that had been used to improve a

17   similar device or method in a similar way.

18                   (3) Whether the claimed invention would

19   have been obvious to try, meaning that the claimed

20   innovation was one of a relatively small number of

21   possible approaches to the problem with a reasonable

22   expectation of success by those skilled in the art.

23                   However, you must be careful not to

24   determine obviousness from using hindsight.  Many true

25   inventions can seem obvious after the fact.

1        You should put yourself in the position

2   of the person of ordinary skill in the field of the

3   invention at the time the claimed invention was made,

4   and you should not consider what is known today or what

5   is learned from the teaching of the patent.

6        The ultimate conclusion of whether a

7   claim is obvious should be based on your determination

8   of several factual issues:

9        (1) You must decide the level of ordinary

10  skill in the field of the invention that someone would

11  have had at the time the claimed invention was made.

12       (2) You must decide the scope and content

13  of the prior art.  In determining the scope and content

14  of the prior art, you must decide whether a reference is

15  pertinent or analogous to the claimed invention.

16       Pertinent or analogous prior art includes

17  prior art in the same field of endeavor as the claimed

18  invention, regardless of the problems addressed by the

19  reference, and prior art from different fields

20  reasonably pertinent to the particular problem with

21  which the claimed invention is concerned.

22       Remember, that prior art is not limited

23  to patents and published materials but includes the

24  general knowledge that would have been available to one

25  of ordinary skill in the field of the invention.

1              (3) You must decide what difference, if

2    any, existed between the claimed invention and the prior

3    art.

4              Finally, you should consider any of the

5    following factors that have -- that you find have been

6    shown by the evidence:

7              First is factors tending to show

8    non-obviousness; in other words, that it's non-obvious.

9              And those factors include:

10             (1) the commercial success of a product

11   due to the merits of the claimed invention;

12             (2) a long-felt but unsolved need for the

13   solution provided by the claimed invention;

14             (3) unsuccessful attempts by others to

15   find a solution provided by the claimed invention;

16             (4) copying of the claimed invention by

17   others;

18             (5) unexpected and superior results from

19   the claimed invention;

20             (6) acceptance by others of the claimed

21   invention as shown by praise from others in the field of

22   the invention or from the licensing of the claimed

23   invention;

24             And (7) disclosures in the prior art that

25   criticize, discredit, or otherwise discourage the

1    claimed invention and would, therefore, tend to show

2    that the invention was not obvious;

3              (8) other evidence tending to show

4    non-obviousness.

5              And by non-obviousness, I mean that it

6    was not obvious.

7              Now, you may consider the presence of any

8    of the factors that I've just listed for you as an

9    indication that the claimed invention would not have

10   been obvious at the time the claimed invention was made.

11             Now, (B) factors tending to show

12   obviousness:

13             (1) independent invention of the claimed

14   invention by others before or at about the same time the

15   named inventor thought of it;

16             And (2) other evidence tending to show

17   obviousness.

18             You may consider the presence of any of

19   the factors listed above as an indication that the

20   claimed invention would have been obvious at such time,

21   although you should consider any evidence of these

22   factors, the relevance and importance of any of them to

23   your decision on whether the claimed invention would

24   have been obvious is, again, up to you, the finder of

25   fact.

1              IBM must prove with clear and convincing

2     evidence -- there's that standard -- that a claimed

3     invention was obvious.  If you find that the claimed

4     invention was obvious as explained above, you must find

5     that the claim -- that claim invalid.

6              Now, with regard to the scope and content

7     of prior art, ACQIS and IBM disagree on whether the

8     prior art references relied upon by IBM should be

9     included in the prior art you use to decide the validity

10    of the asserted claims.

11             To qualify as prior art relevant to the

12    patents-in-suit, these references must be reasonably

13    related to the claimed invention of that patent.

14             A reference is reasonably related if it

15    is in the same field as the claimed invention or is from

16    another field to which a person of ordinary skill in the

17    field would look to solve a problem.

18             Remember that prior art is not limited to

19    patents and published materials but also includes the

20    general knowledge that would have been available to one

21    of ordinary skill in the field of the invention.

22             In reaching your conclusion about whether

23    or not claims of the patents-in-suit would have been

24    obvious at the time the claimed invention was made, you

25    should consider any difference or differences between

1    the prior art references and the claim requirements.

2               Now, with regard to level of ordinary

3    skill, several times in my instructions I have referred

4    to a person of ordinary skill in the field of the

5    invention or otherwise referred to as ordinary skill in

6    the art.

7               It is up to you, the finder of fact, to

8    decide the level of ordinary skill in the field of the

9    invention or art.  You must consider all the evidence

10   introduced at trial in making this decision, including:

11              (1) the levels of education and

12   experience of persons working in the field;

13              (2) the types of problems encountered in

14   the field;

15              And (3) the sophistication of the

16   technology.

17              ACQIS contends that the level of ordinary

18   skill in the field of the invention was at least a

19   bachelor's degree in computer science, computer

20   engineering, or electrical engineering and three to five

21   years of experience working in the field of computer

22   design, packaging, and interconnect.

23              IBM contends that an individual with

24   ordinary skill in the field would have a bachelor's

25   degree in electrical engineering and four or more years

1     of relevant experience, a master's degree or a doctorate

2     degree in electrical engineering, and two or more years

3     of relevant experience or eight or more years of

4     relevant experience.

5                    All right.  That concludes the

6     instructions regarding the second question, which is

7     invalidity.

8                    I now turn to the third question, which

9     is damages.

10                    If you find that IBM has infringed one or

11    more claims of the asserted patents, you must decide the

12    amount of money damages to which ACQIS is entitled.

13                    By instructing you on damages, I do not

14    suggest that one or the other party should prevail.

15                    These instructions are provided to guide

16    you on the calculation of damages in the event you find

17    infringement of a valid patent and thus must address the

18    damage issue.

19                    And you saw that in the instructions.  If

20    you find that it's infringed and not invalid, then you

21    find damages.

22                    The amount of damages must be adequate to

23    compensate ACQIS for the infringement, but it may not be

24    less than a reasonable royalty.

25                    At the same time, your damages

1    determination must not include additional sums to punish

2    IBM or to set an example.  You may award compensatory

3    damages only for the loss that ACQIS proves was more

4    likely than not caused by IBM's infringement.

5              Now, with regard to the burden of proof,

6    where the party -- where the parties dispute a matter

7    concerning damages, it is ACQIS's burden to prove that

8    it is more probable than not -- that's that

9    preponderance of the evidence standard -- that ACQIS's

10   version is correct.

11             ACQIS must prove the amount of damages

12   with reasonable certainty but need not prove the amount

13   of damages with mathematical precision.  However, ACQIS

14   is not entitled to damages that are remote or

15   speculative.

16             Now, with regard to when damages begin,

17   in this case, for each patent found infringed that was

18   granted before the infringing activity began, you should

19   calculate damages as of the date you determine that the

20   infringement began.

21             If you find the patent was granted after

22   the infringing activity began, damages should be

23   calculated as of the date that the patent issued.

24             Now, let me define for you reasonable

25   royalty.  A royalty is a payment made to a patent holder

1    in exchange for the rights to make, use, or sell the

2    claimed invention.

3              A reasonable royalty is the payment that

4    would have resulted from a negotiation between ACQIS and

5    IBM taking place just before the time when the

6    infringement first began.

7              In considering the nature of this

8    negotiation, the focus -- the focus is on what the

9    expectations of ACQIS and IBM would have been had they

10   entered into an agreement at that time and acted

11   reasonably in their negotiations.

12             However, you must assume that both

13   parties believed the patent was valid and infringed.

14             In addition, you must assume that ACQIS

15   and IBM were willing to enter into an agreement.  Your

16   role is to determine what that agreement would have

17   been.

18             The test for damages is what royalty

19   would have resulted from this hypothetical negotiation

20   and not simply what either party would have preferred.

21             You may consider expert opinions as to

22   what the amount of a reasonable royalty should be, but

23   you're not bound by any of that.  You can believe all of

24   either witness or none of either witness or anything in

25   between.

1              In determining the royalty that would

2     have resulted from the hypothetical negotiation, you may

3     consider real-world facts, including the following, to

4     the extent they are helpful to you:

5                   (1) licenses or offers to license the

6     patent at issue in this case;

7                   (2) licenses involving comparable

8     patents;

9                   (3) the licensing history of the parties;

10                  (4) licensing practices in the relevant

11    industry;

12                  (5) whether the patent owner had an

13    established policy of refusing to license the patent at

14    issue;

15                  (6) the relationship between the patent

16    owner and the alleged infringer, including whether or

17    not they were competitors;

18                  (7) the significance of the patented

19    technology in promoting sales of the alleged infringer's

20    products and earning it profit;

21                  (8) alternatives to the patented

22    technology and advantages provided by the patented

23    technology relative to those alternatives.

24              I lost count, but the next one is:  The

25    portion of the alleged infringer's profit that should be

1    credited to the invention as distinguished from

2    non-patented features, improvements, or contributions.

3              And, finally, any other economic factor

4    that is norm -- that a normally prudent business person

5    would, under similar circumstances, take into

6    consideration in negotiating a hypothetical license.

7              When considering evidence of licenses

8    taken by other parties in the patents-in-suit, the time

9    of the taking of the license may be important.

10             Licenses taken during an arm's-length

11   transaction before litigation begins or before threats

12   of litigation have been made may be more probative than

13   license that -- licenses that are taken during or under

14   the threat of litigation, as there may be other factors

15   at play in the litigation setting, such as, for example,

16   the cost of defending the litigation.

17             Now, you've heard testimony regarding the

18   entire market value rule.  Let me explain that to you.

19   Under the entire market value rule, a patent owner may

20   recover a reasonable royalty based on the value of an

21   entire apparatus or product containing several features,

22   even though only one feature of that entire apparatus or

23   product is patented.

24             However, the entire market value rule

25   only applies where the patent owner establishes that the

1    patented feature creates the basis for customer demand

2    or substantially creates the value of the component

3    parts.

4                    Now, with regard -- that concludes my

5    instructions on damages.  Now I have just a few final

6    instructions for you regarding your deliberations.

7                    You must perform your duties as jurors

8    without bias or prejudice as to any party.

9                    The law does not permit you to be

10   controlled by sympathy, prejudice, or public opinion.

11                   All parties expect that you will

12   carefully and impartially consider all the evidence,

13   follow the law as you -- as it is now being given to

14   you, and reach a just verdict regardless of the

15   consequences.

16                   It is your sworn duty as jurors to

17   discuss the case with one another in an effort to reach

18   agreement, if you can do so.

19                   Each of you must decide the case for

20   yourself but only after full consideration of the

21   evidence with the other members of the jury.

22                   While you are discussing the case, do not

23   hesitate to re-examine your opinion and change your mind

24   if you become convinced that you are wrong.

25                   However, do not give up your honest

1    beliefs solely because the others think differently or

2    merely to finish the case.

3              Remember that in a very real way, you are

4    the judges:  Judges of the facts.  Your only interest is

5    to seek the truth from the evidence in this case.

6              You should consider and decide this case

7    as a dispute between persons of equal standing in the

8    community, of equal worth, and holding the same or

9    similar stations in life.

10             A corporation is entitled to the same

11   fair trial as a private individual.  All persons,

12   including corporations and other organizations, stand

13   equal before the law and are to be treated as equals.

14             When you retire to the jury room to

15   deliberate your verdict, you may take this charge with

16   you, as well as all of the exhibits which the Court has

17   admitted into evidence.

18             Those will be sent to you.  There will

19   also be an index sheet that you can use to locate

20   specific exhibits.

21             You should first select your foreperson

22   and then begin conducting your deliberations.  If you

23   should recess during your deliberations, follow the

24   instructions that the Court has given you about your

25   conduct during the trial.

1                   If you -- when you retire to deliberate,

2      if you wish to take a break just to get outside or clear

3      your heads, just to take a break and want to leave the

4      jury room, please give a note -- send a note to me

5      through the Court Security Officer that you would like

6      to take a break; and at that time, I'll clear the

7      hallways, have everybody in here while you take your

8      break where you won't be bumping into lawyers and

9      witnesses and that type of thing in the hallway.

10                  Then when you come back, just -- the

11     Court Security Officer will let me know you're back.

12     But while you're on those breaks, remember the

13     instructions.

14                  Again, you're still not to break up into

15     little groups and start talking about the case.  You're

16     only to discuss the case when all eight of you are there

17     and everyone can hear everything that's said.

18                  That even applies if somebody has to go

19     to the restroom.  You just all need to take a break,

20     talk about anything else, but wait till that person gets

21     back until you discuss the case further.

22                  After you have reached your unanimous

23     verdict, your foreperson is to fill in on the form --

24     verdict form, your answers to the questions.  Do not

25     reveal your answers until such time as you are

1    discharged unless otherwise directed by me.

2              You must never disclose to anyone, not

3    even to me, your numerical division on any questions.

4              Any notes that you may have taken during

5    this trial are not evidence.  They're only aids to your

6    memory.  If your memory should differ from your notes,

7    then you should rely on your memory and not on your

8    notes.  The notes are not evidence, as I said.

9              A juror who has not taken notes should

10   rely on his or her independent recollection of the

11   evidence and should not be unduly influenced by the

12   notes of other jurors.  Notes are not entitled to any

13   greater weight than the recollection or impression of

14   each juror of the testimony.

15             If you wish to communicate with me at any

16   time, please give a written message or question to the

17   Court Security Officer, who will bring it to me.  I will

18   then respond as promptly as possible either in writing

19   or by having you brought into the courtroom so that I

20   can address you orally.

21             I will always first disclose to the

22   attorneys your question and my response before I answer

23   your question.

24             After you have reached a verdict, you are

25   not required to talk with anyone about the case unless

1    the Court otherwise -- orders otherwise.

2                    Now, let me give you one final

3    instruction.  And we're about through, and we'll take a

4    short break here before we hear closing arguments.

5                    After closing arguments, I'm actually

6    supposed to be in Rockwall at 1:00 o'clock for a meeting

7    of the Eastern District Judges to interview magistrate

8    judges for the Beaumont Division.  I'm going to try to

9    make that.  I'm going to be a little bit late.

10                   So I will not be here physically during

11   your deliberations, but Judge Love, who is a Magistrate

12   Judge, will be here.  And so if you get a note back

13   that's signed by Judge Love instead of Judge Davis, I'm

14   not trying to get familiar with you; I'm just -- I

15   wanted you to understand who Judge Love was.

16                   He's an excellent Judge.  I'll be

17   available to him by phone if any matters come up, so

18   he'll have the benefit of my experience through setting

19   through the trial in responding to your questions, but I

20   just want -- I wish I could be here.

21                   I always like to come back and visit with

22   the jurors afterwards to thank them for their work, and

23   I won't have the opportunity to do that this time, so

24   I'll just do it now.

25                   And I do thank each and every one of you

1   for being here, for lending your wisdom, your time to

2   this collective process we call trial by jury.  And I'm

3   confident that you'll reach the right decision in this

4   case.  You've paid attention, you've done a good job,

5   and the Court really appreciates your service.

6               So at this time, we'll take our recess.

7   Please remember my instructions.  Still don't discuss

8   the case.  We'll come back at 15 minutes after 10:00, at

9   which time we'll begin closing arguments.

10              COURT SECURITY OFFICER:  All rise.

11              (Jury out.)

12              THE COURT:  Please be seated.

13              All right.  Did the parties have a matter

14  that they wanted to take up with me before we argue the

15  case?

16              MR. VERHOEVEN:  Sorry.  I think we've

17  resolved it.  We met and conferred since I spoke.

18              THE COURT:  Great.  You're doing

19  wonderful.

20              MR. VERHOEVEN:  So I've been told that

21  the thing I objected to is not -- that Counsel is not

22  going to go into it, so...

23              THE COURT:  All right.  Very good.

24              Anything else?

25              MR. FRIEL:  Yes.  One very small

1   housekeeping matter.  First, I think we all appreciate

2   the hard work that Ms. Werlinger has done on the

3   transcripts.

4              We've combed through them, and the

5   remarkable thing is we found only one error, and we've

6   stipulated to it.  And on the February 14th transcript,

7   there's a typographical error at Page 56, Line 14.  It

8   refers to Exhibit -- sorry.  It -- the -- as it exists,

9   it refers to PX60, and it should be a reference to PX16,

10  1-6.

11             THE COURT:  Okay.  We'll make that

12  correction.

13             MR. FRIEL:  Thank you.

14             THE COURT:  Any other corrections or

15  suggestions?

16             MR. VERHOEVEN:  I was -- I wasn't here

17  when we did the conference charge -- charge conference,

18  Your Honor, but I was informed that there was a change

19  from last night on Question 2 that basically says:  You

20  only go to Question 2 if you find infringement in

21  Question 1.

22             I just wanted to inquire of Your Honor on

23  that, because I've seen it done -- for example, I did a

24  couple of trials down in Marshall last year where the

25  judge had them answer even if they found, for example,

1    non-infringement just so we would have a complete record

2    and know what they wanted to do.

3                    Now, I apologize, Your Honor.  I didn't

4    notice this until you were reading the charge, and we

5    got it passed out right before then.  But I didn't know

6    what Your Honor's preference was on that.

7                    I think I would -- well, if it's equal, I

8    would prefer them to answer all the questions just so we

9    would have a complete record.

10                   THE COURT:  Okay.  What's the Plaintiff's

11   position with regards to that request?

12                   MR. FRIEL:  Your Honor, our position is,

13   we're happy with the verdict form as given.  It's

14   already been read to the jury, and we would prefer to do

15   it this way.

16                   MR. VERHOEVEN:  There's a technical

17   matter, Your Honor.  We do have a counterclaim of

18   invalidity in the pleadings, and so, you know, this

19   would -- we would request that this -- these questions

20   be answered because of those counterclaims.

21                   THE COURT:  So you're saying -- the

22   reason I usually do this is just so the jury can quit

23   and won't have to go into that if they don't find

24   infringement, to save them time.

25                   But you're saying, even if they didn't

Page 51

1    find infringement, you, under your counterclaim, would

2    still be wanting findings as to --

3              MR. VERHOEVEN:  Yes, Your Honor.  And I

4    apologize for not raising this earlier.

5              THE COURT:  Yeah.  Let me think about

6    that, and I'll -- if I decide to do it, I'll so instruct

7    the jury before we get to closing arguments.

8              MR. VERHOEVEN:  Thank you, Your Honor.

9              COURT SECURITY OFFICER:  All rise.

10             (Recess.)

11             COURT SECURITY OFFICER:  All rise.

12             (Jury in.)

13             THE COURT:  Please be seated.

14             All right.  Ladies and Gentlemen of the

15   Jury, before we do the closing arguments, let me ask you

16   to do one thing.  The verdict form that we passed out to

17   you, if you will, pass all of those back to the Court

18   Security Officer.  I am going to take those up.

19             And then we're going to pass out a new

20   verdict form to you.  And what has happened, after

21   visiting with the attorneys, I've decided I think it

22   will be simpler on Question No. 2, rather than

23   conditioning that on a finding of yes on Question No. 1,

24   just answer Question No. 2 as to each claim with regard

25   to invalidity.

1           And so you'll -- the only change we made

2    was at Question 2 where it had said for each listed

3    claim that you answered yes to Column 1, we took that

4    out.

5           And now it just says:  For each asserted

6    claim of the patents-in-suit, did IBM prove by clear and

7    convincing evidence that such claim was invalid?

8           And so just answer it as to each claim

9    for both anticipation and obviousness, okay?

10          So you will fill in every blank on the --

11   on the verdict form.  Make it simpler.

12          Finally, I just want to tell you, I know

13   those instructions went on for almost an hour.  You are

14   probably just starting to feel like I think I understand

15   this case, and now I give you all those instructions and

16   you may be overwhelmed.

17          But, again, let me just reassure you, the

18   attorneys in closing argument are going to do an

19   excellent job.  They will point out to you the

20   instructions and the evidence what they believe is

21   important, and help guide you through that.

22          And y'all just get in there and use your

23   collective wisdom, which is how our jury systems works,

24   and you'll do fine.

25          So with that, the Court will recognize

1    Counsel for the Plaintiff for purposes of closing

2    argument.

3                    MR. STACY:  With your permission, Judge?

4                    THE COURT:  Yes.

5                    MR. STACY:  Good morning, Ladies and

6    Gentlemen.

7                    So all week you've seen patents on the

8    screen.  You've seen the pictures of them, and you have

9    copies in your notebook.  I just wanted to take a moment

10   to show you what this is really about.

11                   Dr. Chu got three of these from the

12   United States Patent & Trademark Office.  These are

13   called ribbon copies.  It comes with the seal of the

14   Department of Commerce on it, a seal from the United

15   States Trademark -- or Patent & Trademark Office.

16                   This is what we're here for.  These are

17   very important documents.  You've seen that through the

18   week; but sometimes when you see them in PDF up on the

19   screen like this, it takes away from the majesty of what

20   these things really are and how important they really

21   are.

22                   Each of these three documents or these

23   three patents has a very special invention in them.

24   They all attack or all solve the problems in the prior

25   art.

1          Before Dr. Chu's invention -- you've seen

2     it all week -- no serial PCI.  Or I take it back; now

3     you've seen it for two weeks.  You expected to see it

4     just for one week.  But all the old systems, no serial

5     PCI and the problem with that, the same problem you hear

6     with computers all the time:  Slowness and bottlenecks;

7     the data couldn't go through fast enough.

8          What Dr. Chu added was serial PCI.  That

9     was the key.

10          Now, he filed for his patents in 2000.

11     In 2005, IBM began incorporating this idea, this

12     invention into their own technology.  And with that,

13     IBM's technology became successful, but not just IBM,

14     the whole industry.

15          The industry for blade servers changed.

16     It went from a little market, a niche industry, to a

17     multibillion-dollar industry.  Blade servers became

18     important, once this invention was brought in.

19          Now, if you remember on the first day,

20     Dr. Chu drew on the board to try to explain in his own

21     words what his invention was, what he was trying to

22     solve.

23          So if you remember, up at the top, he

24     drew the old computer.  And in that, you see the old PCI

25     bus right here (indicates).  That PCI bus, the best way

1   to visualize it -- and I grew up in the Texas Panhandle,

2   a lot of two-lane roads, and you'd get one lane shut

3   down while they were repairing it, and inevitably, you

4   would have to stop and the traffic come one way, all the

5   traffic would clear, and then they'd let the other one

6   go.  And if you've ever been in a hurry, that is just

7   the worst thing in the world.

8              But computers are always in a hurry, and

9   that was the problem with the old systems.  And it's

10  even a bigger problem when you start putting multiple

11  computers together in those kinds of form factors.

12  That's what Dr. Chu knew, and so he came up with this

13  idea.

14              That is serial PCI.  That's what you saw

15  in his claims.  This solved the bottleneck problem.

16  This allowed everything to work faster.  And this is

17  what the Patent Office granted the patents on, three of

18  them, on this invention, three separate patents.

19              And you heard Counsel from IBM talk about

20  it's one invention; it's one patent.  Well, folks, I

21  don't know what they're talking about.  This is what the

22  Patent Office gave Dr. Chu:  Three patents.

23              Now, that was his drawing here in court.

24  Here's the one exactly out of his patents.  It's

25  Figure 8.  You can see the same type of issues going on

1    here with what he fixed.  Never been done before.  You

2    heard about the northbridge and the southbridge and the

3    serial PCI.  That's what Dr. Chu added.

4                    And what happened when Dr. Chu's

5    invention was put out there?

6                    People recognized the value of it.

7    You've seen this chart over and over.  Other blade

8    server manufacturers recognize that serial PCI is the

9    way of the future.  That's the way you have to go.  And,

10   in fact, what you know now is that all blade servers are

11   relying on serial PCI.  They've now moved completely to

12   Dr. Chu's invention.

13                   So this is really not a fight about

14   whether IBM will compensate Dr. Chu for his invention.

15   So let me take on some of their argument, and I'll just

16   take them from what you heard yesterday.  So we'll start

17   with validity.

18                   Start with Dr. McClure.  So what do we

19   know about Dr. McClure?

20                   What we know about Dr. McClure is that he

21   is a man known for giving invalidity opinions.  You

22   heard from his testimony -- Mr. Brogan drew it out --

23   that in his entire career he's never found a patent

24   valid.  Every time he's asked to opine, he opines the

25   patent is invalid.  He's known for that.

1              It's no wonder that IBM went to him to

2     give an opinion in this case.

3              And what you also heard is when he was

4     asked about what were you asked to do in this case, he

5     said:  I was hired to give an invalidity opinion.  It's

6     his testimony.  I was hired to give an invalidity

7     opinion.  Not to give his opinion, not to give an

8     objective analysis.  He was hired to do what he always

9     does:  Give an invalidity opinion.  It's no surprise

10    that's what he did.

11             But to get there in this case, he had to

12    ignore quite a few facts.  The first thing he had to

13    ignore is the fact that all of the other license -- or

14    all the other licenses that were put out there, these

15    people recognized the validity of Dr. Chu's invention.

16             You heard about it in the Judge's

17    instructions, something called secondary indicia of

18    non-obviousness.  Leave it to the Supreme Court to put a

19    big term on common sense.

20             If a bunch of other people acknowledged

21    the patents, maybe that's a data point you should

22    consider.  It's not the only thing, but maybe you should

23    consider it.

24             Dr. McClure didn't consider it.

25             You remember the Dell white paper.  This

1    was from 2004 or four years after Dr. Chu filed his

2    invention -- or filed for his patent application.

3    Dr. McClure didn't consider this document.  But what

4    does it say?

5              The new bus technology is expected to

6    allow the PCI Express transmission rates.

7    New bus technology in 2004.  And just to make clear, it

8    applies to servers.

9              Figure 13 shows how PCI Express could be

10   implemented.  Could.  Not "has been."  Not "was

11   implemented in the '90s," but "could be implemented."

12             And the reality is, Dell came out with a

13   product several months later, the first in the industry,

14   with blade server and integrated PCI.

15             Dr. McClure didn't consider it.

16             Dr. McClure opined on RLX and said RLX

17   renders all these patents invalid.  Did he once mention

18   who owns RLX; the fact that Hewlett-Packard bought RLX?

19             If anybody knows about RLX, it's probably

20   Hewlett-Packard; not Dr. McClure, not IBM.  Something

21   else he forgot to consider or at least mention to you.

22             You heard Mr. Verhoeven mention several

23   times in the trial that certain pieces of prior art

24   weren't considered by the Patent Office, and you heard

25   it in the Judge's instructions.  Something to think

1    about, something to consider.

2                    Well, if you're going to consider that,

3    wouldn't you like to know the other side, what was

4    considered?

5                    So when you go back in the jury room,

6    pull up these three patents.  Turn to the second page.

7    You'll see a list of patents; you'll see a list of

8    documents.  Those are the things considered by the

9    Patent Office.  Those are the things known by the Patent

10   Office before they sent Dr. Chu these.

11                   And what are you going to find in there?

12   Remember Hong?  You're going to find Hong in there.

13   Nobody bothered to tell you that.

14                   And what else are you going to find?

15   Remember QuantumNet and Mr. Pocrass?  You're going to

16   find Pocrass in there.  The Patent Office knew about

17   Pocrass' work.  There they knew about his patent.  So

18   you won't see the word QuantumNet, but you'll see the

19   Pocrass name.

20                   So now let's look at Dr. McClure's

21   individual opinions.  See if I can put a little light on

22   this.  What do we know?

23                   We know from RLX what Guy Irving had to

24   say.  Unequivocal:  No PCI Express in the old RLX server

25   system.  That means there's no serial PCI.  No debate.

1    You see the same thing for Ketris.  Jim Medeiros:  No

2    serial PCI.

3                    And you see the same thing for

4    QuantumNet:  No serial PCI.

5                    None of those systems had Dr. Chu's

6    serial PCI.  So those three witnesses left IBM in a

7    little bit of a bind.  Their whole theory about the

8    exact math -- we'll show you that it's exactly there --

9    fell apart coupled what they're going to have to do.

10                    But better before I tell you know, remember

11   Dr. Gafford.  Dr. Gafford -- I want you to recall his

12   testimony, and I'm going to point to him several times

13   as we go through this, because Dr. Gafford gets fired up

14   in a way only an engineer can get fired up about this

15   kind of material.

16                    So first, remember the most important

17   thing here -- you saw a debate about it yesterday -- PCI

18   bus transaction.  This is what we're looking at, but

19   we're going to look at it in terms of the whole claim.

20                    So there are two things that we care

21   about, and these claims are representative of all of

22   them:  An interface controller and an ethernet

23   controller.  Notice they're two different things.

24                    Now, I have to remember this and memorize

25   it by focusing on the first letter, I and E.  An

1    interface controller is for internal communications.

2    That's what Dr. Gafford said:  I to I.

3    Ethernet controller here for external communications; E

4    to E.

5                   Helps me keep it straight in my mind at

6    least.  So two separate components.

7                   Now, you didn't see Dr. McClure focusing

8    on these two separate components.  He tried to ignore a

9    lot of the language up here and just focus on something

10   down here (indicates).  But the fact is,

11   internal/external.

12                  You see this in the picture that Dr. Chu

13   drew.  Here, internal; out here, ethernet, external

14   (indicates).  Those are the two separate elements.

15                  Why do you need them?  Because you need

16   to talk inside your computer and outside your computer.

17   You're in an office building.  You need to talk within

18   your office.  You need to talk outside your office.

19   They're two separate things.

20                  The other thing that's important is this

21   PCI address.  This is for internal.  Somebody described

22   it as your internal mail routing at work.

23                  External, it has no meaning; it's

24   gibberish.

25                  These two things speak a different

d1c067ad-0a6c-4ad9-ac0f-1e16aba1a0ce

1    language.  That's why you have to have both of them, and

2    that's why Dr. Chu has both of them in his claims.

3              Now, this was IBM's slide, and I'll try

4    to be very clear about that today.  You'll see this

5    stamp, if I'm using something that they put in front of

6    you.  They brought this up and said other serial

7    protocols that meet claim language.  Their language --

8    it's theirs, not mine.

9              But all of these are external, starting

10   with ethernet.  Ethernet, external.  Not a single one of

11   those has anything to do with an interface controller.

12   Not a single one of them can speak the right language to

13   be internal.  These are all external.

14             Let's take a look at the claim, and I'll

15   give you a specific example of what Dr. McClure tried to

16   do.

17             Here, this is the claim:  The interface

18   controller, and an ethernet controller.  So they pulled

19   up -- Dr. McClure pulled up this picture from Ketris,

20   and maybe you remember this one.  And then he pointed to

21   these two orange things and said:  Well, one is an

22   interface controller and one is an ethernet controller.

23   Satisfies everything.

24             I see some people squinting, so let me

25   see if I can help.

1             Here's what those two things are.  They

2   are the same thing.  Dr. McClure pointed to two ethernet

3   controllers and what he said is:  Well, that's an

4   ethernet controller, and that's an interface controller.

5             Folks, two ethernet controllers are two

6   ethernet controllers.  There is no interface controller

7   in this system.

8             So Dr. Gafford -- and we told you he gets

9   a little bit fired up -- he was pressed on this issue

10  that ethernet and interface controllers, well, they're

11  just the same.  His quote -- and I have to read it to do

12  it justice:

13             The idea of pitching ethernet as a

14  substitute for PCI is --

15             I'm sorry, Counsel.

16             -- it's nuts.

17             Well, that's his opinion.  But you can

18  see for yourself in that claim language, there are two

19  separate things required there.  Those of skill in the

20  art understand that interface controller, internal;

21  ethernet controller, external.  They're trying to pull a

22  fast one.

23             So what did they do?  They retreat from

24  that position, or at least have another backup plan.  So

25  now we're on Backup Plan No. 2 and they say:  Well,

1    okay, so we're wrong with all of those arguments.  You

2    can take Ketris and RLX and QuantumNet and you can just

3    combine them with Hong.

4                    Remember, Hong considered by the Patent

5    Office.  You can just plug it in.  Well, my gut reaction

6    is no, but I don't matter.

7                    When you talk to the experts, what you

8    get pointed out is that Hong is about this cable.  What

9    are blade servers about?  Eliminating cables.

10                   When you looked at any of those over

11   there -- remember the IBM system in the back that

12   Mr. Yost displayed?  Did you see cables hooking one

13   blade to the next?

14                   The whole point of blade server is that

15   you can just plug them in and pull them out.  The point

16   is to eliminate cables.  But what they're telling you

17   is, oh, you can just combine it by -- by what?

18                   Whatever you're going to come up with,

19   just have lots of cables.  This is that hindsight

20   reconstruction.

21                   But what Dr. Gafford -- or Mr. Gafford

22   says is that it doesn't even make sense.  It won't work

23   if you put it together.  It defeats the very purpose of

24   a blade server.

25                   Remember, the cable ball video, the

1   commercial?  That's how important eliminating cables is

2   to blade servers, yet Dr. McClure is here to tell you,

3   oh, go ahead and put those cables back in; no problem at

4   all.

5                   It doesn't make sense.

6                   That secondary indicia of non-obviousness

7   comes back to this:  If it was so obvious, if it was so

8   easy, why did all of these people take a license?

9                   And Counsel may try to pitch that these

10  are nuisance licenses.  It's just to avoid litigation.

11                  Folks, there are two things about these

12  licenses.  First, some of them are very substantive;

13  but, second, they're all consistent within a range that

14  shows everybody is paying according to what they're

15  selling.  That's the fair way to charge.

16                  So all of these have merit.  You should

17  think about it.  Why would these people take a license

18  if it was just so obvious?

19                  So what that leaves IBM with is three

20  positions in their invalidity case.  This is kind of a

21  continual fallback position from a man that's very, very

22  skilled, but who decide -- remember, he testified that

23  he said he's not seen anything new in the computer

24  industry since the '90s?

25                  He believes it.  That didn't stop IBM

1    from filing for thousands of patents a year in the

2    computer industry.  He's just too extreme for analyzing

3    patents.  He's too extreme to be helpful in his

4    analysis.  And he overlooked too many things to get to

5    his opinion.

6                    So IBM says, well, if you're not -- if

7    the patents are invalid, we don't infringe.  You're

8    beginning to see a little bit of Mr. Chandler's Fido

9    argument.  Oh, not my dog.  So we don't infringe.  They

10   put up the computer modules.

11                   So you'll remember this issue.  This is

12   the language:  And wherein each of the computer modules

13   operates fully independent of each other.

14                   IBM got a little surprise from their own

15   witness, Bill Holland.  You remember Mr. Holland?  He

16   was the man that IBM -- for 20-plus years, he was the

17   one that worked on blade servers.  What did he have to

18   say about IBM's initial theory?

19                   Mr. Holland didn't think about what the

20   lawyers were putting out there.  Will operate fully

21   independently?  Yes.

22                   You can tell when Mr. Brogan was shocked:

23   Okay.  You're very clear on that?

24                   Yes.

25                   Not what anybody expected, but what you

1    saw there was one of the majesties of this process.  Why

2    you take the oath, why you sit in that stand, why you

3    have to stare at the jury.  Because the truth comes out.

4    It's hard to sit there and evade answers.

5              Mr. Holland got a chance to say it again.

6    And in this particular case, after IBM worked him over a

7    little bit in redirect, this is what he came back with.

8              He said it again:  They do operate fully

9    independently of each other when operating correctly.

10             So IBM's new position is, if they're

11   broken, they don't operate independently.  Well, folks,

12   when they work correctly, they operate independently;

13   and that means when they're working correctly, they

14   infringe.

15             I'm going to represent to you right now

16   we want no damages on their broken products.  That's not

17   what we're after.  What we're after is the ones that

18   operate correctly.

19             This is just a bizarre excuse.  What you

20   know, though, is they operate independently when they're

21   working as they were designed to work.

22             So to fix this little surprise, what does

23   IBM do?

24             They come back and start pointing to the

25   management module.  You remember that management module

1    they were talking about?

2              Your Honor, may I approach the --

3              THE COURT:  Yes.  Yes you may.

4              MR. STACY:  So if you remember that

5    management module, this was the blade (indicates).

6              I promise I won't drop it.

7              This was the blade.  The management

8    module has walked away from me.  The management module

9    is this size (indicates).  You remember they put up the

10   picture.  This is actually the switch, but they are

11   these different things.

12             These are two blades.  These are the two

13   things that go in the front.

14             But IBM's position is, hey, we'll just

15   point to the management module.  Well, what's the number

16   one requirement to be a computer module under the

17   claims?

18             So we go right back to the claim

19   language.  The claim language requires plurality of

20   computer modules that has a processing unit, a main

21   memory, and an interface controller with serial PCI.  To

22   be a computer module under the terms of the claim is

23   what it must be.

24             And what did we learn?

25             What we learned is that this management

1   module doesn't have that interface controller.  It

2   doesn't have serial PCI.  It's not in it.  It doesn't

3   count as a computer module under the terms of the claim.

4   IBM's trying to squeak one by and just kind of ignore

5   that.

6                    And don't take my word for it.  We will

7   go right back to the man who knows.  What did

8   Mr. Holland have to say?

9                    Sitting here today, you're not aware of

10  any management module that's been sold by IBM that has a

11  PCI Express in it?

12                   No, I am not.

13                   Remember, PCI Express and serial PCI are

14  the same thing.  PCI Express is the brand name, like

15  Dr Pepper.  Serial PCI is the generic name, like cola or

16  soda, or for me, Coke.  I use it generically and for the

17  real thing.

18                   But at the end of the day, that's what

19  you know from the evidence.  IBM's own witness confirms:

20  Management modules aren't computer modules.  So there

21  goes their fallback position for infringement.

22                   Now, they come up with the Fido argument.

23  Well, we may infringe.  The patents may be valid, but

24  even if they are, we only infringe a little bit.

25                   Remember that whole thing about

1    unassembled sales?

2                       Well, we ship things in separate boxes.

3    We don't put it together.  Our customers put it

4    together, so we shouldn't be held liable.

5                       Mr. Ratliff knocked off 40 percent --

6    what 40-plus percent of his damages numbers for

7    unassembled sales.  Had no real explanation for one, but

8    he knocked off a huge portion, hundreds of millions of

9    dollars in sales.

10                      But you heard the Judge say sales and

11   offers for sale are infringement.  When you get your

12   jury charge, go look at it.

13                      And what does IBM do?  Unequivocal from

14   Mr. Yost who's been IBM's representative for this entire

15   trial, who heads this division, what does he have to

16   say?  IBM sells infringing blade servers.

17                      And what about offer for sale?  This is

18   not an escape route for them to get away from

19   infringement.  They sell; they offer for sale; they

20   manufacture these products.

21                      So you turn to IBM's damages case now.

22   So this is the next piece of it.  Well, okay, but we

23   only owe a little bit.  We only owe a little bit.  And

24   they put up Mr. Ratliff for this.

25                      So, first of all, you remember

1    Mr. Ratliff doing the calculations on HP and getting to

2    that .12 percent?  Recall that?

3                    Why didn't he do anything for the rest of

4    people on the chart?  Ten people; he picked one.  I

5    think that's cherry-picking.

6                    Remember this slide (indicates)?

7                    Now, when it was originally used, I think

8    this number was 62.  It was used to cross Dr. Vellturo.

9    So now between when he was crossed and today, it's grown

10   to 86.  It's an IBM slide.  I don't know why, but it

11   doesn't really matter.

12                    Now, again ten licensees.  One, two,

13   three, four, five, six (counts).  Why did they leave the

14   other four off?

15                    I think you know why.  Because they don't

16   like how their graph looks with them.  Plus, you heard

17   Dr. Vellturo say it's not fair; it's not even a fair

18   depiction, because you've got to compare the amount of

19   sales before you can just look at raw amounts paid.

20                    SuperMicro is a lot smaller than IBM, so

21   it should pay a lot less, because it sells less product.

22   But they tried to trick you with this, trying to make

23   you think that we're seeking something outrageous,

24   completely unlike anything else.  It's not the case.

25                    You've seen this (indicates).  Same type

1    thing.  I think you're going to see it again today.

2    Same type thing.  They show you HP.  I don't agree with

3    a number on this slide, but I want to show you something

4    more important.

5                Why did they pick just HP?  Let's assume

6    it's all correct, which none of it is, but assume it's

7    all correct.  Why HP?  Why isn't Dell, Oracle,

8    SuperMicro, Hitachi, Fujitsu -- why are they not on this

9    chart?

10                Because it doesn't look good.  They want

11   to make this point and sell you this bill of goods

12   without showing you everything else.

13                So you run through some of the other

14   issues.  Remember the continuation issue.  Well, they

15   said continuations count as one patent.  I said at the

16   beginning, the Patent Office issued three patents, but

17   IBM is saying, oh, it's just one.  No idea where that

18   comes from.

19                They didn't put any documents in front of

20   you saying this is our policy.

21                This is what we know.  This is from their

22   website.  What do they tell the world?

23                They make no distinction in their policy,

24   their public-announced policy, between continuations and

25   any other type of patent.  A patent is a patent, period.

1   I'd offer that that's an argument or an excuse that was

2   recently developed.

3              My favorite that I heard:  Mr. Yost leans

4   forward in the microphone and says:  I shouldn't -- I

5   don't want to say this, but we're not making a profit.

6   We've lost money for the last seven years.

7              Really?  That doesn't even pass the

8   straight-face test.

9              What did he testify to?  There are their

10  target margins.  He said, well, those are target

11  margins; we didn't hit any of those.  But that's what he

12  testified to.  Those are his target margins.  He wasn't

13  trying to lose money.

14             But what did Dr. Vellturo find?  After

15  combing through all of IBM's financial records of 3

16  million entries, he found an 18-percent profit.

17             So for their almost a billion dollars in

18  sales over the last two years, that's $180 million in

19  profit.  That's what Dr. Vellturo found from their

20  numbers.  They didn't offer you any analysis on their

21  part.  Instead, they just threw out we're not making any

22  money.  The numbers, the math, their books show an

23  entirely different story.

24             And I'm skipping some of these just to

25  move forward on time.

1            The next thing they throw up:  Oh, well,

2    we've got a bunch of non-infringing alternatives.  We'll

3    just switch to those.  We don't need Dr. Chu's

4    invention.  We'll just abandon it.

5            Well, and they throw out some numbers.

6    These are BladeCenters they said they can move to.  But

7    you heard Mr. Yost:  Discontinued, not acceptable today.

8    He wanted to fight a little bit; but at the end of his

9    testimony, he said, okay, they're not acceptable today.

10            And then he confirmed why:  No serial

11    PCI.

12            They've abandoned these products for a

13    reason.  They won't go back to them for a reason.  IBM

14    walks away from that argument and says, oh, well, we've

15    got racks and servers and tower servers.  That's what

16    we're going to move to.

17            Folks, remember the cable ball video that

18    solved this problem?

19            For the people that need this problem

20    solved, they want blade servers.  And IBM threw up this

21    slide to say, well, the 2 to 4 percent, look it's just a

22    tiny bit of our business.  That's a billion-dollar slice

23    of pie.  For that billion dollars' worth of sales, those

24    people want blade servers.

25            IBM can't move to rack servers, and this

1    is why.  Mr. Yost confirmed that blade servers are

2    growing faster than any other segment of the server

3    business.  It's the future.  The future is a blade

4    server with Dr. Chu's invention.

5              This is where we started the week, and I

6    want to talk to you about the evidence on our case, what

7    Mr. Chandler said he would prove when he started.

8    So we have the infringement.  I promised I wouldn't mock

9    my friend and partner for his wonderful checkmarks on

10   the board.  But you remember when he had the big board

11   up, we were all afraid for his safety and ours with

12   those checkmarks.

13             He went through that in excruciating

14   detail at times, and I even knew what was coming and

15   it's tough, because it's a lot of detail.  You've got to

16   go through each one of them.  But you remember that he

17   did.

18             We showed the video of the IBM witnesses

19   telling you what was in those products.  Went through it

20   in excruciating detail, because you have to get every

21   checkmark.

22             When you go back into the jury room, keep

23   that in mind.  Remember that evidence, but you're going

24   to get something else called a request for admission.  I

25   think it's going to be in a folder marked something

1    along the lines of joint exhibit.

2              These are signed IBM admissions about

3    certain things, not all things but some things.  So you

4    take that -- and when I say some things, it's about

5    what's in their accused products.

6              So when you take that, those admissions,

7    combine it with that testimony, what you end up with are

8    the not-so-elegant charts that Mr. Brogan had up on the

9    stand.

10             I will not subject you to his checkmarks

11   again.  The miracle of PowerPoint, this is what it turns

12   out to be.

13             Sorry, Jim.

14             And as you go through each one of the

15   claims, just remember what Mr. Brogan did.  I've got a

16   feeling you won't forget it, and it will stick in your

17   mind for a long time about this is what patent lawyers

18   and patent litigators do all day.

19             My wife tells me when I started this

20   case, I had hair, so it tells you that it's -- actually,

21   I think she just doesn't like my hair.

22             But at the end of the day, this is what

23   we want:  This fence rebuilt.  We want the property line

24   established around Dr. Chu's patents again.  And we want

25   to put IBM back on IBM's side.  It's a simple request.

1    Dr. Chu's property; he just wants to protect it.

2              So how do you do that?

3              Remember Dr. Vellturo.  Dr. Vellturo,

4    Ph.D. out of MIT in economics, adjunct professor of

5    finance at the University of Boston -- I'm sorry --

6    Boston University.

7              And then when you look at all of his

8    experience, you remember his CV that went up on the

9    board.  He works for the Justice Department in analyzing

10   mergers.  This is a guy who knows his stuff.  Absolutely

11   knows his stuff.  And he's got extensive experience in

12   combing through books, analyzing financial records.  You

13   heard the phrase, forensic accounting.  That became a

14   big deal -- become a very big deal over the last five or

15   six years analyzing books, finding missing records.

16   This is what the man does.

17             And when he did that, remember this?  We

18   put up a piece of it.  The complete chart is

19   frightening, 3-plus million entries on just these

20   products, not all of IBM's products but just the accused

21   products.

22             He crunched through 3 million records and

23   distilled it down, and it's almost shameful to reduce

24   his work to this, but that's what he managed to do.

25   He's good at what he does.

1          And so at the end of the day, what he
2   calculated, here were IBM sales for the chassis and
3   blades.  Here were those unique options, and that's the
4   total sales:  1 percent per patent, you get to this
5   number (indicated), not a rounded $3.5 million number.
6          This is the mathematical precision that
7   comes with an accountant, with somebody that specializes
8   in finance.
9          So if you haven't written this number
10  down, I'm going to recommend you do, because that is
11  actually the damages number, not 27 million, but
12  26,999,166.  I think he did round off the cents part.
13          Dr. Vellturo, Mr. Murtha -- you remember
14  Mr. Murtha was very, very conservative.  Remember, he
15  put this up:  Blade, chassis, blade, unique options.  He
16  drew it on the board.  Said he excluded these two
17  categories.  He was asked what those two categories
18  were.
19          Well, over $300 million, according to Dr.
20  Vellturo.  He wouldn't put those in his base.  Now, he
21  gave that number to Dr. -- or Mr. Murtha to be used in
22  the royalty calculation, but Dr. Vellturo didn't put
23  them in his base.
24          Remember Mr. Murtha, 41-plus years in
25  doing patent licensing; 28 at IBM, 14 out on his own.

1    Represents most of the major universities on the East

2    Coast.  Does all the patent licensing for American

3    Express.  This is one of the most distinguished men or

4    people in this field, period.  He has been around a

5    long, long time.

6                    Remember, he was the director of IBM's

7    licensing for 14 years, but he's learned a lot since

8    then.  It's not just his knowledge from IBM.  He's got

9    14 additional years of knowledge.  I don't think -- if I

10   did my math right, he retired in '97, so 14 additional

11   years doing licensing negotiations for other people.

12                    Remember what he said?  He's done

13   500-plus negotiations.  So what did he come to as a

14   reasonable royalty rate?  3 percent.

15                    How did he get there?  It wasn't based on

16   one thing.  It was based on a whole host of factors.

17   Remember that 15 factors, Georgia-Pacific analysis he

18   went through?

19                    So you start with IBM's substantial

20   margins.  You've got the target margins of 20 percent.

21   You've got Dr. Vellturo's 18-percent calculation.

22                    You've got the IBM practice.  It's not

23   that IBM follows that practice that matters.

24                    What matters is that IBM is so big, so

25   powerful that when it puts out a policy like that, other

1   people look at it and gravitates toward it.  And that

2   policy, which you heard from Mr. Murtha, has impacted

3   the computer industry.  Other people have started

4   quoting it and using it.  That's from Mr. Murtha's

5   personal experience from -- since leaving IBM.  He's

6   seen the effects.

7                    Down here, success of IBM's new blade

8   servers.  You notice their sales have taken off, right

9   at a billion sales in the last two years.  All of the

10  extra sales -- I just mentioned the 300 million in extra

11  sales -- those are extra things to be considered here.

12  They weren't in the base, but Mr. Murtha considered them

13  to justify the royalty.

14                   And then those licenses.  Looking at them

15  altogether, you saw the range from 2.8 to 5 percent.

16  Mr. Murtha's 3 percent is at the lower end of that.  But

17  that was the key to what Mr. Murtha was saying.  It's

18  not about one piece of evidence.  It's about following

19  all of it, looking at everything together, and that's

20  what takes you to 3 percent.

21                   And I just wanted to, again, show you

22  that I'm not hiding anything here.  But as you see, 2.8

23  to 5 percent, 5 percent in the future, those are the

24  rates that Mr. Murtha considered.

25                   So I'll leave you with the last piece,

1    and that's the verdict form that's just been handed out

2    to you, the revised one.  And I want to make sure that I

3    give you or talk to you about the revised one.

4                    So if you look at the revised one, it's

5    pretty straightforward.  What ACQIS submits to you is

6    that the first page:  Did ACQIS prove by a preponderance

7    of the evidence that IBM infringed?

8                    It's all yeses.

9                    When you turn to the second page:  Did

10   IBM prove by clear and convincing evidence that such a

11   claim is invalid?

12                   Now, remember that difference in the

13   standard.  That clear and convincing, that is a big

14   standard.  Why is that a big standard?

15                   This is why (indicates), because it's

16   presumed the Patent Office did its job.  So what you're

17   having to do, in essence, here is you're deciding, did

18   the Patent Office made a mistake three times?  That's

19   why it's that clear and convincing evidence standard.

20   So on this page it's all nos.

21                   And then the final piece, No. 3:  What

22   sum of money?  There, that's why I suggested you write

23   it down.  The sum is not 27 million; it's 26,999,166.

24                   Thank you.

25                   THE COURT:  All right.  Thank you,

1    Counsel.

2                      All right.  The Court will recognize

3    Counsel for the Defendant for purposes of closing

4    argument.

5                      MR. VERHOEVEN:  Can we have an

6    audiovisual person?

7                      THE COURT:  It will take just a second.

8                      (Pause.)

9                      MR. VERHOEVEN:  Okay.  Your Honor, may I

10   proceed?

11                     THE COURT:  Yes, you may.

12                     MR. VERHOEVEN:  Good morning, Members of

13   the Jury.  Let me start by again thanking you for your

14   service and the careful attention you've been paying

15   before I get into my closing statement in this case.

16                     As you know, my client, IBM, has two

17   defenses to this charge in this case.

18                     The one we spent the most time on is

19   invalidity.  And IBM believes that it's shown that the

20   six asserted claims of the continuation patents in this

21   case are invalid because somebody else did it first.

22                     The folks at Ketris did it first.  And we

23   had Mr. McClure up here, and he walked through element

24   by element showing you the physical exhibits and

25   documentation as to why Ketris -- the Ketris folks did

1    it first.

2              As the Judge instructed you, you can't

3    get a valid patent if somebody else did the same thing

4    first.  We believe the evidence shows the folks at

5    Ketris built this system first.

6              We presented evidence to you that -- a

7    timeline showing they did it before the March 12th date

8    of 2000 that the Court said is the critical date.

9    That's undisputed.  Their expert doesn't dispute it.

10             Prior art.  And we went through and we

11   showed you element by element, and I'll get into that.

12             Importantly, you didn't hear anyone say

13   that the Ketris system was before the Patent Office.

14             Now, Counsel has said:  Well, IBM wants

15   you to conclude that the Patent Office made a mistake.

16   Well, no, no.  You don't make a mistake if you don't

17   even know that the system exists.  That's our point.  No

18   one told the Patent Office that Ketris was out there.

19             And you remember my opening statement, I

20   asked you to bear in mind one question on invalidity as

21   you heard the evidence; and that question was:  What if,

22   what if the Examiner at the Patent Office knew about the

23   systems, the prior art systems that you're learning

24   about?

25             Would they have issued these continuation

1    patents if they had known that there's a system out

2    there -- you saw it; it's right over here in the box --

3    that does every single thing in the six asserted claims

4    of these patents?  Would they have issued these patents?

5    We think that you'll conclude the answer is no.

6                  We also have our second defense, which is

7    non-infringement, and I'll go into that in a minute as

8    well.

9                  Each of the asserted claims in this case

10   have an element that says that each of the computer

11   modules in the plurality of computer modules must

12   operate independent of each other.

13                 And we showed you evidence that the IBM

14   accused system, there's a computer module called the

15   management module.  That's one of the each computer

16   modules that has to operate independently of each other.

17                 And the evidence is undisputed -- and

18   I'll go through it in more detail in a moment -- that

19   with respect to the IBM system, the blade servers cannot

20   operate independently of the management module.  It's

21   not a dispute about that.

22                 So I encourage you, when you -- when you

23   go back and you look at the claim language, the claim

24   says you have a plurality of computer modules.  The

25   blades are computer modules.  The management module is a

1    computer module.

2              And it has certain requirements for those

3    computer modules.  One of the requirements is that each

4    of these computer modules operate independently of each

5    other.

6              The management module -- it's undisputed,

7    undisputed -- does not operate independently of the

8    blade server model and vice versa.  So this element

9    isn't met.

10             And you heard on the cross-examination

11   that I did of Mr. Gafford that he admits it, too.

12   And you also heard that -- on the cross-examination,

13   that this requirement of independent operation is an

14   element in each and every one of the six asserted

15   claims.

16             Now, it's the Plaintiff's burden of proof

17   to show infringement.  So if you conclude they haven't

18   shown that each of these modules, the management module

19   and the blade server module, operate independent of each

20   other, according to the Judge's instructions, you are

21   required to find non-infringement because an element of

22   each of the claims is missing.

23             Now, I'm going to go into these defenses

24   in more detail, but let me back up for a minute and talk

25   about the parties in this case and what the evidence has

1    shown generally.

2              Now, IBM takes this case very seriously.

3    We've brought Mr. Yost here, the Vice President of the

4    business; that he has taken out of his time and made

5    sure he was here for every single day of this trial.

6              And he came and he talked to you about

7    the business.  He talked to you about IBM and the

8    BladeCenter product, and he showed you that IBM has been

9    a U.S. patent leader for 18 years.  He explained that

10   the accused BladeCenter system, he told you that IBM had

11   multiple patents of its own on this product.

12             The evidence has shown that IBM is a

13   major employer both in the United States, with over a

14   hundred thousand U.S. employees, 9,000 in Texas.  IBM

15   makes things.  It makes innovative products, and it gets

16   patents on those products as a patent leader.  It has

17   been for years.

18             We also brought, so that you could hear

19   him testify, Bill Holland.  Mr. Holland began working on

20   BladeCenter in 1999.  He talked about how -- the months

21   he spent working on strategies for optimizing this

22   technology that IBM has.

23             He told you that the IBM BladeCenter

24   product was commercially released in 2002.  2002, years

25   before any of the three patents in this case even

1    issued, IBM has already developed the product.  It's

2    already on the marketplace.

3              It's not till years later that these

4    patents come out, and now, after the fact, the Plaintiff

5    says:  Well, IBM should be liable, even though it

6    developed the technology before these patents issued.

7    Is that fair?  We don't think it is.

8              Now, let's look at what the evidence has

9    shown about ACQIS, which is the Plaintiff in this case.

10             What is ACQIS?  ACQIS LLC, that's the

11   Plaintiff.  What is it?  It's a shell corporation, a

12   shell corporation formed for the purpose of bringing

13   this litigation in Texas.

14             Well, who's the only full-time employee

15   of this shell corporation?  Well, Mr. Chu.  Well, he

16   lives in California.  That's what the evidence has

17   shown.

18             And the evidence has also shown, Members

19   of the Jury -- you'll remember on cross-examination,

20   when I was cross-examining Dr. Chu, that he used to work

21   at a company called CIRRUS.  Remember that?

22             And he was the Chief Technology Officer

23   at CIRRUS, important technological executive of the

24   company.  And he testified:  Well, I left CIRRUS on

25   December 5th.  And then within about three weeks, you

1    hear the Plaintiff say:  Here, this is a really

2    important invention.  It's a real breakthrough.  It's

3    valid and new and unique, and you should award millions

4    of dollars in damages for it.

5              Well, let's look at how he came up with

6    this.  He leaves CIRRUS on December 5, and then in

7    approximately three weeks, he writes the white papers

8    that come up with his invention.

9              Here's the testimony.

10             QUESTION:  So from start to finish, this

11   invention that you've been talking about took you about

12   three weeks.  You didn't create any prototypes to see

13   how the invention would work during this timeframe, did

14   you?

15             ANSWER:  No.

16             QUESTION:  You didn't rely on any

17   research when you wrote those white papers, did you?

18             ANSWER:  No.

19             He just did it off the top of his head.

20   But yet he said he came up with a new and unique

21   invention.

22             The facts are, as we established on

23   cross-examination as well, that Mr. Chu never

24   successfully commercialized his alleged new invention.

25             With respect to the multi-modular

1    computer system, he never even tried to assemble any

2    equipment to make it.  He never built any prototypes of

3    it.  He didn't do anything.

4                   So we've got IBM that makes things of

5    value for people; and we've got the Plaintiff, who files

6    patents and doesn't even bother to try to make anything.

7                   That's what we're looking at in this

8    case.

9                   Now, one of the things you're going to

10   have to do in this case is assess credibility and weigh

11   the evidence.  And Mr. Chu -- Dr. Chu's testimony bears

12   on that.

13                  This brand new, great invention that he

14   created, I asked him at his deposition -- the whole

15   point of this invention, by the way, Members of the

16   Jury, is what's called modular PCs.  You have these

17   modules, and you take them in, and you pull them out.

18                  You remember Figure 1 from the patents

19   we've seen a couple of times with the little yellow

20   squares that got pulled out and put in?  Those are the

21   modules.  That's his invention.  We've got the patents,

22   at least that's what the patent says his invention is.

23                  So I asked him at his deposition:

24                  QUESTION:  You had -- had you had

25   experience with modular computers prior to leaving

1    CIRRUS?

2                      ANSWER:   There was no such product.

3                      Sworn testimony by Dr. Chu.

4                      QUESTION:   And when you say there was no

5    such product, what do you mean?

6                      ANSWER:   I was not aware of any such

7    product.

8                      QUESTION:   No awareness of modular?

9                      ANSWER:   No.

10                     Sworn testimony at his deposition.

11                     But then on cross-examination in this

12   trial, I showed him his own inventor notebook that he

13   had created while he was at CIRRUS.

14                     Now, remember, he just testified under

15   oath he had never heard modular PCs.

16                     Frank, can we bring up this handwritten

17   bit here (indicates)?

18                     And this is the excerpt in his own

19   handwriting, from his own notebook, when he was the

20   chief technology officer at CIRRUS.

21                     Up here -- I don't know if you can --

22   move it down just a little bit so I can read it there.

23   I asked him about it.

24                     QUESTION:   You see there at the top left,

25   it says 7/23?

1                    ANSWER:  Yes.

2                    QUESTION:  That reflects discussions you

3      personally had with Intel on July 23, 1997, correct?

4                    ANSWER:  Not discussions.  I'm taking

5      notes.

6                    QUESTION:  Okay.  But those notes reflect

7      somebody talking to you from Intel, correct?

8                    ANSWER:  Yes.

9                    This is July 1977.  He's the chief

10     technology officer at CIRRUS.  And what is he learning

11     from Intel?  Modular PC.

12                    Can you pull that out again, Ryan?

13                    But his deposition, there was no modular

14     PC.

15                    QUESTION:  When you said there was no

16     product, what did you mean?

17                    ANSWER:  I was not aware of such a

18     product.

19                    Directly contradicted by his own

20     handwriting.  This is a relevant fact when you're going

21     to measure credibility in this case.

22                    You must not forget, further on

23     cross-examination, I said:  Well, what about this

24     notebook here?  This is a notebook that you created with

25     your handwritten notes while you were at CIRRUS.

1           Do you remember I showed him there was an

2     employment agreement he entered into when he was at

3     CIRRUS that said that he would have to return every

4     single thing when left the company.

5           The ideas he came up with at CIRRUS were

6     CIRRUS's ideas, and he couldn't take those with him.

7           Well, he took this (indicates), which

8     just coincidentally happens to have the idea for a

9     modular PC -- which he said he never came up with at

10    CIRRUS -- in it.

11          When I cross-examined him about it, I

12    said:  Did you take this in violation of your employment

13    agreement, sir?

14          ANSWER:  Yes.

15          Well, that's an important fact when

16    measuring credibility.

17          Is there really something new and unique

18    here?  Is this something that Dr. Chu really came up

19    with on his own, or is this something that already was

20    out there that he heard about from Intel when he was at

21    CIRRUS?

22          And he decided to quit, and in three

23    weeks, wrote it off the top of his head and filed a

24    patent for it.  We think the evidence shows the latter.

25          Now, you also heard about Dr. Chu's plans

1   when he got his multi-mode patent.  In other words, the

2   patents at issue in this case, there's some earlier up

3   ones as well that aren't asserted that concern having

4   more than one module in a computer.  That's what we mean

5   by multi-mode.

6                  And he testified that in 2004, his plan

7   all the way back then was to proceed to litigation.  He

8   wasn't making things.  He wasn't planning on taking his

9   ideas and doing something useful.  His plan from the

10  start, before he even got his patents, was to sue

11  people.

12                 QUESTION:  You had that plan in February

13  of 2004, yes?

14                 ANSWER:  Yes.

15                 And he testified:  And in connection with

16  collecting information from 2004 going onward, you

17  identified certain targets for licensing, right?

18  You remember he said one of those was my client, IBM,

19  all the way back in 2004.

20                 QUESTION:  And it targets in terms of

21  what companies are in the business?

22                 ANSWER:  Yes.

23                 QUESTION:  Well, so you were writing --

24  you were filing continuation patents and writing claims

25  that would cover certain aspects of what you saw

1    happening in the blade server industry; isn't that fair?

2              ANSWER:  Yes.

3              What does this tell us?  In 2004, he

4    filed these patents for these multi-modes, had no

5    intention of actually trying to build anything, and he

6    monitored the industry being developed by others, by IBM

7    making real products.

8              And his plan was to file continuation

9    patents as he's monitoring to try to get claims that

10   cover things people are already doing.  Is that the kind

11   of activity that deserves being rewarded?  We don't

12   think so.

13             Look at the timeline.  Here's 2004.  This

14   is when he testified that he's looking at the industry,

15   writing patents to try to cover the industry.

16   BladeCenter has been out since 2002.

17             Here's when he filed the application to

18   the three patents-in-issue in this case.  Years after

19   BladeCenter's already been out.  Those patents didn't

20   issue until 2008, over five years after IBM's already

21   been in the market.  Yet he says it's his new unique

22   idea, and IBM should have to pay.

23             Now, let's talk -- let's switch subjects

24   and talk about the merits here.

25             And first, I'd like to address the issue

1    of whether these patents are valid or not.

2                    IBM contends that the six asserted claims

3    are all invalid because they're anticipated by the folks

4    at Ketris, who did it first.

5                    And then in addition, they would be

6    obvious in light of RLX, QuantumNet, and Hong being

7    combined to work together with Ketris.

8                    Before we get into the element-by-element

9    analysis you saw Dr. McClure do, let's take a step back

10   and say:  Well, what on earth is new or unique in these

11   patents that would justify getting a patent?

12                   You need to have something new or unique?

13   You can't just do something that's already been done.

14                   Well, let's look at what the Plaintiff

15   says is new and unique.

16                   Dr. Chu on direct examination:

17                   QUESTION:  Can you tell us what your --

18   what the key invention described in this third white

19   paper, Plaintiff's Exhibit 23, is?

20                   ANSWER:  I was the first to invent using

21   serial PCI.

22                   That's what he testified to on direct.

23   And that's, in fact, what you hear Counsel saying over

24   and over again:  The invention is serial PCI.

25                   Well, you remember when I showed Dr. Chu

1    on cross-examination that slide from his own expert,

2    Mr. Gafford, where Mr. Gafford says:

3                    QUESTION:  Others before Dr. Chu had

4    serialized PCI transactions, had they not?

5                    Answer from ACQIS's own expert:

6                    ANSWER:  At least one reference that I

7    know of.

8                    I showed Dr. Chu that in

9    cross-examination after he said he was the first.  What

10   happens?  He changed his testimony.

11                   QUESTION:  You didn't invent just plain

12   old serialized PCI transactions, did you?

13                   ANSWER:  Plain old serialized PCI

14   transactions, no.

15                   So, again, you're measuring credibility

16   here.

17                   On direct, he says he invented it.  Once

18   I showed him that his own expert said he didn't, he

19   changed his testimony.

20                   Mr. Gafford, their expert, as I said,

21   admits that Chu's invention cannot be serialized PCI

22   because Hong did it.

23                   He says here:  Which reference were you

24   referring to just a moment ago as having serialized PCI

25   transactions before Dr. Chu did?

1            ANSWER:  One of the two references from

2     the inventor is named Hong.

3            So he admits that there's a piece of --

4     there's a prior art patent out there that already shows

5     what the Plaintiff says is his invention.  And you've

6     seen it.  Here it is.  PCI.  There it is.  PCI to PCI

7     (indicates).

8                 And there's the serialized right there.

9     This is PCI.  PCI bus.  This is parallel.  It runs

10    through a serialized interface, just like in the figures

11    in the patent, to another PCI, parallel PCI (indicates).

12                 That is indisputably serial PCI, and it's

13    indisputably done by somebody else.  It's not new and

14    unique.

15                 Mr. Gafford, on cross-examination --

16    excuse me.  Let me back up.

17                 On direct examination, Mr. Gafford said:

18    Well, the -- the Hong reference is not the same thing as

19    Dr. Chu's invention because the Hong reference is going

20    from a parallel PCI bus having a serial interface and

21    then going to another parallel serialized bus, right?

22    Parallel, serial to parallel.  He says that's different

23    from Dr. Chu's patent on direct examination.

24                 But then on cross-examination, I showed

25    him Figure 7 -- remember that, Members of the Jury --

1    from Dr. Chu's own patent.  This is an example of the

2    claims.

3                   And here you can see it says northbridge

4    primary PCI bus, secondary PCI bus, and it's got the

5    little squiggly line.

6                   And I said:  Okay.  Now, this is an

7    example of the preferred embodiments of Dr. Chu's

8    invention, right?

9                   ANSWER:  Yes.

10                  QUESTION:  And the northbridge primary

11   PCI bus is a parallel bus, isn't it, sir?

12                  ANSWER:  Yes.

13                  QUESTION:  And the secondary --

14                  That's this one here (indicates).

15                  QUESTION:  And the secondary PCI bus on

16   the bottom is a parallel bus, isn't it?

17                  ANSWER:  Yes.

18                  QUESTION:  And the serial bit is a little

19   squiggly line between those two; is that right?

20                  ANSWER:  That's right.

21                  That's right there (indicates).

22                  QUESTION:  And that is in the prior art,

23   isn't it, sir?

24                  ANSWER:  It is.

25                  So on cross-examination, again, we've got

1    a pattern here.  Just like Dr. Chu, Dr. Gafford had to

2    change his tune.

3              On direct examination, he said:  Hong is

4    different because it's parallel to serial to parallel,

5    but then he acknowledged that Chu's invention is the

6    same thing, parallel to serial to parallel.

7              Now, I might take a moment to address

8    something that Counsel said trying to distinguish

9    between what he called serial PCI and serial ethernet

10   connection.

11             He said:  I is for internal and E,

12   ethernet, is for external, suggesting that the interface

13   in the patent is somehow internal, within this

14   northbridge stuff.

15             Well, that's not what the patent shows.

16   And you remember I crossed Mr. Gafford on this yesterday

17   afternoon.

18             This is the computing system in this box.

19   This is the peripheral system in this box.  Where is the

20   little serial squiggly line?  It's external to the

21   computing system, between the computing system and the

22   peripheral system.

23             It's exactly the same as Hong.  They keep

24   trying to come up with different distinctions after we

25   bat down the ones they have.  The fact of the matter is,

1    what they claim is new or unique in this patent is not.

2    It was done by others first.

3              And there's one other thing that is very

4    important to underline, and that is, this whole issue of

5    whether this patent requires a serial PCI interface has

6    been answered by the Judge.

7              Here's the phrase that Mr. Gafford points

8    to as being where in the claims the innovation is, but

9    the Judge has already construed peripheral component

10   interconnect bus transaction.

11             And you heard him say you have to use his

12   construction -- not the expert witness's construction,

13   but his construction as to all this means is a data

14   signal communication with an interconnected peripheral

15   component.

16             The Judge specifically said it is not

17   limited to a specific protocol like PCI.  It can be

18   other protocols.  All it needs to be is simply a data

19   signal communication.  That's it.  A serial data

20   communication.  That's the rule.  That's what the Judge

21   says.

22             So what's ironic here, Members of the

23   Jury, is that the thing that they're saying is the new

24   or unique invention, serial PCI, that was not new or

25   unique; it's not even claimed.

1          You don't have to use PCI to infringe
2    this, and you don't have to use PCI to invalidate this.
3    All you need is a data signal communication with an
4    interconnected peripheral component.
5          So their whole story of what they
6    invented is filled with holes.
7          I asked Mr. Gafford yesterday afternoon
8    about this, and he admitted that under the Court's claim
9    construction, it's not limited specifically to PCI.  You
10   just need to look at the patent to see the Court's
11   construction is well-founded here.
12         Here you see -- here's the same Figure 7,
13   the serial interface.  And the patent itself at Column
14   25, Lines 26 through 28 says:  The present invention --
15   so it's talking about what the invention is.
16         The present invention overcomes the
17   aforementioned disadvantages of the prior art by
18   interfacing two PCI or PCI-like buses -- that's this and
19   this (indicates) -- by interfacing two PCI or PCI-like
20   buses using a non-PCI or non-PCI-like channel.
21         That's referring to this (indicates).
22   And it's calling it non-PCI.  The Court construed it
23   that way.  It's simply a data signal communication with
24   an interconnected peripheral component.
25         It's not even limited to serial PCI.  It

1    could be ethernet; it could be USB.  It could be

2    anything that's a serial data communication that's

3    interconnected between a computer and a peripheral.

4    That's not new or unique.

5                You heard from Mr. -- Dr. McClure, our

6    expert, that ethernet data met this limitation.

7                QUESTION:  So is ethernet a data -- a

8    serial data signal communication that could be used with

9    an interconnected peripheral component?

10               ANSWER:  It is.

11               Of course it is.  So is universal serial

12   bus, which we talked about, which has serial right in

13   its name.

14               Now, Mr. Gafford, he followed me on this

15   on cross-examination yesterday afternoon, and he

16   testified that ethernet wouldn't fit -- wouldn't fit the

17   Court's construction.

18               But on cross-examination, while it was

19   difficult to get it, he basically admitted it.

20               QUESTION:  People of ordinary skill

21   understand, when you're talking about peripheral devices

22   to a computer, you're talking about things like

23   printers, keyboards, mouses, screens, right?

24               ANSWER:  Those are peripheral.  They are

25   generally peripheral to an entire computer system, yes.

1              Okay.  So he admits they're peripheral.

2              QUESTION:  Okay.  And so this little

3    squiggly line here is a serial data signal, correct?

4              ANSWER:  Yes, it is.

5              Serial data signal, that's it.  Admits

6    it.

7              QUESTION:  And that serial data signal

8    permits the computer to communicate with the printer.

9              ANSWER:  It does permit that, yes.

10             Serial data communication.

11             QUESTION:  The printer here is

12   interconnected with the computer, right, sir?

13             ANSWER:  It's interconnected.

14             So he admits it's a serial data signal.

15   This is an ethernet connection.  They're saying it

16   doesn't meet this claim language.  On cross-examination,

17   he admits, it's a serial data signal; it's in

18   communication; it's interconnected with a peripheral.

19             That's exactly what the claim language

20   is.  Serial data signal communication with an

21   interconnected peripheral.

22             The claim language covers ethernet

23   connections, it covers USB connections, any kind of

24   serial interconnected -- connection.

25             Dr. Chu did not invent serial PCI.

1    You also heard from Counsel arguing and also on

2    cross-examination of some of our prior art witnesses,

3    some suggestion that maybe Dr. Chu's invention is PCI

4    Express.

5              Well, PCI Express -- you heard the

6    evidence -- is an industry standard developed by a

7    consortium of companies.  It has nothing to do with

8    Dr. Chu.

9              So when they say:  Well, this prior art

10   doesn't show PCI Express, that's a red herring.  Who

11   cares?  The patent doesn't even talk about PCI Express.

12   It's not part of the patent.

13             You also heard repeatedly from

14   Mr. Gafford and Counsel cross-examining witnesses and

15   arguing that somehow the prior art isn't invalidating

16   because it doesn't show PCI within a specific chip

17   called the northbridge chip.

18             But you saw on cross-examination, the

19   claims don't require a northbridge chip.  Again, that's

20   a red herring.  You need to weigh the evidence here

21   against these various witnesses and decide who is -- who

22   is more credible.

23             We've got dueling experts here.  They're

24   talking about highly technical information, but I know

25   you, Members of the Jury, know how to assess credibility

1    because you do it in your everyday life.

2              Now, let's look at Mr. Gafford's

3    credibility.

4              I asked him yesterday afternoon:  Have

5    your opinions been criticized by a judge in any

6    proceeding?

7              Asked him at his deposition, and he said:

8    Yes, on one occasion.

9              But on cross-examination, it turns out he

10   wasn't the telling the complete story to you, Members of

11   the Jury.

12             It turns out in the Relume Corp versus

13   Dialight Corp case, a judge -- a federal judge found Mr.

14   Gafford's conclusory assessment is without a reliable

15   factual foundation, and it ignores the voluminous

16   evidence of record.

17             Another case, second case, Sony case

18   versus Soundview, another, different federal judge found

19   Mr. Gafford's opinion is rejected as, quote, based on

20   flawed definitional premise.

21             Sound familiar?  We have a flawed

22   definitional premise in this case, which is that

23   Mr. Chu -- or Dr. Chu invented serial PCI, which is that

24   the claims require specifically PCI, which is PCI

25   Express is part of the patent, which is northbridge is

1    somehow part of the patent.

2                    Those are all flawed foundational

3    premises that he's offered to try to convince you of

4    something that's not true.

5                    The Default Proof case, another federal

6    judge:  Mr. Gafford's opinions are contradicted by the

7    intrinsic record.

8                    On appeal in that case, the United States

9    Court of Appeals for the Federal Circuit, Gafford's

10   opinions were rejected because it was, quote, either

11   unsupported or contradicted by the express language of

12   the written description.

13                   And then finally in a fifth instance,

14   another United States Court of Appeal Federal Circuit

15   case found Gafford's opinions were rejected because he

16   presented the jury with, quote, an incorrect yardstick

17   with which to measure the prior art, closed quote.

18                   Now, you folks have to measure -- make

19   your own measurement; who's credible here and who's not.

20                   So here we have admittedly -- on

21   cross-examination, Mr. Gafford admitted to this --

22   six -- five instances in which five separate courts have

23   found that his expert testimony on these patent issues

24   is rejected and unreliable.

25                   Is that relevant to your assessment

1   today?  Absolutely.

2                The fact is, the evidence shows that

3   Dr. Chu didn't invent anything new or unique, and he

4   certainly didn't invent serial PCI.

5                Now, let me go to the merits of our

6   argument on the Ketris prior art and walk through that

7   quickly.

8                We think the evidence has shown here in

9   this case that the Ketris system -- we think the

10  evidence has shown in this case that the Ketris system

11  anticipates every element of every asserted claim.

12               Remember, the Judge told you about

13  anticipation, and he said:  Well, a patent -- a claim is

14  invalid if there's a prior art system out there that

15  practices every one of the elements.

16               Well, what does that mean?  That's a

17  fancy way of saying somebody else did it first.  Well,

18  here we think the evidence has conclusively shown that.

19               Now, let's start by talking about the

20  priority date.  And what I put on the screen here is

21  simply the Court's instruction to you, Members of the

22  Jury, I believe the first time -- when we began today,

23  but the first time was on the 14th -- well, that date

24  is, obviously, wrong.  It's probably February.

25               And he said the priority date for the

1   three patents in question is May 12th, 2000.  So what

2   does that mean?  That means this date here is what you

3   look at to see if somebody else did it first.

4               So if there's people who did it, who

5   practiced the invention before this time, then Chu's

6   patents aren't new or unique.  So that's why it's called

7   the critical date or the priority date, the date you

8   guys use to assess whether something's prior art.

9               So we presented evidence from Mr. Jim

10  Medeiros as to the Ketris system.  And these are

11  photographs of the actual physical system that you saw

12  over there.

13              We also presented extensive documentary

14  evidence and expert testimony showing that the Ketris

15  system started being worked on all the way back on

16  October 14th, 1998.

17              They wrote their own white paper in

18  November 1998.  They had the engineering specifications

19  in May of '99.  Product requirements were completed on

20  September 2, 1999.

21              The actual product, that product there

22  (indicates), was actually shipped to customers in April

23  of 2000.  All of this happened before the priority date.

24              And you heard from Mr. Medeiros on this,

25  and you heard from Mr. McClure -- Dr. McClure, our

1    expert on this.

2                   Did you hear anything, anything from

3    ACQIS challenging that this is prior art?  Absolutely

4    not.  Mr. Gafford presented rebuttal testimony yesterday

5    afternoon, didn't even mention any of this.  It's not

6    contested.  This system was done before Dr. Chu's

7    inventions.

8                   So the only question then is:  Does it

9    show each of the elements of the asserted claims?

10                  So I don't have the board that I had

11   before of Claim 12.  I'll just represent to you these

12   are the elements.  We pulled them out.  You've seen them

13   several times.  And you heard Dr. McClure walk through

14   them, and I'll just walk through them as well.

15                  The first element is:  A console

16   comprising an ethernet hub controller.

17                  Hold on just one second.  Hey, Ryan, can

18   you try to set it up while I'm talking on the easel,

19   Claim 12?

20                  So this is the first element.  And

21   Dr. McClure showed you this little system has an

22   enclosure.  It has connectors.  It has ethernet hub

23   switches and slots (indicates).

24                  This is the console.  These are the hub

25   controllers right there.  The coupling sites are back

Page 110

1    here.  It says a first coupling site, a second setup

2    coupling site.  They're all back there (indicates).

3              Each slot comprising a connector and a

4    slot.  The slot and connectors are back there.  And the

5    console being an enclosure.  Well, this is an enclosure.

6    So that element is plainly met.

7              The next element of the claims:  A

8    plurality of computer modules each coupled to one of the

9    coupling sites through the connector and the slot.

10   There's a physical picture, the physical exhibit, which

11   is right over there (indicates).

12             And here is a -- a pull-out that

13   Dr. McClure testified to, DX47, in evidence, Page 2,

14   pulled out this picture.  You can see right here, it

15   shows 16 server blades in the Ketris system.  They're

16   each coupled to this backplane through coupling sites to

17   the connectors and the slots (indicates).

18             By the way, not disputed.  This element

19   is not disputed either.

20             Then it talks about each of the

21   elements -- if you look over here -- each computer

22   module comprises a processing unit, main memory,

23   interface controller, and ethernet controller.

24             So the first one of those, a processing

25   unit.  Here's a picture of the actual physical exhibit

1    over there of the blade server.

2                    Dr. McClure and Mr. Medeiros both

3    testified that's where the processor is.  Meets that

4    element.

5                    They both testified that's where the main

6    memory is.  Meets that element.

7                    Interface controller, this is the element

8    that everyone is fighting about.

9                    By the way, these two elements, not

10   disputed.  Mr. Gafford and ACQIS don't dispute that the

11   prior art Ketris system shows those.

12                   This is the only element they do dispute,

13   and this goes back to the serial PCI dispute.  But as

14   you -- as I've shown you under the Court's construction,

15   that is met by any sort of serial connection.

16                   Well, Mr. Medeiros testified about how

17   the system works.  He says it takes a parallel PCI

18   bus -- excuse me -- quote, it takes a parallel bus PCI;

19   it serializes it into different signal -- differential

20   signaling, sends it across the backplane, then another

21   server would take the serial information in, and then

22   back convert it into a PCI bus that would be running on

23   that server blade.

24                   Serial or parallel PCI, serialized

25   parallel PCI.  Look familiar?  It's exactly what the

1    pictures in the patent disclosed as being the preferred

2    embodiment of the invention, but it was done before the

3    invention.  It was done in the Ketris system.

4    So this element is met.

5                   Wherein each of the computer modules

6    operates fully independent of the other.  Documents show

7    this element is met.  Dr. McClure presented evidence of

8    it.  Mr. Gafford, in rebuttal, did not dispute it.

9                   The last element, the computer system of

10   Claim 11:  Wherein the differential signal channel

11   comprises two sets of unidirectional serial bit channels

12   which transmit data in opposite directions.

13                  Mr. Medeiros testified, the basic

14   fundamental is a differential signal that you

15   communicate.  So there's a pair for one direction, and

16   then there's a pair for the other direction.  Exactly

17   what this claim element is talking about.

18                  So this element is also plainly met.

19   It's not even really seriously disputed.

20                  Now, that is every element, Members of

21   the Jury, of Claim 12.  There is no dispute that every

22   single element of this claim has been met by the Ketris

23   system.  That is, by definition, anticipation.  That

24   renders the patents invalid.

25                  Now, the other claims are almost

1    identical to Claim 12, but you saw there's a few

2    differences.  One was, some of the elements had the

3    addition of a graphics controller.

4              Well, Dr. McClure and Mr. Medeiros both

5    showed you that's where the graphics controller is in

6    the Ketris system.  So that element's already in the

7    prior art system.

8              Another element that's covered by the

9    claims is a mass storage device coupled to the

10   processing unit.

11             Well, again, Dr. McClure and Mr. Medeiros

12   both showed you this is where it is physically.  On the

13   physical exhibit, you have to look at it.  That's a hard

14   drive.  A hard drive is a mass storage device.

15   So that element is met as well.

16             Another element that's in some of the

17   claims is that one of the computer modules can replace

18   another one in operation.

19             Again, Mr. Medeiros and Dr. McClure

20   showed that this element is met as well.  This is just

21   an example of that from DX52 in evidence, a Ketris

22   document from before Dr. Chu's invention.

23             In the event of a failure of an active

24   manager, another server is automatically elected as the

25   active manager, providing the continuous management of

1    the chassis and remaining servers.

2              Replaces another one in operation, right

3    there in the document.

4              The second to last element that's in some

5    of the claims is:  A console comprising a power supply

6    and a serial communication hub controller powered by the

7    power supply.

8              Again, Dr. McClure and Mr. Medeiros

9    showed you, here's the power supply.  It's in the

10   system.  Has to be in the system.  And the serial hub

11   controllers that are powered by that power supply.  So

12   they're all there in the prior art system.

13             And then the final element that's in some

14   of the claims but not others is circuitry that can vary

15   clock frequency of the processing unit for various power

16   consumption.

17             You saw the documents that showed that

18   the Ketris system used a Pentium III processor.  And as

19   Dr. McClure testified, anyone of skill in the art would

20   know that this processor had the capability of changing

21   clock frequency for the purposes of lowering power

22   consumption.

23             Not disputed.  Not disputed by

24   Mr. Gafford.

25             So, Members of the Jury, I have just gone

1    through every element of all six asserted claims.

2                      You've just seen with your own eyes in

3    these slides, and you can recall from the testimony,

4    that every one of these elements is in the Ketris

5    system.

6                      That's really important.  That shows you

7    that somebody else did it first, every one of the

8    elements.  And please, remember the Ketris system was

9    not before the Patent Examiner when these patents were

10   filed.  The Patent Examiner didn't know anything about

11   it.

12                     You ask:  Well, how could these patents

13   get issued?  Well, he didn't know.

14                     If this system had been presented to the

15   Patent Examiner, the Patent Examiner could see, like

16   you've seen Mr. Medeiros go through and show how the

17   system works.

18                     Do you think the Patent Office would have

19   said:  Well, you've got a valid patent on each and every

20   element that's already in a single system?  No, it would

21   not.  It would not.

22                     So for this reason alone, we believe that

23   we have shown that the asserted claims here are not

24   valid; they're not new; they're not unique.  And if you

25   don't have a new or unique patent, you can't get money

1    for it.  It's invalid.

2                   Now, we also went through and showed you

3    the RLX blade server system.  And I'm not going to take

4    as much time, but you heard from Mr. Irving on the RLX

5    system.

6                   This, again, was a prior art system.  We

7    showed you the evidence that showed it was conceived in

8    January of 2000; that they had engineering documents

9    developed in January 28th; that they had their

10   engineering design down April 19th, 2000, all done

11   before the priority date.

12                  Mr. Gafford did not dispute any of that.

13   It's undisputed.  It is prior art.

14                  Again, I'm not going to take the time

15   that I did with Ketris, but you saw, going through each

16   and every element, that it's met.  Just like Ketris,

17   it's got an enclosure.  It's got slots.  It's got

18   multiple blade servers.

19                  It's got an ethernet hub controller.

20   It's got coupling sites, the modular coupled to the

21   coupling sites through the connector, just like in the

22   claims.

23                  It's got a processor.  It's got a main

24   memory.  It's got an interface controller that's coupled

25   to a differential channel signal.

1          You heard Mr. Irving testify extensively
2    about how, just like in Figure 7 of the patent, the
3    system went from parallel PCI into a serial bus, back
4    into parallel PCI, just like Figure 7.  Exact same
5    thing.
6          You saw the evidence that the elements
7    operate independently of each other and that the channel
8    comprises unidirectional serial bit channels, the same
9    evidence there.  It shows both of those things.
10          The graphics controller on it was shown.
11    The mass storage element was shown.  The processor
12    element for varying clock frequency was shown.  The
13    replaceability was shown.  Any blade server set up as an
14    installation server can be used to re-image any other
15    server blade in any chassis on the management network.
16    The power supply was shown.
17          So every element is also shown here and
18    in QuantumNet.  Again, even an earlier blade server
19    system had the slots and the connectors and multiple
20    blades, was independently testified to, was done well
21    before May 12th, undisputed, not challenged by
22    Mr. Gafford.
23          Similar system of computer modules,
24    slots, connectors, console, ethernet hub controller.
25          All of these different systems we

1    maintain, in addition to Ketris anticipating these

2    claims, that it would simply be obvious for a person of

3    ordinary skill in the art, as of the date, the priority

4    date, when all this stuff had already been done, to do

5    what it is that Mr. Chu claims is his invention.

6                    And we believe the evidence will show

7    that and that you'll conclude that.  There's really no

8    question here.

9                    Now, let me switch subjects to

10   non-infringement.  Our second defense is

11   non-infringement.

12                   Now, you'll recall in my opening

13   statement and my cross-examination of Mr. Gafford on

14   infringement, we focused on this element here:  Wherein

15   each of the computer modules operates fully independent

16   of each other.  This requirement of independent

17   operation is in each of the asserted claims.

18                   The Court has construed the phrase

19   computer module as an assembly for providing a computing

20   function within computer system as recited in a

21   particular claim.

22                   So this is an element.  As the Court has

23   instructed you, for any given claim, it is the

24   Plaintiff's burden to proof to prove that every element

25   has been met.  This is an element that they haven't

1    proved that they've been met.

2              If you look at the accused system,

3    they've got blade servers, and they've got a management

4    module.

5              Now, you heard Counsel pull out some

6    nitpick testimony from Mr. Holland about independent

7    operation.  Well, he didn't tell you that those

8    questions were just focused on these guys, the blade

9    servers, okay?

10             Conspicuously absent from those questions

11   is another computer module in the IBM system.  Mr.

12   Gafford admitted the management module is a computer

13   module.  Under the Court's construction, there's no

14   question it's a computer module.

15             Well, the undisputed evidence shows,

16   Members of the Jury, that the management module is not

17   independent to blade servers.

18             Now, the claim language here is, you've

19   got a plurality of computer modules that are coupled to

20   these coupling sites.  Well, the blade server is coupled

21   with the coupling sites on the other side.

22             And it says you've got this plurality and

23   each of the computer modules in that plurality, each of

24   them, have to operate fully independent of each other.

25             This is one of them, but it's undisputed

1    it does not operate fully independent.  This is

2    responsible for initializing these blades.  This module

3    isn't doing it.  These blades don't work.

4              This element here, chassis-level power

5    management, that's done by the management computer, the

6    computer module called the management module.  If

7    that -- the management module isn't working in doing

8    this, these other computer modules don't work.

9              Now, you -- they showed you testimony

10   from Mr. Holland.  He was talking about just blade

11   servers and not the management module.  But when asked

12   about the management module, what did he say?

13             QUESTION:  And would you say that each of

14   the blade servers then is dependent upon the management

15   module?

16             ANSWER:  Yes.  The most critical element

17   in maintaining the chassis viability is the management

18   module be able to control all of these factors.

19             QUESTION:  And also that the operation of

20   any one server blade within the chassis can impact the

21   operation of any other blade server -- any other server

22   blade?

23             ANSWER:  Yes.

24             So actually, when asked about the

25   management module, which is a computer module,

1    Mr. Holland said there's a dependency.  They are not

2    independent.

3                  But it's not just Mr. Holland.

4    Mr. Gafford, on cross-examination, admitted the same

5    thing.

6                  QUESTION:  And these blade server

7    computers are dependent, at least to a certain extent,

8    on this management module computer, correct, sir?

9                  ANSWER:  Yes.

10                 Their own expert admits that there's a

11   dependency between the computer module called the

12   management module and the computer module called the

13   blade server.  That means there's non-infringement.

14                 This element:  Wherein each of the

15   computer modules operates fully independent of each

16   other is not met.

17                 Mr. Gafford has the burden -- ACQIS and

18   Mr. Gafford, their expert, have the burden of proof to

19   show you through evidence that this element is met, and

20   they can't do so.

21                 You'll remember Mr. Gafford doesn't even

22   accuse any software.  He just accuses an empty piece of

23   hardware.  And he says:  That empty piece of hardware

24   with no software running on it shows that these modules

25   are operated independent of each other.

1          It's nonsensical.  They don't even

2   operate if they don't have software on them.  You can

3   put software on them to make them work as a team,

4   virtualization software.  You remember on

5   cross-examination, he freely admitted that.

6          THE COURT:  Counsel, you have about 10

7   minutes left.

8          MR. VERHOEVEN:  Thank you, Your Honor.

9          You know, if he wanted to prove this, he

10  would have to show you that IBM is selling software that

11  causes the -- all of these different modules to work

12  independently.

13         He can't just point to a piece of

14  hardware and say:  Oh, it operates independently.  Take

15  my word for it.

16         It's their burden of proof, and they

17  haven't shown you that the software operates, whether

18  these modules even operate, much less operate

19  independently.

20         If they wanted to prove that to you, they

21  should have done a demonstration and used IBM's software

22  on there and showed you how it works independently.  Not

23  just stood on the stand, when they have the burden of

24  proof, and point to the element and say:  Well, it's met

25  based on this deposition testimony you saw played for

1    two-and-a-half hours in the morning.

2                    That's what he testified to.  Does that

3    meet his burden of proof?

4                    This is serious business.  They're asking

5    for tens of millions of dollars, and they haven't even

6    tried to show that this element is met.  In fact,

7    they've admitted that it's not on cross-examination.

8                    This element is in every single one --

9    this independent operation requirement is in every

10   single one of the claims, Members of the Jury.  If you

11   find that they didn't meet their burden of proof on this

12   element, you must, under the Court's construction, find

13   non-infringement.  And we think you should, and that's

14   another defense to the case.

15                   Now, let me use my remaining time, if I

16   could, to talk a little bit about ACQIS's claim for

17   damages.

18                   Now, as I told you in my opening

19   statement, we think damages in this case should be zero.

20   IBM does not infringe these patents, and these patents

21   are not valid.

22                   But just in case you disagree with me and

23   the evidence we presented, I must address their damages

24   claim because I won't have an opportunity to do it

25   later.

1           But just because I'm addressing their

2    damages claim, Members of the Jury, please do not infer

3    that I somehow implicitly think that we're liable.  We

4    are not.  It's just the way the situation works.

5           As the Court instructed you, you

6    shouldn't draw any inferences from when the Court talks

7    about damages rules, and you shouldn't draw any

8    inferences by me, too.  We dispute liability and think

9    damages should be zero.

10          But let's look at the evidence that the

11   Plaintiff has, briefly.  In the opening statement, you

12   heard from Counsel:  IBM charges a royalty rate of 1

13   percent per patent when it charges others -- when

14   someone else uses one of their patents.

15          Remember hearing that?

16          We're only asking for what they asked

17   for.  That's all we're asking.

18          That was their pitch in the opening

19   statement.  But what did the evidence show?

20          Well, we presented an IBMer who's been in

21   charge of licensing for over 10 years, and she was

22   asked -- this is Ms. Baumgartner.

23          QUESTION:  In the past 10 years, have you

24   ever seen IBM pay as high as 1 percent per patent for a

25   license to patent in the computer sector?

1               ANSWER:   No.

2               So the evidence doesn't support what

3    Counsel told you in the opening statement.

4               You heard from Mr. Murtha on direct

5    examination.

6               QUESTION:   How did Factor 1 come into

7    your analysis?

8               Factor 1 is the first of the

9    Georgia-Pacific Factors that deals with whether there's

10   an established royalty rate.

11              QUESTION:   How did Factor 1 come into

12   your analysis?

13              ANSWER:   Well, this is a critical factor,

14   because, in fact, ACQIS has granted, up till today, 10

15   licenses to the patents in question.

16              So on direct, he says it's a critical

17   fact, these licenses, these litigation licenses that

18   he's referring to.

19              He further said:   Now, I think it's been

20   raised several times that these licenses were all part

21   of litigation settlements.   Is that your understanding?

22              He answered yes.

23              QUESTION:   And how does that impact your

24   opinion?

25              He said:   In a very positive way.

1          So on direct, he says:  I'm relying on

2    these litigation licenses, and the fact that they're

3    part of litigation impacts me in a positive way.

4          Well, what did he say on cross?

5          Again, this is the positive way, quote,

6    on direct.  On cross, I showed him what he said in

7    another case just a little while ago, and he took the

8    exact opposite direction.

9          QUESTION:  What is the significance of

10   entering into an agreement under a threat of litigation?

11         ANSWER:  You're not really focused on the

12   value of the patent but possibly on the cost of the

13   lawsuit.  It's not an arm's-length transaction.

14         So he admits on cross-examination that

15   none of those agreements are reliable for the purpose of

16   determining a reasonable royalty.

17         And again, on direct, he said they were

18   critical.  On cross, he said:  Excuse me.  If you're

19   referring to the 10 agreements we were talking about

20   during my direct examination, those ones I did not rely

21   on.

22         Again, you have to assess credibility

23   here.

24         On direct, they're critical.  The fact of

25   the litigation is positive.  I show him his inconsistent

1    position in the LaserDynamics case, and he admits

2    they're not reliable and changes his position and says:

3    I don't even rely on them.

4              Your Honor, if you could let me know when

5    I have a couple of minutes, so I --

6              THE COURT:  Yes.  You have about four

7    minutes left.

8              MR. VERHOEVEN:  Thank you.

9              ACQIS -- he then said on redirect,

10   Members of the Jury, said:  Okay.  Okay.  I didn't rely

11   on them.  I just looked at them as a, quote, sanity

12   test.

13             If my royalty rate was so far away from

14   what ACQIS actually was doing currently, then as a

15   sanity test, I would mean -- it would mean I was

16   probably wrong.

17             Okay.  What we put on this chart, Members

18   of the Jury, are the agreements.  He said ten but, in

19   fact, he only relied on one, two, three, four, five,

20   six; and those are the six agreements that he had on his

21   chart that had those implied royalty rates to see

22   whether 3 percent made sense or not.

23             But when you look at how much is actually

24   paid on those agreements that he said was a sanity

25   check, you see that what he's asking for for IBM is over

1    86 times higher than was paid to any of these

2    agreements, by the way, which were all lump-sum

3    agreements that he was relying on for a sanity test.

4                 What does this tell us?  He was probably

5    wrong, just like he admitted.

6                 The other agreement that they rely on

7    extensively is the HP agreement.  It was a settlement

8    for a lot of money, $30 million.

9                 But you heard from Mr. Ratliff that if

10   you -- if you adjust that using the same math to IBM

11   sales time period and market share, what do you get?

12                For the time period, it's reduced to 5.6

13   million, and when you adjust it for sales and market

14   share, 2.4 million.  The exact same math used for the

15   litigation agreement for HP when adjusted for IBM's

16   market share and time period equals $2.4 million, not

17   $27 million.

18                So it's all smoke and mirrors.

19                Finally, let's look at what IBM actually

20   had to say.  IBM said:  In my experience, the ones I've

21   personally been involved with, we have paid between 1

22   and $4 million.  That's 10 years of experience

23   Ms. Baumgartner had.  But she also testified that the

24   definition of a licensed patent includes all

25   continuations.

1           So what does the evidence show here?  It
2      shows there's no way IBM would ever, in a hypothetical
3      negotiation, have paid that much money.  If anything,
4      Mr. Ratliff's number, 3.5 million, if you find
5      liability, is generous.  Most likely, a reasonable
6      royalty would be much less.
7           So let me conclude, Members of the Jury,
8      by again thanking you for your service.  I know you're
9      all going to carefully look at the evidence and form
10     your own independent judgments.
11          We believe the evidence has shown here
12     that there is no liability; that somebody else did these
13     patents first.  If the Patent Office had known about it,
14     the Patent Office wouldn't have issued these patents.
15          I believe the evidence also shows there's
16     no infringement.  And so when you go fill out these
17     verdict forms, we hope that you'll so find.
18          Thank you for your time.
19          THE COURT:  Thank you, Counsel.
20          MR. GUSKE:  Your Honor, may I split my
21     last 20 minutes with Mr. Chandler?
22          THE COURT:  Yes, you may.
23          Now, the claim language here is, you've
24     got a plurality of computer modules that are coupled to
25     these coupling sites.  Well, the blade server is coupled

1    with the coupling sites on the other side.

2                      And it says you've got this plurality and

3    each of the computer modules in that plurality, each of

4    them, have to operate fully independent of each other.

5                      This is one of them, but it's undisputed

6    it does not operate fully independent.  This is

7    responsible for initializing these blades.  This module

8    isn't doing it.  These blades don't work.

9                      This element here, chassis-level power

10   management, that's done by the management computer, the

11   computer module called the management module.  If

12   that -- the management module isn't working in doing

13   this, these other computer modules don't work.

14                      Now, you -- they showed you testimony

15   from Mr. Holland.  He was talking about just blade

16   servers and not the management module.  But when asked

17   about the management module, what did he say?

18                      QUESTION:  And would you say that each of

19   the blade servers then is dependent upon the management

20   module?

21                      ANSWER:  Yes.  The most critical element

22   in maintaining the chassis viability is the management

23   module be able to control all of these factors.

24                      QUESTION:  And also that the operation of

25   any one server blade within the chassis can impact the

1    operation of any other blade server -- any other server

2    blade?

3                    ANSWER:  Yes.

4                    So actually, when asked about the

5    management module, which is a computer module,

6    Mr. Holland said there's a dependency.  They are not

7    independent.

8                    But it's not just Mr. Holland.

9    Mr. Gafford, on cross-examination, admitted the same

10   thing.

11                   QUESTION:  And these blade server

12   computers are dependent, at least to a certain extent,

13   on this management module computer, correct, sir?

14                   ANSWER:  Yes.

15                   Their own expert admits that there's a

16   dependency between the computer module called the

17   management module and the computer module called the

18   blade server.  That means there's non-infringement.

19                   This element:  Wherein each of the

20   computer modules operates fully independent of each

21   other is not met.

22                   Mr. Gafford has the burden -- ACQIS and

23   Mr. Gafford, their expert, have the burden of proof to

24   show you through evidence that this element is met, and

25   they can't do so.

1              You'll remember Mr. Gafford doesn't even

2    accuse any software.  He just accuses an empty piece of

3    hardware.  And he says:  That empty piece of hardware

4    with no software running on it shows that these modules

5    are operated independent of each other.

6              It's nonsensical.  They don't even

7    operate if they don't have software on them.  You can

8    put software on them to make them work as a team,

9    virtualization software.  You remember on

10   cross-examination, he freely admitted that.

11             THE COURT:  Counsel, you have about 10

12   minutes left.

13             MR. VERHOEVEN:  Thank you, Your Honor.

14             You know, if he wanted to prove this, he

15   would have to show you that IBM is selling software that

16   causes the -- all of these different modules to work

17   independently.

18             He can't just point to a piece of

19   hardware and say:  Oh, it operates independently.  Take

20   my word for it.

21             It's their burden of proof, and they

22   haven't shown you that the software operates, whether

23   these modules even operate, much less operate

24   independently.

25             If they wanted to prove that to you, they

1    should have done a demonstration and used IBM's software

2    on there and showed you how it works independently.  Not

3    just stood on the stand, when they have the burden of

4    proof, and point to the element and say:  Well, it's met

5    based on this deposition testimony you saw played for

6    two-and-a-half hours in the morning.

7                    That's what he testified to.  Does that

8    meet his burden of proof?

9                    This is serious business.  They're asking

10   for tens of millions of dollars, and they haven't even

11   tried to show that this element is met.  In fact,

12   they've admitted that it's not on cross-examination.

13                   This element is in every single one --

14   this independent operation requirement is in every

15   single one of the claims, Members of the Jury.  If you

16   find that they didn't meet their burden of proof on this

17   element, you must, under the Court's construction, find

18   non-infringement.  And we think you should, and that's

19   another defense to the case.

20                   Now, let me use my remaining time, if I

21   could, to talk a little bit about ACQIS's claim for

22   damages.

23                   Now, as I told you in my opening

24   statement, we think damages in this case should be zero.

25   IBM does not infringe these patents, and these patents

1    are not valid.

2                     But just in case you disagree with me and

3    the evidence we presented, I must address their damages

4    claim because I won't have an opportunity to do it

5    later.

6                     But just because I'm addressing their

7    damages claim, Members of the Jury, please do not infer

8    that I somehow implicitly think that we're liable.  We

9    are not.  It's just the way the situation works.

10                    As the Court instructed you, you

11   shouldn't draw any inferences from when the Court talks

12   about damages rules, and you shouldn't draw any

13   inferences by me, too.  We dispute liability and think

14   damages should be zero.

15                    But let's look at the evidence that the

16   Plaintiff has, briefly.  In the opening statement, you

17   heard from Counsel:  IBM charges a royalty rate of 1

18   percent per patent when it charges others -- when

19   someone else uses one of their patents.

20                    Remember hearing that?

21                    We're only asking for what they asked

22   for.  That's all we're asking.

23                    That was their pitch in the opening

24   statement.  But what did the evidence show?

25                    Well, we presented an IBMer who's been in

1  charge of licensing for over 10 years, and she was

2  asked -- this is Ms. Baumgartner.

3                 QUESTION:  In the past 10 years, have you

4  ever seen IBM pay as high as 1 percent per patent for a

5  license to patent in the computer sector?

6                 ANSWER:  No.

7                 So the evidence doesn't support what

8  Counsel told you in the opening statement.

9                 You heard from Mr. Murtha on direct

10  examination.

11                 QUESTION:  How did Factor 1 come into

12  your analysis?

13                 Factor 1 is the first of the

14  Georgia-Pacific Factors that deals with whether there's

15  an established royalty rate.

16                 QUESTION:  How did Factor 1 come into

17  your analysis?

18                 ANSWER:  Well, this is a critical factor,

19  because, in fact, ACQIS has granted, up till today, 10

20  licenses to the patents in question.

21                 So on direct, he says it's a critical

22  fact, these licenses, these litigation licenses that

23  he's referring to.

24                 He further said:  Now, I think it's been

25  raised several times that these licenses were all part

1  of litigation settlements.  Is that your understanding?

2            He answered yes.

3            QUESTION:  And how does that impact your

4  opinion?

5            He said:  In a very positive way.

6            So on direct, he says:  I'm relying on

7  these litigation licenses, and the fact that they're

8  part of litigation impacts me in a positive way.

9            Well, what did he say on cross?

10            Again, this is the positive way, quote,

11  on direct.  On cross, I showed him what he said in

12  another case just a little while ago, and he took the

13  exact opposite direction.

14            QUESTION:  What is the significance of

15  entering into an agreement under a threat of litigation?

16            ANSWER:  You're not really focused on the

17  value of the patent but possibly on the cost of the

18  lawsuit.  It's not an arm's-length transaction.

19            So he admits on cross-examination that

20  none of those agreements are reliable for the purpose of

21  determining a reasonable royalty.

22            And again, on direct, he said they were

23  critical.  On cross, he said:  Excuse me.  If you're

24  referring to the 10 agreements we were talking about

25  during my direct examination, those ones I did not rely

1    on.

2              Again, you have to assess credibility

3    here.

4              On direct, they're critical.  The fact of

5    the litigation is positive.  I show him his inconsistent

6    position in the LaserDynamics case, and he admits

7    they're not reliable and changes his position and says:

8    I don't even rely on them.

9              Your Honor, if you could let me know when

10   I have a couple of minutes, so I --

11             THE COURT:  Yes.  You have about four

12   minutes left.

13             MR. VERHOEVEN:  Thank you.

14             ACQIS -- he then said on redirect,

15   Members of the Jury, said:  Okay.  Okay.  I didn't rely

16   on them.  I just looked at them as a, quote, sanity

17   test.

18             If my royalty rate was so far away from

19   what ACQIS actually was doing currently, then as a

20   sanity test, I would mean -- it would mean I was

21   probably wrong.

22             Okay.  What we put on this chart, Members

23   of the Jury, are the agreements.  He said ten but, in

24   fact, he only relied on one, two, three, four, five,

25   six; and those are the six agreements that he had on his

1    chart that had those implied royalty rates to see

2    whether 3 percent made sense or not.

3              But when you look at how much is actually

4    paid on those agreements that he said was a sanity

5    check, you see that what he's asking for for IBM is over

6    86 times higher than was paid to any of these

7    agreements, by the way, which were all lump-sum

8    agreements that he was relying on for a sanity test.

9              What does this tell us?  He was probably

10   wrong, just like he admitted.

11             The other agreement that they rely on

12   extensively is the HP agreement.  It was a settlement

13   for a lot of money, $30 million.

14             But you heard from Mr. Ratliff that if

15   you -- if you adjust that using the same math to IBM

16   sales time period and market share, what do you get?

17             For the time period, it's reduced to 5.6

18   million, and when you adjust it for sales and market

19   share, 2.4 million.  The exact same math used for the

20   litigation agreement for HP when adjusted for IBM's

21   market share and time period equals $2.4 million, not

22   $27 million.

23             So it's all smoke and mirrors.

24             Finally, let's look at what IBM actually

25   had to say.  IBM said:  In my experience, the ones I've

Page 139

1   personally been involved with, we have paid between 1

2   and $4 million.  That's 10 years of experience

3   Ms. Baumgartner had.  But she also testified that the

4   definition of a licensed patent includes all

5   continuations.

6               So what does the evidence show here?  It

7   shows there's no way IBM would ever, in a hypothetical

8   negotiation, have paid that much money.  If anything,

9   Mr. Ratliff's number, 3.5 million, if you find

10  liability, is generous.  Most likely, a reasonable

11  royalty would be much less.

12              So let me conclude, Members of the Jury,

13  by again thanking you for your service.  I know you're

14  all going to carefully look at the evidence and form

15  your own independent judgments.

16              We believe the evidence has shown here

17  that there is no liability; that somebody else did these

18  patents first.  If the Patent Office had known about it,

19  the Patent Office wouldn't have issued these patents.

20              I believe the evidence also shows there's

21  no infringement.  And so when you go fill out these

22  verdict forms, we hope that you'll so find.

23              Thank you for your time.

24              THE COURT:  Thank you, Counsel.

25              MR. GUSKE:  Your Honor, may I split my

1    last 20 minutes with Mr. Chandler?

2                   THE COURT:  Yes, you may.

3                   MR. STACY:  With the Court's permission?

4                   THE COURT:  You may proceed.

5                   MR. STACY:  I just learned an important

6    lesson:  When you go up against IBM, it's going to be

7    painful.  I feel like I've been spending the last three

8    weeks of my life with a prison rodeo team.

9                   All we did for the first 20 minutes was

10   attack character, attack -- personal attacks.  But let's

11   look at the evidence behind a few of his attacks.

12                  I counted six times that IBM said:  It's

13   three weeks.  Do you remember that?  Three weeks.  It's

14   not fair to compensate Dr. Chu for three weeks of work.

15   I've been doing the math.  I can't figure out how he got

16   three weeks.

17                  Dr. Chu left his first employment,

18   according to IBM, December 5th, 1997, and he filed his

19   patents on May 12th, 2000.  Not three weeks, no matter

20   how you do the math.  It's character assassination.

21                  They're trying to betray Dr. Chu's

22   invention as irrelevant, because there were three weeks.

23   No.  Complete -- completely made up.

24                  Pulled up -- let's see -- pulled

25   Page 5 -- he pulled up Slide 5 out of the patent.  What

1   a wonderful story.  Said, well, this is a cable right

2   here.  It connects things together.  It's just like

3   Hong.

4              Folks, this is one computer chip.

5   Northbridge, southbridge.  Remember that?  Hong was

6   about connecting something to a back room.  This

7   (indicates) this cable.

8              That (indicates) is a computer chip.

9   Those are the real facts.

10             Pull up Slide 25, please.

11             If you'll look at 25, or this slide, this

12  was an IBM slide.  I threw down the challenge as cleanly

13  and as clearly as I could, and IBM just refused to admit

14  it.

15             What we talked about is this language:

16  Interface controller and an ethernet controller.  We've

17  talked about both of those.  Now, when IBM came up here,

18  they talked about it and said, oh, let's look over here.

19             Don't look over here.  Look over here.

20  Look over here.

21             Why did they ignore the challenge I gave

22  them?

23             Ethernet controller and interface

24  controller are different things.  But Mr. Verhoeven

25  didn't want to talk about that difference.

1            The reality is, their entire invalidity

2    case is based on converting that language into that

3    language, pointing to two of the same things.  That's

4    their entire case.

5            And I'll go back to what I said before.

6    Two ethernet controllers are exactly that, two ethernet

7    controllers.  Nothing more.  There is no interface

8    controller on this board.

9            Remember, I, interface, internal;

10   ethernet, E, external.  You didn't hear any challenge on

11   that.

12           The only thing that IBM challenges is a

13   little bit of language down here (indicates), but that

14   doesn't change anything in the Court's construction.

15           The Court construed this term, but left

16   interface controller there.

17           IBM is doing an incredible violence to

18   these claims by just trying to read things out of them,

19   but that's the only way their invalidity case works.

20           Go to Slide 34.

21           They brought up their position again on

22   independent.  I think he called it nit-pick testimony.

23   Pretty clear.  Absolutely clear.

24           Remember the two blades, the big things?

25   Those are absolutely independent.  I addressed Mr.

1    Verhoeven's point about the management modules in the

2    next set of testimony, but we know first that the blades

3    are absolutely independent.  It's not nit-pick testimony

4    that is an admission under cross-examination.

5                    And then what did Mr. Holland confirm for

6    us?  He confirmed that management module, the thing that

7    goes in the back of the computer rather than in the

8    front of the computer, not the same thing.  It doesn't

9    meet the computer module definition.  It doesn't have

10   that serial PCI limitation.

11                   You never heard IBM say Mr. Stacy's off

12   his rocker.  We've got that in testimony right here.  He

13   never brought anything to you to show that.

14                   What's on the record is this by the man

15   that knows.  Computer modules are the blades, the big

16   things that go in front, not those management modules

17   that go in the back.

18                   Slide 80.  Thank you.

19                   Back on Mr. Murtha.  Brings up a couple

20   of things, well, IBM would never pay this.  Sometimes

21   maybe it's good to be the king where you can force your

22   will on others.  But the reality is, this is a

23   hypothetical negotiation.  IBM doesn't get to dictate

24   what it's going to do just because it's big.  It has to

25   sit at the table and behave reasonably.

1           And this, those 15 Georgia-Pacific
2   Factors, the Court has set those out to tell you what's
3   reasonable and how people would behave.
4           What Mr. Murtha did is go through all
5   those factors and looked at all the different data
6   points.  IBM, again, I laid down the challenge.  Why are
7   you just talking about HP?  Why are you going to show
8   that silly graph with the big thing on the end?
9           And they brought it up with no
10  explanation.  They didn't show Oracle, Dell, SuperMicro.
11  They didn't put them up there, even though I issued the
12  challenge.
13          So it comes down to this.  It comes back
14  to two experts in their field doing their jobs,
15  analyzing the data, analyzing 3 million records, going
16  through all of the different factors that the courts
17  have laid out.  They came to this conclusion.
18          And what IBM left with is if we lose, if
19  we do infringe, if the patents are valid, we'll give
20  Dr. Chu 3-1/2 million dollars, because we're generous.
21          What IBM is really saying is we want to
22  pay less than everybody else out there.  It's not
23  generous.  What they are looking for is a better deal
24  than everybody else.  They want a competitive leg up on
25  everybody else, because they get to use Dr. Chu's

1    technology for less.  That's not fair.  That's not

2    reasonable.

3              At the end of the day, it's not about

4    character assassination.  It's about what's fair,

5    reasonable, and right.

6              IBM is using Dr. Chu's technology.  Those

7    patents are not invalid.  And a fair and reasonable

8    royalty is 3 percent.  And when you apply that to the

9    sales of IBM, it comes out to be this number

10   (indicates).  That's just the math.  That's fair and

11   that's reasonable.

12             With that, I would like to give the rest

13   of my time to my mentor and friend, Mr. Chandler.

14             THE COURT:  Thank you, Counsel.

15             MR. CHANDLER:  Your Honor, if it pleases

16   the Court.

17             And, Ladies and Gentlemen of the Jury, I

18   want to first, in making my closing comments, thank the

19   Cooley Firm for giving me the opportunity as an old

20   country lawyer in being involved in the trial of a

21   patent case.  This now makes my -- all the kind of cases

22   I've tried virtually complete.

23             And it was a grand experience.  I've

24   never been around a more dedicated, harder-working, and

25   brilliant group of people, both sides.  Those that held

1    the spark of conflict and came against us, bright,

2    brilliant people that work hard and cared.

3              And IBM, they got awful good lawyers, but

4    they sure need them in this case.

5              But most particularly, I want to thank

6    Bill Chu for allowing me to be part of your trial team,

7    Bill.

8              I made a statement in opening statement

9    that I really believe that Bill Chu in the years I've

10   gotten to know him is probably the finest and most

11   decent client I've ever represented.  I will repeat that

12   now; and after having lived the better part of 75 years,

13   as I told you, it may be my last time to be up before a

14   jury, certainly in federal court.

15             But I cherish these times and this great,

16   great responsibility that I've been part of.

17             Now, Mr. Verhoeven told the jury on

18   opening statement, told you that -- and if you would

19   pull up Page 61 -- something along the lines of:

20             Throughout the last century, IBM has been

21   a major innovator in technology in the United States of

22   America, and it really has been quite responsible for

23   the development of American business and American

24   superiority in business over other countries in the

25   world.

1           No, Mr. Verhoeven.  IBM is not really

2    responsible for the development of American business and

3    American superiority in business, but it's individual

4    Americans and the men and women that make up America

5    that have contributed to this great nation that have

6    made the superiority of American business; not IBM.

7           I know this, because I've spent virtually

8    50 years doing nothing but representing people against

9    big companies.  And there's no one more miraculous, more

10   creative with more credibility than an American working

11   person.

12          I mentioned Bill Chu, and, Bill, when

13   you -- let me remind you of a little something about

14   Bill Chu, and you heard his testimony.  We'll have the

15   picture there.  That's Bill in Shanghai, China, before

16   they had to flee from Mao Tsu-Tung to Hong Kong.

17          That's Bill getting his doctorate, and

18   virtually six-and-a-half years of engineering school.

19          And as I sat there and listened to his

20   testimony, I was so terribly impressed.  At the same

21   time, I remember as a young lawyer, those days in the

22   late 1960s were a dark day in American history.  There

23   was great rebellion and great strife in America.  Flags

24   were being burned on that campus at Berkeley.

25          It was -- it was mayhem, and at the same

1    time, there was a young Chinese lad that spent his time,

2    as others were enjoying indecencies, going about doing

3    some things that his heart must swell on today.  While

4    things were going on out there, he was cleaning toilets

5    and cleaning up their dormitories so that he might earn

6    the money to go to college.

7              And I -- I'm totally amazed by here's a

8    young man that came over with nothing but the hopes and

9    the dreams and a suitcase.  He is the type of American

10   that I think they had in mind when they wrote the

11   Constitution and would have been very proud, if James

12   Madison had been in this courtroom or Thomas Jefferson,

13   to see a Bill Chu.

14             And I would just simply tell IBM, America

15   was made not by you, IBM, but America made IBM, American

16   people did.

17             I'm reminded of a little book that's one

18   of my favorites and written by a person down in Wharton,

19   Texas, and a great little book called To Kill a

20   Mockingbird.  And in the defense of old Tom, a lawyer

21   named Atticus Finch, an old country lawyer, told that

22   jury:  There's one way in this country in which all men

23   are created equal, there is but one human institution

24   that makes a pauper the equal of a Rockefeller, the

25   stupid man the equal of an Einstein, and the ignorant

1    man the equal of any college president; and that

2    institution is the court and the jury.

3                    I want to talk briefly about

4    circumstantial evidence.  His Honor has mentioned it,

5    and my time is very, very short.  I would like to talk

6    to you about what I think of as circumstantial evidence,

7    the footprints in the sand.

8                    There's no question, wherever that

9    beautiful document is, that Bill got a patent.  There's

10   no question, if you'll look at Alex Yost's testimony, at

11   119 that they've used Bill's patent and they profited by

12   it.

13                   And let's go to the next slide of Bill

14   Chu.  They offered his products for sale?  Sure, we do.

15                   Now, go to the next one.

16                   20-percent margin.  20-percent margin.

17   Mid-30s margin.

18                   Come on.  And they didn't make a profit?

19   They want to stand up and ridicule -- and I hope you

20   never have to be a plaintiff in a case, because the

21   company will try you.  I've seen this happen time and

22   time again.

23                   Emmett Murtha, 35 years with IBM.  And if

24   they were to have had one sliver -- with these bright,

25   bright folks at this table -- of information that had

1    been bad on Emmett Murtha, you'd better believe you

2    would have heard it.

3                 The damage chart is clear and

4    unequivocal.  The damages chart is clearly -- if you

5    just use 1 percent, $27 million or $26,999,000.66, and

6    I'd kick in the 4 cents myself -- 14 cents, whatever it

7    is -- 24 cents.

8                 The eight of you have an opportunity --

9    you really do -- like you may never have again in your

10   life.  You can right a wrong.  When you go home today or

11   go back to work, assuming your deliberations are

12   completed, and someone asks you what you've been about,

13   you can tell them, if you wish, that you made IBM do

14   what's right, and you made them pay for the property

15   rights that they tore away from Bill Chu.

16                Frankly, we caught IBM with their hand in

17   the intellectual cookie jar.  We really did.  And all we

18   want them to do is to return the cookies that they took

19   out of the jar.  We're not asking for any damages.  We

20   want them to get off of Bill Chu's property, restore his

21   fence, and put him back like it was.

22                You know, theft of ideas is worse than

23   theft of one's purse or billfold.  Man creates purses

24   and billfolds.  God creates ideas.

25                My hero, John Fitzgerald Kennedy stated

1    that a man may die -- my hero at Baylor, as a young

2    lawyer, I was touched by him and I'll remember it until

3    the day I die -- but nations may rise and fall, but an

4    idea lives on.  Ideas have endurance without death.

5              Ladies and Gentlemen, in closing, I want

6    to tell you that I fervently believe that this system

7    works.  What is on trial here is far greater than just

8    property rights.  It's whether or not you will allow IBM

9    to take the property of another that is not theirs to

10   take.

11             This is such an important issue.  It's

12   not you; it's Bill Chu.  But I will remind you of the

13   call of a gentleman named Martin Neumuller, who, in

14   Berlin in 1937, during the days that the Brown Shirts

15   were marching up and down the street and the call -- the

16   clarion call was clear, but Martin Neumuller later wrote

17   in a dramatic and sad cry.

18             As a Protestant clergyman from Berlin in

19   1937, as Hitler's Brown Shirts were going from house to

20   house taking people away when he said:  In Germany, they

21   first came for the Communists, and I didn't speak up

22   because I was not a Communist.  And then they came for

23   the Jews, and I didn't speak up, because I wasn't a Jew.

24             Then they came for the trade unionists,

25   but I didn't speak up, because I wasn't a trade

1   unionist.  Then they came for the Catholics, but I

2   didn't speak up, because I was a Protestant.  And then

3   they came for me, because I believed in the Lord Jesus

4   Christ.  And by that time, there was no one left to hear

5   my screams.

6                    We ask you to restore on the fences --

7   the fences on the field of justice and make IBM pay for

8   what they owe Bill Chu.

9                    In closing, I want to leave you the words

10  of a Frenchman named Alec de Tocqueville, who was sent

11  over here by King Louis XIV to study the American system

12  here in the mid-1800s.  What was so magical about it?

13  How did this system continue to exist?  How did it work

14  so well, this democracy?

15                   And he concluded that what made this

16  country work was the right of a trial by jury.  In his

17  treatise, Professor Tocqueville stated:  A pencil in the

18  hands of a foreperson of an American juror is more

19  powerful than all the armies that have ever marched and

20  all the navies that have ever sailed.

21                   In closing, Ladies and Gentlemen, there

22  are certain things that I know.  I know about the love

23  that I have for my family.  I know about the care of

24  both sides of this table for their respective causes.

25                       I know that rain falls down, and water

1   doesn't run uphill.  I know that it doesn't snow in

2   Tyler in August.  And I know IBM took Bill Chu's fence

3   down just as well as I know my name is George Edmond

4   Chandler, so help me God.

5               And that's the oath that you good folks

6   took when you agreed to be jurors.  All we ask is you

7   follow the evidence and return a verdict, which in Latin

8   means the truth.  Whatever it is, we'll live by it.

9               God bless you in your deliberations.

10              THE COURT:  Thank you, Mr. Chandler.

11              All right.  Ladies and Gentlemen of the

12  Jury, we started here a little over a week ago with jury

13  selection -- or two weeks ago actually with jury

14  selection and came back.  You've heard the opening

15  instructions.  You've heard all the evidence.  You've

16  heard the Court's Charge.  You've now heard all the

17  final arguments.

18              So it's time for you to go to work, and

19  it's your job to deliberate and reach a verdict.  The --

20  you have been sort of at our mercy as far as schedule

21  and when we take breaks and that type of thing.

22              Everyone in this courtroom is now going

23  to be at your mercy.  We will be waiting on you, and you

24  work at your schedule.  Send notes if you -- if you have

25  anything that you need.  I believe that lunch has been

Page 154

1    provided for you.

2              Go into the jury room.  I would suggest

3    the first thing you do is elect your foreperson, and

4    then decide as a group whether you'd like to just eat

5    lunch and kind of take a break and then discuss it, or

6    whether you'd like to go ahead and discuss it.  And you

7    can do it however -- however you choose.  You're in

8    charge now.

9              So with those instructions, I relieve you

10   of my instruction not to discuss the case among

11   yourselves.  In fact, I instruct you to go discuss the

12   case among yourselves.

13             So with that and the Court's thanks for

14   your service, you are excused to the jury room.

15             COURT SECURITY OFFICER:  All rise for the

16   jury.

17             (Jury out.)

18             THE COURT:  Please be seated.

19             Anything else from either party before we

20   adjourn?

21             MR. VERHOEVEN:  One housekeeping matter,

22   Your Honor.  I don't know what Your Honor's preference

23   is, but in other cases before, some of these PowerPoint

24   slides that were used for demonstratives obviously are

25   not evidence, but for the record in cases in the past,

1    what I've suggested, and it's sometimes done, is just

2    log those so that they're in the record.

3              And, for example, if this case ends up

4    going on appeal or something, people will be able to see

5    what the questions -- follow along with the slides.

6              And I don't know if Your Honor has

7    addressed that before.

8              THE COURT:  What's Plaintiff's position

9    with regard to that?

10             MR. FRIEL:  We disagree on that.  There

11   are hundreds of these slides in color.  Some don't have

12   meaning, unless they're in color, and it would just

13   create much more work on appeal.

14             THE COURT:  If there's not agreement,

15   then we'll just base it on -- the record on the evidence

16   before the Court.  Thank you for the suggestion, though.

17             MR. VERHOEVEN:  Thank you, Your Honor.

18             THE COURT:  All right.  Anything further

19   from either party?

20             All right.  Good luck to both sides, and

21   I will be anxious to hear the jury's verdict.

22             COURT SECURITY OFFICER:  All rise.

23             (Court adjourned.)

24             (Jury out.)

25             COURT SECURITY OFFICER:  All right.

Page 156

1                    THE COURT:  I understand we have an

2     objection regarding two exhibits; is that correct?

3                    MS. CANDIDO:  That is correct, Your

4     Honor.

5                    THE COURT:  All right.  What's the

6     objection?

7                    MS. CANDIDO:  We're trying to figure out,

8     Your Honor, what's happened.  Plaintiff is representing

9     to us that they were on the stipulated list at some

10    point.

11                   We don't think that's correct.  And we

12    have -- there was not a stipulation to the admission of

13    these exhibits.

14                   THE COURT:  I'm sorry?

15                   MS. CANDIDO:  We don't believe that we've

16    ever seen a list from Plaintiff suggesting these were

17    stipulated to, and we don't agree --

18                   THE COURT:  This is why we have a --

19    you're talking about Defendant's Exhibits 182 and 188;

20    is that correct?

21                   MS. CANDIDO:  That's correct, Your Honor.

22                   THE COURT:  That's why -- why I caution

23    y'all to review these lists and why I ask you each day

24    to stand up and say if you have any objections.

25                   According to Plaintiff's Exhibit List No.

1    2, Defendant's Exhibit 182 and 188 were both offered and

2    admitted without objection.

3              MS. CANDIDO:  I'm sorry, Your Honor.  We

4    apparently have a clerical error with respect to

5    tracking these two exhibits in particular.

6              We have copies we can give to the Court,

7    but Defendants do have an objection to their admission,

8    especially DX188.

9              THE COURT:  Well, the evidence has

10   closed.  I'll let you make any kind of record you would

11   like to, but -- any type of objection you want to, go

12   ahead.

13             MS. CANDIDO:  Well, our objection DX188

14   is there's been no -- there's been no witness that's

15   sponsored this agreement.  It's not -- it wasn't relied

16   upon by any of the testifying witnesses.  It's one off

17   of the IBM license agreement, and there's been no

18   other -- of those license agreements that have been in

19   evidence in this case with any of the witnesses.

20             THE COURT:  Okay.  Response?

21             MR. ARMON:  Your Honor, Orion Armon for

22   the Plaintiff.

23             It's our sincere belief those two

24   exhibits were stipulated to and admitted into evidence.

25             So we can check our records to see if

1    we've got confirmation of that, but we believe they were

2    entered.  And we'll have to go back and check to see.

3                    THE COURT:  Do you want to withdraw the

4    exhibits?

5                    MR. ARMON:  No, we don't.

6                    THE COURT:  All right.  The objection is

7    overruled.

8                    What's next?

9                    MS. CANDIDO:  I believe that's it, Your

10   Honor.

11                   THE COURT:  So you just object to 188?

12                   MS. CANDIDO:  Yes.  182 is just a cover

13   page.  We have no objection to that.

14                   THE COURT:  All right.  Very well.

15                   Anything further?

16                   MS. CANDIDO:  No, Your Honor.

17                   THE COURT:  I was almost to the parking

18   lot.

19                   MS. CANDIDO:  Sorry.

20                   COURT SECURITY OFFICER:  All rise.

21                   (Recess.)

22                   (The Honorable John Love, United States

23                   Magistrate Judge, presiding.)

24                   (Jury out.)

25                   THE COURT:  Please be seated.

1              Well, I'm sure Judge Davis has explained

2    to you why I'm here, why you're not seeing him.

3              We do have a verdict -- I mean, not a

4    verdict -- a note -- excuse me -- from the jury.  I

5    don't want to scare anyone.  But the note is about as

6    innocuous as it can get.

7              It simply says:  Can we please obtain

8    Post-It flags or small notes to mark pages and yellow

9    highlighters?  To which I have responded yes, would be

10   my proposal.  And we have them here.

11             Anyone -- anything else to add to that

12   very interesting note?

13             MR. SMITH:  Nothing from the Plaintiff,

14   Your Honor.

15             THE COURT:  Okay.

16             MR. STONE:  Nothing from Defendant, Your

17   Honor.

18             THE COURT:  All right.  Thank you.

19             All right.  Well, we will pass these

20   along to the jury and await further note or verdict.

21             All right.  Well, thank you, and we'll be

22   adjourned, recessed, awaiting a note or a verdict.

23             Thank you.

24             MR. STONE:  Thank you, Your Honor.

25             MR. SMITH:  Thank you, Your Honor.

1              COURT SECURITY OFFICER:  All rise.

2              (Jury deliberations continued.)

3              COURT SECURITY OFFICER:  All rise.

4              THE COURT:  Please be seated.

5              All right.  We have another note from the

6    jury, and I believe y'all have seen what it says.

7              It says:  Can we look at IBM's blade

8    server and chassis, please?  And thank you, signed by

9    the Jury Foreperson.

10             Let me inquire, I don't know if the

11   parties have had a chance to discuss it.  Let me talk

12   first to the Plaintiff, the Plaintiff's position on the

13   jury's note.

14             MR. SMITH:  Our position is we would

15   prefer not to send it back, Your Honor.  It was not in

16   evidence.  It wasn't offered into evidence.  And just

17   because the history of how the BladeCenter was brought

18   into this case, we don't believe that the specific

19   device should go back to the jury.

20             THE COURT:  All right.  Defendant,

21   response?

22             MR. STONE:  Your Honor, we believe that

23   it is in evidence, DX1.  So we can spend a minute

24   talking about that with Mr. Friel.  But it's in

25   evidence; and if the jury is asking for it, then it

1   should be sent back.

2              MR. SMITH:  We sent back the pieces that

3   were offered into evidence.

4              MR. PAUNOVICH:  We discussed with Jim

5   Brogan and apparently before we took it back, it's in

6   evidence.  It's on the stipulated list.

7              MR. SMITH:  When was it offered into

8   evidence?

9              MR. PAUNOVICH:  I don't know when it was,

10  but I wasn't here, but Jim --

11             THE COURT:  We need to be sure of who's

12  talking here.  We're getting kind of outside the box, so

13  be sure you state your name, if you need to.

14             Well, what does the list say?  I mean, I

15  know y'all have been submitting lists as we go.

16             Well, on this list I'm looking at, there

17  is a DX1.  It says it's blade server  -- BladeCenter

18  system and components, Defendant's Exhibit List, Page 3.

19             Mr. Smith, have you seen this?

20             MR. SMITH:  I haven't, Your Honor.  If it

21  is on -- if it was admitted into evidence during the

22  trial, we don't have an objection to it.  My

23  understanding was that it was not on the list.

24             THE COURT:  Well, I'd like to get

25  agreement that it was admitted.  I don't know what the

1    difficulty here is, agreeing or what the holdup is.  I

2    mean, first of all, have we taken it back?

3                    I believe the Court intended to submit

4    all the exhibits that were admitted into evidence to the

5    jury.  If we haven't, we need to get that in there.

6                    Where is it?

7                    MR. PAUNOVICH:  Just right here

8    (indicates).

9                    MR. STONE:  There's a box you can't see

10   behind the witness stand, Your Honor.

11                   MR. SMITH:  Was it admitted?

12                   MR. STONE:  Yes, it was, by stipulation.

13                   MR. SMITH:  Your Honor, in light of -- in

14   light of the representation, it is on the IBM's list of

15   exhibits admitted during trial.  We don't have an

16   objection to it going back to the jury.

17                   THE COURT:  All right.  Thank you.

18                   Well, let me ask this:  I mean, there's

19   agreement it will be submitted.  As far as my response

20   to the jury, it can be just as simple as yes, and we

21   send it to the jury; or I could add something

22   additional, if either party would like me to.

23   Mr. Smith?

24                   MR. SMITH:  I think yes would be fine,

25   Your Honor.

1                    MR. STONE:   That's satisfactory to the

2    Defendant.

3                    THE COURT:   All right.   Then that's the

4    way I'll respond then, which is a simple yes, and we

5    will submit that, Defense Exhibit 1, to the jury.

6                    All right.   Anything else from the

7    Plaintiff at this time?

8                    MR. SMITH:   Not from the Plaintiff, Your

9    Honor.

10                   THE COURT:   And the Defendant?

11                   MR. STONE:   Your Honor, just to clarify,

12   we're going to remove it from the box that it was

13   shipped in.   It was out during the pendency of the

14   trial, and that's the way in which it was demonstrated

15   to the jury.   And it's on a box with wheels, so we can

16   wheel it back, if that's okay.

17                   THE COURT:   Any objection?

18                   MR. SMITH:   No, Your Honor.

19                   THE COURT:   That sounds fine with me.

20                   All right.   We'll be in recess awaiting

21   another note or verdict.   Thank you.

22                   COURT SECURITY OFFICER:   All rise.

23                   (Recess.)

24                   COURT SECURITY OFFICER:   All rise.

25                   THE COURT:   Please be seated.

1          All right.  We have another note from the

2    jury, and I believe y'all have seen what it says.

3          It says:  Can we look at IBM's blade

4    server and chassis, please?  And thank you, signed by

5    the Jury Foreperson.

6          Let me inquire, I don't know if the

7    parties have had a chance to discuss it.  Let me talk

8    first to the Plaintiff, the Plaintiff's position on the

9    jury's note.

10          MR. SMITH:  Our position is we would

11    prefer not to send it back, Your Honor.  It was not in

12    evidence.  It wasn't offered into evidence.  And just

13    because the history of how the BladeCenter was brought

14    into this case, we don't believe that the specific

15    device should go back to the jury.

16          THE COURT:  All right.  Defendant,

17    response?

18          MR. STONE:  Your Honor, we believe that

19    it is in evidence, DX1.  So we can spend a minute

20    talking about that with Mr. Friel.  But it's in

21    evidence; and if the jury is asking for it, then it

22    should be sent back.

23          MR. SMITH:  We sent back the pieces that

24    were offered into evidence.

25          MR. PAUNOVICH:  We discussed with Jim

1    Brogan and apparently before we took it back, it's in

2    evidence.  It's on the stipulated list.

3                    MR. SMITH:  When was it offered into

4    evidence?

5                    MR. PAUNOVICH:  I don't know when it was,

6    but I wasn't here, but Jim --

7                    THE COURT:  We need to be sure of who's

8    talking here.  We're getting kind of outside the box, so

9    be sure you state your name, if you need to.

10                   Well, what does the list say?  I mean, I

11   know y'all have been submitting lists as we go.

12                   Well, on this list I'm looking at, there

13   is a DX1.  It says it's blade server  -- BladeCenter

14   system and components, Defendant's Exhibit List, Page 3.

15                   Mr. Smith, have you seen this?

16                   MR. SMITH:  I haven't, Your Honor.  If it

17   is on -- if it was admitted into evidence during the

18   trial, we don't have an objection to it.  My

19   understanding was that it was not on the list.

20                   THE COURT:  Well, I'd like to get

21   agreement that it was admitted.  I don't know what the

22   difficulty here is, agreeing or what the holdup is.  I

23   mean, first of all, have we taken it back?

24                   I believe the Court intended to submit

25   all the exhibits that were admitted into evidence to the

1    jury.  If we haven't, we need to get that in there.

2                    Where is it?

3                    MR. PAUNOVICH:  Just right here

4    (indicates).

5                    MR. STONE:  There's a box you can't see

6    behind the witness stand, Your Honor.

7                    MR. SMITH:  Was it admitted?

8                    MR. STONE:  Yes, it was, by stipulation.

9                    MR. SMITH:  Your Honor, in light of -- in

10   light of the representation, it is on the IBM's list of

11   exhibits admitted during trial.  We don't have an

12   objection to it going back to the jury.

13                   THE COURT:  All right.  Thank you.

14                   Well, let me ask this:  I mean, there's

15   agreement it will be submitted.  As far as my response

16   to the jury, it can be just as simple as yes, and we

17   send it to the jury; or I could add something

18   additional, if either party would like me to.

19   Mr. Smith?

20                   MR. SMITH:  I think yes would be fine,

21   Your Honor.

22                   MR. STONE:  That's satisfactory to the

23   Defendant.

24                   THE COURT:  All right.  Then that's the

25   way I'll respond then, which is a simple yes, and we

1   will submit that, Defense Exhibit 1, to the jury.

2                     All right.  Anything else from the

3   Plaintiff at this time?

4                     MR. SMITH:  Not from the Plaintiff, Your

5   Honor.

6                     THE COURT:  And the Defendant?

7                     MR. STONE:  Your Honor, just to clarify,

8   we're going to remove it from the box that it was

9   shipped in.  It was out during the pendency of the

10  trial, and that's the way in which it was demonstrated

11  to the jury.  And it's on a box with wheels, so we can

12  wheel it back, if that's okay.

13                    THE COURT:  Any objection?

14                    MR. SMITH:  No, Your Honor.

15                    THE COURT:  That sounds fine with me.

16                    All right.  We'll be in recess awaiting

17  another note or verdict.  Thank you.

18                    COURT SECURITY OFFICER:  All rise.

19                    (Recess.)

20                    (Jury out.)

21                    COURT SECURITY OFFICER:  All rise.

22                    THE COURT:  Please be seated.

23                    All right.  Well, we have Jury Note

24  No. 3, and the jury's note says:  Can somebody bring us

25  our work excuses for the week?  Thank you, Jury.  And

1    another smiley face, signed by the Foreperson.

2               Anything -- my proposed response would

3    be:  Yes, we will bring them to you.  We have them here.

4               I believe Ms. Ferguson has them so we can

5    bring them to the jury right now.

6               Any objection or problems with that?

7               Plaintiff?

8               MR. FRIEL:  None, Your Honor.

9               MR. STONE:  None, Your Honor.

10              THE COURT:  All right.  Well, we'll

11   respond that way, and be awaiting something from the

12   jury.

13              Thank you.

14              COURT SECURITY OFFICER:  All rise.

15              (Jury deliberations continued.)

16              (Jury out.)

17              COURT SECURITY OFFICER:  All rise.

18              THE COURT:  Please be seated.

19              All right.  I have a note from the jury

20   that they have arrived at a verdict.

21              Anything to take up before we bring the

22   jury?

23              MR. FRIEL:  Not from the Plaintiff, Your

24   Honor.

25              MR. VERHOEVEN:  No, Your Honor.

1                    THE COURT:  All right.  You may bring the

2      jury in.

3                    COURT SECURITY OFFICER:  All rise for the

4      jury.

5                    (Jury in.)

6                    THE COURT:  Please be seated.

7                    All right.  Ladies and Gentlemen of the

8      Jury, I'm United States Magistrate Judge John Love.  I

9      know Judge Davis has explained to you why he's unable to

10     finish this trial with you.  I know he expressed his

11     regret in not being able to do so, but I'm here, and

12     I'll finish this trial with you.

13                    Now, let me ask, is Mr. Griffith the

14     Foreperson?

15                    Mr. Griffith, has the jury arrived at a

16     verdict?

17                    THE FOREMAN:  Yes, sir.

18                    THE COURT:  If you'll hand it to the

19     Court Security Officer, who will hand it to

20     Ms. Ferguson, who will hand it to me to review.

21                    (Pause.)

22                    All right.  Ms. Ferguson will now read

23     the verdict of the jury.

24                    COURTROOM DEPUTY:  In Case

25     No. 6:09-cv-148, ACQIS LLC versus IBM, Verdict Form.

1               As to Question No. 1:  Did ACQIS prove by

2     a preponderance evidence that IBM infringed any of the

3     asserted claims of the ACQIS patents identified below?

4               The answer as to the '415 patent on both

5     claims is:  Yes.

6               The answers to the '416 patent, single

7     claim, is:  Yes.

8               The answer to the '779 patent, all three

9     claims:  Yes.

10              Question No. 2:  For each asserted claim

11    of the patents-in-suit, did IBM prove by clear and

12    convincing evidence that such claim is invalid?

13              Answer as to the '415 patent for both

14    claims is:  No, under anticipation; and, no, under

15    obviousness.

16              As to the '416 patent, the answer is, no,

17    as to anticipation and obviousness.

18              As to the '779 patent, the answer is, no,

19    as to anticipation and obviousness on all three claims.

20              Answer (sic) No. 3:  What sum of money

21    now -- if now paid in cash, do you find from a

22    preponderance -- preponderance of the evidence would

23    fairly and reasonably compensate ACQIS?

24              And I'm not going to read the rest of

25    that question, but the answer is nine million

1  ninety-four thousand -- ninety four, one forty eight.

2              Dated and signed by the Jury Foreperson.

3              THE COURT:  All right.  Thank you.

4              Is there a request to poll the jury from

5  either side?

6              MR. SMITH:  Not from the Plaintiffs, Your

7  Honor.

8              MR. VERHOEVEN:  Not from the Defendant,

9  Your Honor.

10              THE COURT:  Well, Ladies and Gentlemen, I

11  want to thank you very much for your service.  I know

12  Judge Davis thanks you as well.  I would tell you that

13  you're about to be dismissed, and no one from either

14  side should contact you about this case.

15              If anyone does contact you, I would ask

16  that you contact Judge Davis's Chambers immediately.

17              Now, as I say, you're about to be

18  excused.  What I would ask you to do is go to the jury

19  room and wait there.  Someone will be there shortly to

20  excuse you.  I, again, thank you very much for your

21  service, for your hard work.  And as I say again, Judge

22  Davis does, as well.

23              So you are excused to the jury room.

24  Please wait there until someone arrives to excuse you.

25              COURT SECURITY OFFICER:  All rise for the

1    jury.

2                    (Jury out.)

3                    THE COURT:  Please be seated.

4                    All right.  Anything to take up from the

5    Plaintiff before we adjourn?

6                    MR. FRIEL:  Not from the Plaintiff, Your

7    Honor.

8                    THE COURT:  Anything from the Defendant?

9                    MR. VERHOEVEN:  No, Your Honor.

10                   THE COURT:  Thank you.  We're adjourned.

11                   COURT SECURITY OFFICER:  All rise.

12                   (Court adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         CERTIFICATION

2

3

4

5              I HEREBY CERTIFY that the foregoing is a

6     true and correct transcript from the stenographic notes

7     of the proceedings in the above-entitled matter to the

8     best of our abilities.

9

10

11

12    /s/_____

      SHEA SLOAN, CSR                    Date

13    Official Court Reporter

      State of Texas No.:  3081

14    Expiration Date:  12/31/12

15

16

17    /s/_____

      JUDITH WERLINGER, CSR              Date

18    Deputy Official Court Reporter

      State of Texas No.:  731

19    Expiration Date  12/31/12

20

21

22

23

24

25